**JAMES L. DRIESSEN, PRO SE, jd@driessenlaw.com, USB #09473**
MARGUERITE A. DRIESSEN, PRO SE, mad@driessenlaw.com
305 N 1130 E, LINDON, UT 84042
PHONE (801)796-6924
FAX (801)785-2744

---

# UNITED STATES DISTRICT COURT

### District of Utah, Central Division

| | |
|---|---|
| James L. Driessen and Marguerite A Driessen<br><br>                      Plaintiffs<br><br>V.<br><br>Sony BMG Music Entertainment et.al.<br>                      Defendants | PLAINTIFFS' OPENING CLAIM<br>CONSTRUCTION BRIEF<br><br><br>CASE NUMBER:  2:09-cv-00140<br>Judge:  Dale A. Kimball |

CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1
BACKGROUND ...................................................................................................................... 4
A. The Parties............................................................................................................................ 4
   1. Plaintiffs James and Marguerite Driessen................................................................. 4
   2. Defendant Sony Music Entertainment, Inc. (formerly Sony-BMG)........................... 5
   3. Defendants Best Buy, Target, and FYE...................................................................... 5
B. Technology and Patentability Background ........................................................................... 6
C. Claim Construction Proceedings .......................................................................................... 9
   1. Legal Standards for Claim Construction..................................................................... 9
D. TERMS OF CONSTRUCTION ......................................................................................... 11
   1. "retail point of sale establishment" ......................................................................... 14
   2. "customer access point"........................................................................................... 15
   3. "internet transaction location" ................................................................................ 17
   4. "means for accepting payment through an in person transaction with a customer"......... 18
   5. "means for storing and retrieving a record on or in a physical medium" ...................... 21
   6. "means for transfer of said physical medium from said retail point of sale establishment
   to said customer"........................................................................................................ 22
   7. "means for Internet transaction authorization on, in, or actuated from said physical
   medium".................................................................................................................... 23
   8. "other means for customer interaction with said retail point of sale establishment"........ 24
   9. "other physical means of recordation without requiring access to a public computer
   network (Internet) during the recording process whether or not access is actually made" .. 25
   10. "buyer computer"................................................................................................... 25
   11. "selling computer" ................................................................................................. 26
   12. "transaction location of said product"................................................................... 27
   13. "payment message"............................................................................................... 28
   14. "authorization message" ....................................................................................... 28
   15. "cryptographic keys" ............................................................................................ 28
CONCLUSION....................................................................................................................... 29
EXHIBITS
Store-Value Card Comparison with Tagged Voucher Card ...................................................... 1
   TABLE: PLAINTIFF'S PROPOSED CONSTRUCTION OF DISPUTED CLAIMS ............. 2

TABLE OF AUTHORITIES

35 U.S.C. § 282............................................ 2

*37 C.F.R. 1.75(c)*................................. 15, 16

*A&M Records, Inc. v. Napster, Inc.*, 239
   F.3d 1004 (Ninth Circuit, 2001) ........... 23

*Acumed LLC v. Stryker Corp.*, 483 F.3d 800,
   807 (Fed. Cir. 2007).............................. 10

*Akamai Technologies, Inc. v. Limelight
   Networks, Inc.*, 614 F.Supp.2d 90 (D.
   Mass 2009)............................................ 13

*Amazon.com v. BarnesandNoble.com*   (Fed.
   Cir. 2001) .............................................. 14

*Benjamin Menu Card Co. v. Rand, McNally
   & Co. et al.*, 210 F. 285, 286 (N.D. Ill.
   1894) ..................................................... 12

*BMC Resources, Inc. v. Paymentech, L.P.*,
   498 F.3d 1373 (Fed. Cir. 2007)............. 13

Bobbs-Merrill Co. v. Straus, 210 U.S. 339
   (1908).................................................... 7

Copyright Act of 1976, 17 U.S.C. § 109 .... 7

*Crystal Semiconductor Corp. v. Tritech
   Microelectronics Int'l, Inc.*, 246 F.3d
   1336, 1348 (Fed. Cir. 2001).................. 14

*Day Intern., Inc. v. Reeves Brothers, Inc.*
   260 F.3d 1343, 1348 (Fed.Cir.2001)....... 3

*Elekta Instrument S.A. v. O.U.R. Scientific
   Int'l, Inc.*, 214 F.3d 1302, 1309 (Fed. Cir.
   2000) ...................................................... 2

*Emtel, Inc.. v. Lipidlabs, Inc.*, 583 F.Supp.2d
   811(S.D. Tex. 2008).............................. 13

*Environmental Designs Lid. v. Union Oil
   Co. of California*, 713 F.2d , 699 (1984)
   ............................................................... 15

Free Motion Fitness, Inc. v. Cybex Intern.,
   Inc., 423 F.3d 1343 (Fed. Cir. 2005) ...... 9

*Generation II Orthotics, Inc. v. Medical
   Tech., Inc.*, 263 F.3d 1356, 1365 (Fed.
   Cir. 2001) ................................................ 2

*Global Patent Holdings, LLC v. Panthers
   BRHC, LLC*, 586 F.Supp.2d 1331 (S.D.
   Fla. 2008) .............................................. 13

*In re Abele*, 684 F.2d 902 (C.C.P.A. 1982)
   ............................................................... 18

*In re Bilski, 545 F.3d 943, 88 U.S.P.Q.2d
   1385 (Fed. Cir. 2008)* ............... 12, 18, 29

*In re Freeman*, 573 F.2d 1237 (C.C.P.A.
   1978) ..................................................... 18

*In re Walter*, 618 F.2d 758 (C.C.P.A. 1980)
   ............................................................... 18

*International Automated Systems v. Digital
   Persona*, 565 F.Supp.2d 1276 (Utah
   Central, 2008) ......................................... 4

*Liebel-Flarsheim*, 358 F.3d at 911............. 2

*Markman v. Westview Instruments, Inc.*, .... 9

*Med. Instrumentation & Diagnostics Corp.
   v. Elekta AB*, 344 F.3d 1205, 1210 (Fed.
   Cir. 2003) .............................................. 29

*Medrad Inc. v. MRI Devices Corp.*, 401 F.3d
   1313, 74 USPQ2d 1184, 1188-89 (Fed.
   Cir. 2005) .............................................. 14

*Pfizer Inc. v. Ranbaxy Labs. Ltd.*, 437 F.3d
   1284, 1292, 79 U.S.P.Q.2d 1583, 1589-90
   (Fed. Cir.2006)................................. 15, 16

*Phillips v AWH Corp.* 415 F.3d 1303, 1327
   (Fed. Cir. 2005)....................................... 2

Phillips v. AWH....................................... 9

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed.
   Cir. 2005) .............................................. 14

*Phillips v. AWH Corp.*, 415 F.3d 1303 at
   1317 (Fed. Cir. 2005).............................. 4

*Phillips v. AWH Corp.*, 415 F.3d 1303 at
   1320 (Fed. Cir. 2005).............................. 3

*Realsource, Inc. v. Best Buy Co., Inc.* , 514
   F.Supp.2d 951 (W.D. Tex. 2007)........... 13

Recording Indus. Ass'n of Am. v. Diamond
   Multimedia Sys., Inc., 180 F.3d 1072,
   1079 (9th Cir. 1999)................................ 6

*Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345
   (Fed Cir. 1999)........................................ 2

*Safeguard Account Co. v. Wellington*, 86 F.
   146, 147 (D. Mass. 1898)..................... 12

*SciMed Life Sys.*, 242 F.3d at 1340............. 3

*Simmons, Inc. v. Bombardier, Inc.*, 328
   F.Supp.2d 1188 (Utah Northern, 2004) .. 3

Sony Corp. of America v. Universal City
   Studios, Inc., 464 U.S. 417 (1984).......... 6

*State Street Bank v. Signature Financial
   Group*, 927 F. ASupp. 502 (D. Mass.
   1996) ..................................................... 12

*Texas Digital*, 308 F.3d at 1204.................. 3

*Waring v. Johnson*, 6 F. 500, 502 (S.D.N.Y.
   1881) ..................................................... 12

## *PRELIMINARY STATEMENT*

Plaintiffs, James and Margurite Driessen, submit this opening brief in support of the ordinary and accustomed construction of terms from the asserted claims of the 7,003,500 (hereafter, '500) patent.  To clear up any misunderstanding about the claim charts previously submitted as the joint report of the terms of construction – only 14 groups of claim terms are disputed, 1 group of claim terms has been stipulated, and all remaining terms are agreed to receive only their ordinary and accustomed meanings.

In simple, this case is a dispute between competitors in the growing field referred to as *retail tagging*, which is typically a voucher directed in-person *retail sale* of a pre-determined and itemized *online sale*.[1]   In essence, it is an online shopping cart sold at retail.  Although similar to a stored value gift card or prepaid card (which load money or other value on a card to be used to select and purchase items online) the retail tagged purchase is different because the item purchased is predetermined and very specific.

The nuances, however, to reaching an understanding of the many applications or many different ways in which a retail tag voucher could manifest itself in commerce, allows for some interpretation of claims to help carve out the exact nature of the subject matter protected by the patent.

Plaintiffs will not claim retail tagging to be anything more or less than what it actually is.  The '500 patent claims cannot be made out to read upon any general prepaid sale, gift card, phone card, online prize or CD sales with bonus materials that were never an online and on-sale item to begin with.

---

[1] e.g. U.S. Patent 7,003,500 B1, Col. 3 line 46; Col. 4 line 16;Col. 5 line 7,26-28, 43-48;Col. 9 line 23-27. Other embodiments may also apply.  The patent owner currently licenses two products called the *Apple Digital Release Album* and the *Symtio Digital Media Product Card* (a Harper-Collins Company). The Sony Platinum Music Pass is another example of Retail Tagging in that the Platinum Music Pass card is the single instrumentality which is sold at retail for the transfer of ownership of a specific online asset. Unlike other stored value gift cards or other internet prepaid minutes or cash – retail tagged vouchers represent a very specific online asset or itemized list of assets.

Defendants are making, using, and/or selling the Sony Platinum Music Pass.  They may pay lip service to the legal principles of claim construction, seeking either to invalidate the claim or to deny that they infringe, but given that retail tagging is an entirely new industry, Defendant's preliminary statements suggest that they are simply using claim construction to avoid the presumption of claim validity.

Patents are presumed valid under 35 U.S.C. § 282 and the party asserting invalidity has the burden of proof by clear and convincing evidence. Unless and until no other construction of the claims is reasonably possible (such as when the claim language remains ambiguous even after all other claim construction tools have been applied) the '500 patent claims should be construed in a manner that most preserves their validity.[2]   Those claim terms were carved out by the inventor and the patent examiner to create a clearly narrow path for which the inventor may seek protection.

The obvious strategy, then, for a defendant in a patent law suit is at one end of the spectrum – to push the claim construction to its broadest coverage in order to cause the claim to read upon the various prior art specimens and then to invalidate the patent.  On the other side of the spectrum, a defendant may also want to narrow the construction of certain terms unreasonably in order to force their accused device to fall outside the coverage of the claims.

---

[2] "… claims should be so construed, if possible, as to sustain their validity" *Phillips v AWH Corp.* 415 F.3d 1303, 1327 (Fed. Cir. 2005) quoting from *Rhine v. Casio, Inc*., 183 F.3d 1342, 1345 (Fed Cir. 1999);  "… we have limited the maxim to cases in which "the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous." *Liebel-Flarsheim*, 358 F.3d at 911; see also *Generation II Orthotics, Inc. v. Medical Tech., Inc*., 263 F.3d 1356, 1365 (Fed. Cir. 2001) ("Claims can only be construed to preserve their validity where the proposed claim construction is 'practicable,' is based on sound claim construction principles, and does not revise or ignore the explicit language of the claims."); *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc*., 214 F.3d 1302, 1309 (Fed. Cir. 2000) ("having concluded that the amended claim is susceptible of only one reasonable construction, we cannot construe the claim differently from its plain meaning in order to preserve its validity*"); E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co*., 849 F.2d 1430, 1434 (Fed. Cir. 1988) (rejecting argument that limitations should be added to claims to preserve the validity of the claims). In such cases, we have looked to whether it is reasonable to infer that the PTO would not have issued an invalid patent, and that the ambiguity in the claim language should therefore be resolved in a manner that would preserve the patent's validity." *Id.* at 1327.

To avoid this inherent unfairness of allowing an accused patent infringer to simultaneously play on both sides of this narrowing and expansion of the meaning for the claim terms – the courts have created a very specific process whereby "[t]he court generally 'must presume that the terms in the claim mean what they say' and 'give full effect to the ordinary and accustomed meaning of the claim terms." *Simmons, Inc. v. Bombardier, Inc.*, 328 F.Supp.2d 1188 (Utah Northern, 2004) quoting from *Day Intern., Inc. v. Reeves Brothers, Inc*. 260 F.3d 1343, 1348 (Fed.Cir.2001). Intrinsic evidence must be examined "to determine whether the patentee has set forth an explicit definition of a term contrary to its ordinary meaning, has disclaimed subject matter, or has otherwise limited the scope of the claims." *Id.*

Words found in the specification like "defined as" "always means" or "is limited to the definition of" – and so forth, found within the prosecution file wrapper – can change the meaning of the terms from their ordinary and accustomed meaning. However, simply using the terms within a patent specification in a certain way does *not* create a separate lexicon to be followed by the court. Instead the intrinsic evidence must show that the inventor really intended to change or modify the meaning of the term from its ordinary and accustomed meaning.[3] Without such a showing, claim terms must be assumed to say what they mean and mean what they say.

However, "[I]n in all circumstances, extrinsic evidence is 'less significant than the intrinsic record, (quotations omitted), and is 'unlikely to result in a reliable interpretation of

---

[3] "The Texas Digital court explained that it advanced the methodology set forth in that opinion in an effort to combat what this court has termed "one of the cardinal sins of patent law--reading a limitation from the written description into the claims," *SciMed Life Sys.*, 242 F.3d at 1340. The court concluded that it is improper to consult "the written description and prosecution history as a threshold step in the claim construction process, before any effort is made to discern the ordinary and customary meanings attributed to the words themselves." *Texas Digital*, 308 F.3d at 1204. To do so, the court reasoned, "invites a violation of our precedent counseling against importing limitations into the claims." *Id*. Summarizing its analysis, the Texas Digital court stated: (continued next page)

By examining relevant dictionaries, encyclopedias, and treatises to ascertain possible meanings that would have been attributed to the words of the claims by those skilled in the art, and by further utilizing the intrinsic record to select from those possible meanings the one or ones most consistent with the use of the words by the inventor, the full breadth of the limitations intended by the inventor will be more accurately determined and the improper importation of unintended limitations from the written description into the claims will be more easily avoided. *Phillips v. AWH Corp.*, 415 F.3d 1303 at 1320 (Fed. Cir. 2005) quoting Texas Digital.

patent claim scope unless considered in the context of the intrinsic evidence…'" *International Automated Systems v. Digital Persona*, 565 F.Supp.2d 1276 (Utah Central, 2008) quoting from *Phillips v. AWH Corp.*, 415 F.3d 1303 at 1317 (Fed. Cir. 2005).

Defendants' job, then, might be to make the claims confusing to court – to somehow deny that the claims can have their ordinary and accustomed meanings or try to refute that the claims alone define the scope of the invention.  Defendants may try importing only narrow limitations from the specification that do not really exist. For example, defendants might try selectively importing references from just one of the many possible functions performed by the retail tagging voucher and then assert, with no support whatsoever, that such a function must be read into the claims as an absolute limitation.

The Defendant's objectives however, will be transparent if they try to limit the claims by incorporating only random limitations from illustrative embodiments just enough so its technology may purportedly not infringe. This is not a legitimate or proper basis or method of claim construction.

In this opening statement we wish to persuade the court to follow only proper themes in claim construction – to not allow Defendants to assert retail tagging as more than what it really is – or to try and diminish it by referring only to selective embodiments.  Claim construction must not serve to thwart the basic legal principle in the construction process that the issued claims first receive the presumption of validity; they are to be interpreted based only on proper use of evidence and are not to read on any of the prior art of record.

## BACKGROUND
### A. The Parties
### 1. Plaintiffs James and Marguerite Driessen

James Driessen is the inventor, owner, and pro se prosecutor of the '500 patent.

Marguerite Driessen and James Driessen are residents of Utah which is considered an "equitable

distribution" state. Therefore, among other reasons, Marguerite, as a spouse to James, has

constructive ownership rights in the '500 patent.[4]

## 2. Defendant Sony Music Entertainment, Inc. (formerly Sony-BMG).

Retail tagging solves many problems intrinsic to delivering ownership rights in a digital

asset or other online sale items to a consumer. Defendant, Sony-BMG Music Entertainment

described several of these problems in its product launch of the Sony Platinum Music Pass in

January 2008.  For instance, Sony wrote in a press release its desire to "bring its artists' music to

fans in <u>new and innovative</u> ways, and to develop compelling <u>new business models</u>," commented

Thomas Hesse, President, Global Digital Business & U.S. Sales, SONY BMG MUSIC

ENTERTAINMENT."[5]  "Rich Romano, Prepaid Card Sales Manager, Winn-Dixie, commented,

'We are excited to have the opportunity to partner with SONY BMG to launch this initiative. An

extensive list of titles and bonus material from superstar artists makes this offering <u>unlike any</u>

<u>other in the marketplace</u>; it gives our customers the opportunity to purchase new release albums

while they do their grocery shopping.'"[6]

## 3. Defendants Best Buy, Target, and FYE.

Best Buy Co. Inc., Target Corporation, and FYE (a Trans World Entertainment

Company) are each operators of freestanding and/or shopping mall-based retail stores.  Prior to

the announcement and launch of the Sony Platinum Music Pass products, Plaintiffs had

---

[4] Marguerite Driessen is also majority owner of their business called Vibme LLC, which has been named, currently, as the exclusive agent for licensing of the patent.  Vibme LLC has negotiated existing and/or previously existing licensing agreements related to the '500 patent.  Vibme LLC is also the owner of the registered "SCART" service mark, which stands for, among other things, "Secure Consumer Advantaged Retail Tagging."  SCART distribution products provide consumers the ability to anonymously or otherwise make internet purchases without the need for an account or credit card.  An unexpected benefit of SCART distribution technology has been the ability for it to operate as either a stored value or as a product inventory item voucher.
[5] http://press.sonymusic.com/2008/01/07/sony-bmg-music-entertainment-launches-platinum-musicpass/  page accessed on February 1, 2010.
[6] Id. emphasis added.

contacted each defendant separately and actively educated those businesses of the advantages of using retail tagging in distribution.

## B. Technology and Patentability Background

Plaintiffs understand that with only a cursory look at *retail tagging* it might be difficult to appreciate the nuances among things like internet access, website access, downloads, bonus downloads, prepaid stored value cards, prepaid credit item cards, gift cards, browsing access, merchandise access, ownership access, copyrighted material objects, sampling, streaming, open source and so forth – associated with the '500 patent. Plaintiffs would first ask the court to turn its attention to Exhibit 1, herein attached. Once the reader of this brief can readily understand and see the differences between these two types of prepaid cards, there is the beginning of understanding exactly what retail tagging for ownership means.

In order to fully understand and appreciate the disclosures and teachings found in the devices and methods taught in '500 patent specification, one must consider the relevant state of the art at the time of invention. The "time shifting and space shifting"[7] activities that end-users did to record content viewed (rather than content sold) is somewhat technical, yet most people even at the time of invention readily understood that copying without permission was stealing.

Most people knew that watching and recording a show on a TV or cable channel did not give them the rights to make a copy and sell or give it away to a third party. On the other hand, many people probably did not know that when they grew tired of a movie or music they had purchased on CD, VHS tape, or DVD that they had the right to resell that specific article. Many

---

[7] Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417 (1984), also known as the "Betamax case", is a decision by the Supreme Court of the United States which ruled that the making of individual copies of complete television shows for purposes of time-shifting does not constitute copyright infringement, but is fair use. In Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc., 180 F.3d 1072, 1079 (9th Cir. 1999), the Ninth Circuit Court of Appeals applied the "space shifting"as a term is argued as an analogy to the time shifting argument that succeeded in Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417 (1984), in which the United States Supreme Court held that the sale of VCRs did not contribute to copyright infringement because taping a televised event to watch at a later time was not an infringing activity.

of us have either purchased or resold content media items in this way, but may not know that it is related to an axiom of copyright law called the "first sales" doctrine.[8]

It was asserted in the patent disclosure documents[9] that the invention was a completely new financial scheme. However, if the readers of the '500 patent disclosures only focus on either the prepaid aspects or network file locations alone, associated with the "voucher" in the invention, it may have the unfortunate side effect of trivializing the invention which was conceived and disclosed in the original specification.

Payments have and will continue to happen on the Internet with or without a retail tagging voucher. Certainly, transfers of ownership will happen in commerce everywhere whether or not certain structures are employed, including the Internet. However, the tagged transfer of ownership *on a network* was never an operative aspect of the prior art of record and the predetermined *transfer of rights* in a type of media or merchandise that one could hold *ownership* was never an aspect of the traditional browse and buy model. Transfer of ownership rights for money may have been a part of commerce since 2000 B.C.,[10] but the prior art of record and other prepaid voucher cards in the prior art only did one or more of the following: 1) created an account from which money was withdrawn at the time of selection; 2) registered a number of system access calls that could be debited; or 3) it was a card or advertisement with an online pointer to media that was never for sale to begin with – after all the internet was a virtual realm where only virtual payments could be processed to purchase items. [11]

---

[8] When we purchase a used DVD at a yard sale, for example, the first-sale doctrine is a limitation on copyright that was recognized by the U.S. Supreme Court in 1908 (see Bobbs-Merrill Co. v. Straus, 210 U.S. 339 (1908)) and subsequently codified in the Copyright Act of 1976, 17 U.S.C. § 109

[9] "It does not require a trusted vendor, trusted bank, or buyer authentication. While RPOS may facilitate some of the same types of functions mentioned above, it uses a completely new method." IFW 09/630,272, Spec. page 7, line 144-45

[10] The Lydians of Asia Minor, or Anatolia (roughly where Turkey lies today) invent coins. See Davies, Glyn, A history of Money From Ancient Times to the Present Day (Cardiff: Univ. of Wales Press, 1994) 15-18

[11] e.g. bonus download with purchase of a CD.

To help the Court best understand the patent claims, Plaintiffs would encourage the court to focus on the <u>voucher directed in-person *retail sale* of a pre-determined and itemized *online sale*</u>[12] embodiment as disclosed.  This new idea about transfer of *ownership* in the cloud[13] (as included in both the original and issued claims) is clearly an operative aspect of the prepaid itemized merchandise card as claimed in the '500 patent, but was entirely new and useful to the industry at the time of invention.

The purpose in encouraging the court this way to take time in the understanding the patentability of the '500 patent is to help the court avoid jumping to conclusions that the patented art is quickly and readily understood. Once an invention is understood … then yes, it often is pretty simple.  Even the most complicated things are easy once fully understood.  In understanding of the proper claim construction for this patent, each word rather than groups of words is important because single word construction is more akin to how patent examination takes place.  For example, the claimed invention as disclosed in the '500 patent disclosures are operative in transfer of rights in a virtual asset capable of ownership.[14]  Thus, the inventive steps of the '500 patent were clear to the patent office and since at least one element of each claim was not anticipated or obvious, the claims were considered as a whole to be patentable.[15]  Plaintiffs would persuade this court that the claims, therefore, must be construed within a presumption of validity. And, in order to understand the validity, the court must also clearly understand the

---

[12] e.g. U.S. Patent 7,003,500 B1, Col. 3 line 46; Col. 4 line 16;Col. 5 line 7,26-28, 43-48;Col. 9 line 23-27. Other embodiments may also apply.  The patent owner currently licenses two products called the *Apple Digital Release Album* and the *Symtio Digital Media Product Card* (a Harper-Collins Company). The Sony Platinum Music Pass is another example of Retail Tagging in that the Platinum Music Pass card is the single instrumentality which is sold at retail for the transfer of ownership of a specific online asset. Unlike other stored value gift cards or other internet prepaid minutes or cash – retail tagged vouchers represent only the ownership of a very specific online asset or itemized list of assets.

[13] Cloud computing is a style of computing in which dynamically scalable and often virtualized resources are provided as a service over the Internet. ...en.wikipedia.org/wiki/Cloud_computing

[14] US Patent Publication, 7,003,500 B1, see rights and ownership col 2, ln. 10; col 2 ln 15; col 8 ln 26; specific items fig 1-5; merchandising, Title, col 1 ln 33, 47, col 2 ln 67, col 4 ln 3,16, col 5 ln 25, 33-34 ; and claims

[15] "If the examination at the initial stage does not produce a prima facie case of unpatentablility, then without more the applicant is entitled to grant of the patent." In re Oetiker, 977 F.2d 1442, 24 USPQ 2d at 1444 (Fed. Cir.1992).

reasons for patentability. Once the patentability over the prior art is readily understood, then the court may better avoid construing the claims to read on just any *prepaid card*[16] – or presuming that one voucher card is just the same as the next.

## C. Claim Construction Proceedings

### 1. Legal Standards for Claim Construction

The basic legal standards for construing patent claims are well known. The Court determines the meaning of pertinent claim language to establish the scope of the patent's claims for purposes of determining questions of infringement and validity. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 978-79 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). In *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005), the Federal Circuit reaffirmed and clarified the basic rules of claim construction.

"[T]he words of a claim 'are generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art "as of the effective filing date of the patent application." Phillips, 415 F.3d at 1312-13. See also *Free Motion Fitness, Inc. v. Cybex Intern., Inc*., 423 F.3d 1343 (Fed. Cir. 2005) appealed from: United States District Court for the District of Utah.

The person of skill in the art is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313; see also dessent in *Free Motion Fitness, Inc. v. Cybex Intern., Inc.*, 423 F.3d 1343 at 1354. Where the ordinary meaning of claim

---

[16] Definitions of Prepaid card on the Web:

    1) A stored-value card refers to monetary value on a card not in an externally recorded account and differs from prepaid cards where money is on. en.wikipedia.org/wiki/Prepaid_card

    2)A card paid for at point of sale permitting the holder to buy goods and services up to the prepaid value. www.perfectplastic.com/glossary.html

    3) A card that will work exactly like a credit card, except that money must be deposited in it first for it to have any credit in the account. www.low-rate-credit.com/financial-glossary-of-terms.htm

language is readily apparent, as it is here, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." Phillips, 415 F.3d at 1314. In such a case, "general purpose dictionaries may be helpful." *Id*. Where the meaning of terms is not clear, courts may look to sources available to the public that will help determine how a person of skill in the art would understand the disputed claim language. *Id*.

The Court should look to the claim language in which the disputed term appears, and may also consider other claims of the patent in question (whether asserted or not). Similarities and differences among claims may be instructive. *Phillips*, 415 F.3d at 1314-15. For example, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315. The claims should be read in view of (and so as to be consistent with) the specification of the patent. If the patentee provided a special definition for a term in the specification, that construction should govern. *Phillips*, 415 F.3d at 1316. However, as Phillips reiterated, courts must avoid reading limitations from the specification into the claims. *Phillips*, 415 F.3d at 1323; See also *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 807 (Fed. Cir. 2007). "Without more, an embodiment disclosed in the specification may not limit the claims." (internal citations omitted). Although a specification often describes very specific embodiments of the invention, or only one embodiment, claims are not to be construed as being limited to the described embodiments. *Phillips*, 415 F.3d at 1323.  The Court may also consider the prosecution history of the patent, if relevant and entered in evidence. Still, because the prosecution history reflects an "ongoing negotiation" between the applicant and the patent office, the prosecution history is often "less useful for claim construction purposes." *Phillips* at 1317; *Acumed*, 483 F.3d at 809.

The Court may also consider extrinsic evidence (all evidence other than the patent and prosecution history) but such evidence is less significant in determining the meaning of claims

and should be considered in view of the intrinsic evidence. *Phillips*, 415 F.3d at 1317-18.

In the present case, claim construction proceedings should generally be directed toward assisting the court.  Claim terms for which there is no genuine need for construction (for example, when the claim language is clear and readily understood on its face) should not be needlessly undertaken. Plaintiffs believe that many of the terms the Defendants are asking the Court in this case to construe are in fact clear and do not require construction.

Thus, Plaintiffs are forced to request a number of terms which are present in the 14 identified groups of terms in dispute that Defendants believed required construction. It is well settled that claim construction is a matter of law for the Court, and that claims are to be construed objectively with foremost reliance on the intrinsic evidence. Claims of a patent are not to be construed simply to facilitate a particular defendant's effort to create a non-infringement position.

Only after Defendants proposed a number of grouped terms, Plaintiffs were forced to propose numerous ordinary dictionary meanings for all the individual terms the Defendants asserted as having a need for construction.  Plaintiffs asserted dictionary definitions simply to illustrate that indeed there was nothing complicated and that the claim terms are in fact clear and do not require construction (only that if construction is pursued, that dictionary meanings will suffice)

## D. TERMS OF CONSTRUCTION

Plaintiffs seek to have individual claim terms receive only the ordinary and accustomed meanings – prior to the considering any groups of words, phrases, or clauses for construction. On the other hand, Defendants wish to skip directly to the construction of 14 groups of phrases or clauses before understanding the meanings of the individual words, perhaps because it will

better meet with their seemingly "multiple instrumentalities" approach to construction of the claims.

In their choice of the 14 *groups* of terms, the Defendants have shown a pattern and purpose of "fuzzying"[17] up the claim terms, making the construction vague, and replacing the groups of words with a short and simple statement allowing a far more creative interpretation than the claim words themselves would give. On its face, these short and simple statements would appear to help serve the court in understanding the claim, but to the contrary, the shortened construction of the claims only exposes Defendants' intentions to improperly use claim construction to negate apparent infringement.

Plaintiffs contend, however, that there is only one accused instrumentality of infringement in this case – namely the "Sony Platinum Music Pass." Prosecution history will show that to preserve intact, the system or method that the '500 patent claimed, the very nature of this purely business sales system and method[18] required that the claims would read upon the voucher card that controlled and directed a retail sales system or operation. While those retail sales systems and operations are necessarily spelled out in the claims and commerce necessarily requires more than one person or entity[19], the one instrumentality to preserve the system is found

---

[17] Fuzzy or fuzzy logic in claim construction is a form of employing a range of meanings rather than specific meanings to better facilitate a particular strategy of the party.

[18] A purely business system or method claim differs from a computer program or logic claim. Patent laws do not limit business model patents to computer programs or code. The patent office has long been granting patents on business methods and payment systems that can be practiced with simple devices, such as printed business forms, coupon bond forms, and restaurant menus. See *Waring v. Johnson*, 6 F. 500, 502 (S.D.N.Y. 1881); *Safeguard Account Co. v. Wellington*, 86 F. 146, 147 (D. Mass. 1898); *Benjamin Menu Card Co. v. Rand, McNally & Co. et al.*, 210 F. 285, 286 (N.D. Ill. 1894).

[19] *State Street Bank v. Signature Financial Group*, 927 F. ASupp. 502 (D. Mass. 1996) has change the face of patent law where methods of commerce (business methods) can no longer be rejected by courts simply because business methods are not proper subject matter. *In re Bilski, 545 F.3d 943, 88 U.S.P.Q.2d 1385 (Fed. Cir. 2008)*, is an en banc decision of the United States Court of Appeals for the Federal Circuit (CAFC) on the patenting of method claims, particularly business methods. The Federal Circuit court affirmed the rejection of the patent claims involving a method of hedging risks in commodities trading. The court also reiterated the machine-or-transformation test as the applicable test for patent-eligible subject matter, and stated that the test in *State Street Bank v. Signature Financial Group* should no longer be relied upon. The Supreme Court of the United States granted certiorari on June 1, 2009 and oral argument on the patent applicants' appeal was heard on November 9, 2009.

within the structure of the one voucher card.[20]  At its base, the alleged infringing instrumentality, the Sony Platinum Music Pass, is also just such a voucher.  To take groups of words and condense them into one short statement only serves to hide the meaning of the Platinum Music Pass voucher compared to the voucher claimed in the '500 patent.

Likewise, the alleged infringing instrumentality, the "Sony Platinum Music Pass," cannot preserve its own system or functionality without also directing or controlling the specific retail sales systems and operations for which the instrumentality (voucher card) was designed to accomplish.  The one "in-person" retail sale embodiment disclosed in the '500 patent gave notice to the public exactly what type of single instrumentality would be covered by the claim.

Plaintiffs' reasoning for individual word construction is that since any particular single word does not always have the same job, for example, some usages of words express action while other uses of that same word may express a thing. Like the parts of a house, each word of the claim has its own job; therefore, individual claim words are also the building blocks of the language to be construed in any phrases or clauses.

Plaintiff, as an inventor who prosecuted his own patent, went on to build a sentence along with the Examiner to ultimately arrive at an agreement upon what job those words had in describing the patentable subject matter. Those individual words each deserve a particular meaning within that proposed job because many words can be categorized according to multiple types or classes. These classes are called "parts of speech" which help us to analyze sentences

---

[20] Commerce (sales) necessarily involves at least two parties – a seller and a buyer.  Infringement of a patent may also involve sales with the controlling "make use or sell" language of 35 U.S.C.271.  Retail sales necessarily involve at least one or more third parties such as a retailer and possibly multiple distributors.   Holdings in District Court cases after *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373 (Fed. Cir. 2007)  such as *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 614 F.Supp.2d 90 (D. Mass 2009); *Emtel, Inc.. v. Lipidlabs, Inc.*, 583 F.Supp.2d 811(S.D. Tex. 2008); *Global Patent Holdings, LLC v. Panthers BRHC, LLC*, 586 F.Supp.2d 1331 (S.D. Fla. 2008); and  *Realsource, Inc. v. Best Buy Co., Inc.* , 514 F.Supp.2d 951 (W.D. Tex. 2007) – cannot stand for the proposition that a "sale" as part of a claim in a purely business systems patent which necessarily involves "commerce" are rendered unenforceable.  The "direction and control" analyses of *BMC, Id.* were as to the contractual or agency relationships between parties with multiple instrumentalities of infringement.

13

and understand them. It also helps the legal system to properly construct claims. (compare *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001); *Amazon.com v. BarnesandNoble.com*  (Fed. Cir. 2001); *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005); *Medrad Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 74 USPQ2d 1184, 1188-89 (Fed. Cir. 2005)).

## 1. "retail point of sale establishment"

Defendants have proposed to Plaintiffs and the court that a retail point of sale establishment should be limited only to:  "a physical place where merchandise is sold."  Plaintiffs contend, however, that the individual terms of the grouped terms "retail point of sale establishment" should each receive only their ordinary and accustomed meanings and therefore, do not need construction by the court.  If, however, the claims are going to be construed by the Court, Plaintiffs proposed the following meaning: "a physical piece of real estate, including but not limited to a public or private institution or any place of business that may include its furnishings and staff, which operates for the purposes of interacting with customers and transferring goods or services to a customer for a price."[21]

Plaintiffs' construction of each word in the claim is more precise.  To take an important group of terms, such "retail point of sale establishment" and simply condense it as the Defendants have done, may at first glance seem to simplify the construction for the Court.  However, exactly the opposite will occur; the broad implications of the short statement makes it more confusing for the court and easier for the Defendant to manipulate or express in varying probabilities or degrees of truth.

---

[21] A home based business which is a residence may also operate as a retail point of sale establishment, but a typical residence is not a home based business and does not operate for the purpose of transferring goods or services to its customers.

Since the terms "retail point of sale" which occur in the title of invention, and the word "establishment" is also frequently found with or near "retail point of sale" throughout the file wrapper of the '500 patent, and the words are not given specific limitations within that specification or file wrapper, then the terms "retail point of sale establishment" must receive their ordinary and customary meanings.

By definition, a dependent claim specifically refers to and relies upon another claim, thereby "limiting another claim or claims in the same application." *37 C.F.R. 1.75(c)*.  Claim 2 of the '500 patent is such a dependant claim which further limits the "retail point of sale establishment" in claim 1 to a "retail store, convenience store, vending machine, parking lot, hallway, lobby, or other physical place to conduct business."

Therefore, any construction of "retail point of sale establishment" in claim 1 must include at least those things recited in claim 2, but is not limited to those alone.  Compare, *Pfizer Inc. v. Ranbaxy Labs. Ltd.*, 437 F.3d 1284, 1292, 79 U.S.P.Q.2d 1583, 1589-90 (Fed. Cir.2006). Claim differentiation dictates that it would be "improper for the courts to read into an independent claim a limitation explicitly set forth in a dependent claim." *Environmental Designs Lid. v. Union Oil Co. of California*, 713 F.2d , 699 (1984)

Since nothing in the prosecution history file wrapper would indicate a narrowing of the retail point of sale establishment, only the ordinary and accustomed meanings to the words should apply and the court need not construe any further or limited meaning.

## 2. "customer access point"

Defendants have proposed to Plaintiffs and to the court that a <u>customer access point</u> should be construed as:  <u>"a place within a retail point of sale establishment where money is exchanged for merchandise."</u>  Plaintiffs contend, however, that the individual terms of the grouped terms "customer" "access" and  "point" should each receive only their ordinary and accustomed

meanings and therefore, do not need construction by the court.  If, however, the claims are going to be construed by the Court, Plaintiffs proposed the following meaning: <u>"a particular place or locality where the person or entity who may desire to purchase a commodity or service has permission, liberty, or ability to enter, approach, or pass to and from, or to communicate with another person or thing wishing sell that commodity or service."</u>

Defendants' pattern to propose grouped terms rather than the individual terms again serves only to broaden the possible interpretations for the meaning, making it more confusing for the court, and providing the Defendant an easier means to manipulate or express claim terms in varying probabilities or degrees of truth.

Since the terms "customer" "access" and "point" are frequently found throughout the file wrapper of the '500 patent, and the words are not given specific limitations within that specification or file wrapper, then the terms "customer access point" must receive their ordinary and customary meanings.

By definition, a dependent claim specifically refers to and relies upon another claim, thereby "limiting another claim or claims in the same application." *37 C.F.R. 1.75(c)*.  Claim 3 of the '500 patent is such a dependant claim which further limits the "customer access point" in claim 1 to a "a checkout, kiosk, cashier's station, cash register, self check out, self-service, or other means of customer interaction with said retail point of sale establishment." Any construction of "customer access point" in claim 1 must include at least those things recited in claim 3, but is not limited to those alone.  Compare, *Pfizer Inc. v. Ranbaxy Labs. Ltd.*, 437 F.3d 1284, 1292, 79 U.S.P.Q.2d 1583, 1589-90 (Fed. Cir.2006). Claim differentiation dictates that it would be "improper for the courts to read into an independent claim a limitation explicitly set forth in a dependent claim." *Environmental Designs Lid. v. Union Oil Co. of California*, 713 F.2d , 699 (1984).

Since nothing in the prosecution history file wrapper would indicate a narrowing of the "customer access point" then only the ordinary or customary meanings should apply. The court need not construe any further or limited meaning.

### 3. "internet transaction location"

Defendants have proposed to Plaintiffs and to the court that an <u>internet transaction location</u> should be limited only to:  <u>"the precise location on the Internet where the itemized Internet merchandise or itemized downloadable media material objects is stored"</u>

Plaintiffs contend, however, that the individual terms of the grouped terms "internet" "transaction" and "location" should each receive only their ordinary and accustomed meanings and therefore, do not need construction by the court.  If, however, the claims are going to be construed by the Court, Plaintiffs propose the following meaning: <u>"a position or site occupied or available for occupancy on a network that connects communication devices, computers, networks, or organizational computer facilities around the world where something is transacted, especially an exchange or transfer of goods, services, or funds such as electronic transactions"</u>

Defendants' focus on the item for sale rather than properly on the transactions involved in an "internet transaction location" – perhaps to narrow the meaning or make it more confusing for the court.  A construction hearing's purpose is not simply to provide the Defendant an easier means to manipulate or express claim terms in varying probabilities or degrees of truth.

Since the terms "internet" "transaction" and "location" are frequently found throughout the file wrapper of the '500 patent, and the words are not given specific limitations within that specification or file wrapper, then the terms "internet transaction location" must receive their ordinary and customary meanings.[22]

---

[22] "The present invention is an apparatus for the money transactions." U.S. Pat. Spec. 7,003,500 B1, Abstract; "Public Key infrastructure (PKI) is one method that has evolved into a secure and anonymous means of handling

Patentable inventions, claims, and specifications need to be interpreted as a whole during claim construction, rather than any particular embodiment.[23]  Since nothing in the prosecution history file wrapper would indicate a narrowing of the terms "internet transaction location" then only the ordinary or customary meanings should apply. The court need not construe any further or limited meaning.

## 4. "means for accepting payment through an in person transaction with a customer"

Defendants have proposed to Plaintiffs and to the court that means for accepting payment through an in person transaction with a customer should be limited only to:  "accepting payment through an in person transaction with a customer" and that "no disclosed structure" exists anywhere within the patent specification.

Since Defendants merely repeat the words with the exclusion of the "means for" invocation of the 35 U.S.C. 112 ¶6, Plaintiffs can only assume that Defendants do not require claim construction, but merely challenge whether the patent specification disclosed any structures that could be deemed capable of accepting payments.[24]

Plaintiffs contend, however, that 35 U.S.C. 112 sixth paragraph will not require some sort of single embodiment of causality test in order to achieve functionality for a §112 ¶6 construction.

---

web transactions …" U.S. Pat. Spec. 7,003,500 B1, Col. 2, line 21-3; "Most secure web transactions require cookies and Web delivered applets (such as JAVA). A cookie is information that a Web site puts on an end-users hard disk so that it can use the information at a later time." U.S. Pat. Spec. 7,003,500 B1, Col. 2, line 31-3; "… is used to divine the predetermined transaction that provided access to a particular URL location." U.S. Pat. Spec, 7,003,500 B1, Col. 3, line 46-8;

[23] The *Freeman-Walter-Abele* is an outdated judicial test in United States patent law.  *In re Freeman*, 573 F.2d 1237 (C.C.P.A. 1978); *In re Walter*, 618 F.2d 758 (C.C.P.A. 1980); *In re Abele*, 684 F.2d 902 (C.C.P.A. 1982). The U.S. Supreme Court review of *In re Bilski*, 545 F.3d 943, 88 U.S.P.Q.2d 1385 (Fed. Cir. 2008) may offer some clarity, but regardless of the test used to determine patent subject matter eligibility, all these patent cases suggested that patent claims need to be read as whole and the determining of the patentability must be taken from the specification as a whole.

[24] Plaintiffs have proposed to Defendants that automated kiosks, bill acceptors, card readers, check-out registers, check stands, cashier's station, cash register, self check out, self-service, or other means of customer interaction with said retail point of sale establishment, all of which were disclosed in the specification, would each individually or together provide the necessary systems to accomplish the required functionality for the mean-plus-function claim, "accept payment through an in-person transaction."

Meaning, that if the specification puts forth and describes any overall system or groups of systems that would accomplish a function, than all of those overall systems or groups of systems may fulfill the structure requirements of §112 ¶6.  Especially in the new business systems and methods patents, the *In Re Bilski*[25] oral arguments at the Supreme Court speak volumes to the issues of the "machine or transformation" test that looks to the heart of functionality.   The required disclosures of structure in the specification to complete a business systems claim may reveal to the reader and to the public either single or multiple structures and those structures may have single or multiple functions.

Therefore, Defendant's argument, that they simply cannot find one part of the structure when the whole voucher computer system is the one instrumentality and structure, their argument fails. The individual terms of the grouped terms "<u>means for accepting payment through an in person</u> <u>transaction with a customer</u>" should each receive only their ordinary and accustomed meanings and do not need construction by the court.  If, however, the claims are going to be construed by the Court, Plaintiffs propose the following meaning: "<u>means to receive willingly by being able or</u> <u>designed to take or hold (something applied or added) as in accepting a payment through means,</u> <u>agency, or relationship, from one or more person in the bodily appearance of one or more human</u> <u>beings, especially in relation to a transfer of a commodity or services with one or more customer</u> <u>entity that purchases any such commodity or service</u>"

The corresponding structures in the '500 patent will be automated kiosks, self check outs (bill acceptors), card readers, check-out registers, check stands, cashier's station, cash registers,

---

[25] In re Bilski, 545 F.3d 943, 88 U.S.P.Q.2d 1385 (Fed. Cir. 2008), is an en banc decision of the United States Court of Appeals for the Federal Circuit (CAFC) on the patenting of method claims, particularly business methods. The Federal Circuit court affirmed the rejection of the patent claims involving a method of hedging risks in commodities trading. The court also reiterated the machine-or-transformation test as the applicable test for patent-eligible subject matter, and stated that the test in State Street Bank v. Signature Financial Group should no longer be relied upon. The Supreme Court of the United States granted certiorari on June 1, 2009 and oral argument on the patent applicants' appeal was heard on November 9, 2009.

vending machines, self-service, or other means of customer interaction with said retail point of sale establishment.

Despite the U.S. Supreme Court not having yet rendered a decision in the *In re Bilski* case,[26] the Board of Patent Appeals and Interferences has upheld means-plus-function claims for business systems claims.  For example, in *Ex Parte Verhaegh*, Appeal 2009-000128 (BPAI 2009), the application described a method of determining a schedule for executing a plurality of tasks requiring a plurality of resources, and the claims were directed towards creating a schedule for tasks using project management techniques.  The Examiner interpreted the means-plus-function claims as a process and rejected them under §101.  On appeal at the Board, The BPAI sided with the Appellants, who argued that the Specification links the scheduler to various systems and that it determines a schedule for executing tasks.  After presuming that each of the "means" elements require construction § 112, ¶6, the Board reasoned that (1) none of the means-plus-function elements recited any structural limitations, and (2) the claim as a whole was directed to a scheduler and the Specification describes it as part of a digital video transmission system, which is a "particular machine."[27]  Thus, the Board found that the claim was directed to a "machine" and the Examiner erred in rejecting the claim under § 101 as being directed to non-statutory subject matter.

Likewise, in the '500 patent, the "means for accepting payment through an in-person transaction" relates to a part of a computer related voucher, a particular machine, which can be embodied as automated kiosks, bill acceptors, card readers, check-out registers, check stands, cashier's station, cash register, vending machines, self-service, or other means of customer interaction with said retail point of sale establishment.

---

[26] Id.
[27] *Ex Parte Verhaegh*, Appeal 2009-000128 (BPAI 2009)

## 5. "means for storing and retrieving a record on or in a physical medium"

Once again, Defendants merely repeat the words with the exclusion of the "means for" invocation of the 35 U.S.C. § 112, sixth paragraph. (all other means-plus-function arguments as discussed above are herein incorporated by reference). In this claim element, however, after simply repeating the words of the claim element, Defendants also unreasonably proposed to limit the claim to only "<u>corresponding to said URL information that is an Internet transaction location of said itemized Internet merchandise or itemized downloadable media material objects</u>" without any basis in the specification or patent prosecution file wrapper for such limitation.

Plaintiffs can only assume that Defendants do not require claim construction, but merely challenge whether the patent specification disclosed any structures that could be deemed capable of <u>storing and retrieving a record.</u>[28]

It is understandable that the Defendants would not want to recognize their very own Platinum Music Pass as an instrumentality capable of storing and retrieving a record.  Or perhaps, they would not wish to recognize that the Platinum Music Pass can perform multiple functions as the one instrumentality of multiple claim elements.  In the invention disclosure of the '500 patent, plastic cards, paper tickets, disks, magnetic strips, bar codes, and any means for recording information were described and can fulfill the §112, ¶6 structure and function requirements.

However, Plaintiffs contend that the Defendant's own assertion of limiting factors "corresponding to said URL information that is an Internet transaction location of said itemized Internet merchandise or itemized downloadable media material objects" uncover an admission that Defendants do in fact understand very well how the Platinum Music Pass is a card, ticket, or

---

[28] Plaintiffs have proposed to Defendants that plastic cards, paper tickets, disks, magnetic strips, bar codes, and any means for recording information, all of which were disclosed in the specification, would each individually or together provide the necessary systems to accomplish the required functionality for the mean-plus-function claim, "means for storing and retrieving a record on or in a physical medium."

21

disks containing a magnetic strip, or bar code, or means for recording information. It is clear that a Platinum Music Pass is a structure that will perform the multiple elements of the retail tagging functions as claimed.

Likewise, in the '500 patent, the "means for storing and retrieving a record on or in a physical medium" relates to a particular machine, which can be embodied as plastic cards, paper tickets, disks, magnetic strips, bar codes, and any means for recording information as described in the specification and can fulfill the §112, 6th paragraph, structure and function requirements. Therefore, the element does not need construction, or in the alternative, Plaintiffs construction of the claim terms should be adopted by the Court.

## 6. "means for transfer of said physical medium from said retail point of sale establishment to said customer"

Defendants have proposed to Plaintiffs and to the court that means for transfer of said physical medium from said retail point of sale establishment to said customer should be limited to: "transfer of said physical medium from said retail point of sale establishment to said customer" and that "no disclosed structure" exists anywhere within the patent specification. (all other means-plus-function arguments as discussed above are herein incorporated by reference). Since Defendants merely repeat the words with the exclusion of the "means for" invocation of the 35 U.S.C. § 112 ¶6, Plaintiffs can only assume that Defendants do not require claim construction, but merely challenge whether any of the disclosed structures could be deemed capable of transferring the physical medium to the customer.[29]

Plaintiffs, on the other hand, insist that any shelf, package, counter, vending system, or really any other location associated with the retail establishment in which to place the physical

---

[29] Plaintiffs have proposed to Defendants that store shelves, packages, counters, vending machines, or other means of placing the physical media in the retail point of sale establishment, all of which were disclosed in the specification, would each individually or together provide the necessary systems to accomplish the required functionality for the mean-plus-function claim, "means for transfer of said physical medium from said retail point of sale establishment to said customer"

medium, fulfills the structure requirement.  Even if the Defendant's do not wish to accept that

such structures disclosed in the patent specification can fulfill the necessary disclosure

requirements of §112 ¶6, for this claim (means to transfer physical media to a customer) the

court may none-the-less accept it.

## 7. "means for Internet transaction authorization on, in, or actuated from said physical medium"

Once again, it seems Defendants' desire to simply deny the existence of any machine

system with the capable instrumentalities to perform retail tagging (all other means-plus-function

arguments as discussed above are herein incorporated by reference).  The desire to ignore any

computer machine structures as if they are somehow virtual and do not exist, deters from their

ability to see what was clearly defined in the patent specification.  "Internet transaction

authorization on, in, or actuated from said physical medium" can be any means or structure

capable of providing a code.[30]

Defendant's argument is reminiscent of the old "*Napster*"[31] case where those defendants

insisted that since the internet was a virtual world, that there was no longer any chance of

infringement of intellectual property rights.  Of course, we learned from the *Napster* court that

all intellectual property rights, which existed in the physical world prior to the computer, will

still exist after the computer; we just need to have new ways of looking at the network as a

machine.  The machines that perform such virtual functions always exist somewhere in the real

world.  Hard drives, wires, and even wireless transmitting and receiving devices will still provide

the required machine structures needed to meet the demands of intellectual property laws.

---

[30] Plaintiffs have proposed to Defendants that plastic cards, paper tickets, disks, magnetic strips, bar codes, and any means for recording and retrieving information, all of which were disclosed in the specification, would each individually or together provide the necessary systems to accomplish the required functionality for the mean-plus-function claim, "means for internet transaction authorization on, in, or actuated from said physical medium."
[31] *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (Ninth Circuit, 2001)

Defendants in this case cannot skirt the system simply by claiming ignorance as to those real world devices that carry on the virtual functions.

Plaintiffs, on the other hand, insist that any scratch off, bar code, magnetic strip, or really any other means to relay information which is on, in, or actuated from the physical medium, fulfills the structure requirement. Even if the Defendant's do not wish to accept that such structures as disclosed in the patent specification even exist (in virtual realms) for this claim – the court certainly may choose to accept that such machine structures do in fact exist.[32] It is understandable that the Plaintiffs would wish to complicate the meanings of the words, but authorization on, in, or actuated from a card or ticket really is simple; it is just the act of providing a code. Any of the numerous means or structures described in the specification which are capable of providing a code will fulfill the §112 ¶6 requirement.

## 8. "other means for customer interaction with said retail point of sale establishment"

Once again, Defendants merely recite the exact words of the claim for the construction indicating that the claim element should only receive its ordinary and customary meaning (all other means-plus-function arguments as discussed above are herein incorporated by reference). Plaintiffs can only assume that Defendants only challenged whether any of the structures disclosed in the patent specification could be deemed <u>capable of interacting with a customer</u>.[33]

---

[32] For a function that is performed by a computer, memory device, or other programmable logic, the computer itself is the machine and no other structure need be recited. For example, in Ex Parte Verhaegh, Appeal 2009-000128 (BPAI 2009), the application described a method of determining a schedule for executing a plurality of tasks requiring a plurality of resources, and the claims were directed towards creating a schedule for tasks using project management techniques. The Examiner interpreted the means-plus-function claims as a process and rejected them under §101. On appeal at the Board, the BPAI sided with the Appellants, who argued that the Specification links the scheduler to various systems and that it determines a schedule for executing tasks.
[33] Plaintiffs have told Defendants that kiosks, automated kiosks, self check outs (bill acceptors), card readers, check-out registers, check stands, cashier's station, cash registers, vending machines, and self-service stations are all means of customer interaction with said retail point of sale establishment.

Plaintiffs therefore contend that any automated kiosks, self check outs (bill acceptors), card readers, check-out registers, check stands, cashier's station, cash registers, vending machines, or self-service machines are all means of customer interaction with said retail point of sale establishment.  Simply mentioning the words "other means" indicates that the list of structures should not be inclusive and that equivalents, more than just mentioned generally, are being suggested in the claim language itself.

## 9. "other physical means of recordation without requiring access to a public computer network (Internet) during the recording process whether or not access is actually made"

Since Defendants once again only repeat the words of the claim as their proposed construction, Plaintiffs can only assume that Defendants only challenge whether any physical structures disclosed in the patent specification could be deemed capable of recording information with or without access to the internet.[34] (all other means-plus-function arguments as discussed above are herein incorporated by reference). Plaintiffs would reject the Defendants' assertions that no structures are found within the patent specification.

## 10. "buyer computer"

Defendants wish to limit the meaning of buyer computer only to: "a computer operated by the consumer on which the media is downloaded."  Once again the Defendants' proposed construction reveals their deliberate need to create multiple interpretations.  The '500 patent discloses a voucher directed in-person *retail sale* of a pre-determined and itemized *online sale*[35]

---

[34] Plaintiffs have told Defendants that writing on plastic cards, bar codes, magnetic strips, scratch off codes,  tickets, and really any disclosed means for making a record are all means of recording information with or without access to the internet.

[35] e.g. U.S. Pat. Spec. 7,003,500 B1, Col. 3 line 46; Col. 4 line 16;Col. 5 line 7,26-28, 43-48;Col. 9 line 23-27. Other embodiments may also apply.  The patent owner currently licenses two products called the *Apple Digital Release Album* and the *Symtio Digital Media Product Card* (a Harper-Collins Company). The Sony Platinum Music Pass is another example of Retail Tagging in that the Platinum Music Pass card is the single instrumentality which is sold at retail for the transfer of ownership of a specific online asset. Unlike other stored value gift cards or other internet

which can be media or merchandise.  Plaintiffs maintain that the terms "buyer" and "computer" should only receive their ordinary and accustomed meanings.  If the court still feels it must construe the terms, then "buyer computer" should be taken to mean <u>"a programmable usually electronic device that can store, retrieve, or process data which is operated by or under the control of a person or entity desiring to acquire possession, ownership, or rights to the use of products or services of by way of payment."</u>

## 11. "selling computer"

Defendants wish to limit the meaning of "selling computer" only to: <u>"a computer operated by the retail point of sale establishment on which rights to download purchased media is transferred to the customer."</u>  Once again the Defendants' proposed construction reveals their deliberate need to confuse the court into multiple interpretations.  The '500 patent discloses a <u>voucher directed in-person *retail sale* of a pre-determined and itemized *online sale*</u>[36] which can be media or merchandise and the selling computer is usually embodied as a computer not within the confines of the retail point of sale, but usually at a remote location.  In other embodiments, the selling computer could be at the retail point of sale location.  Plaintiffs maintain that the terms "selling" and "computer" should only receive their ordinary and accustomed meanings.  If the court still feels it must construe the terms, then "selling computer" should be taken to mean <u>"a programmable usually electronic device that can store, retrieve, or process data which is</u>

---

prepaid minutes or cash – retail tagged vouchers represent only the ownership of a very specific online asset or itemized list of assets.

[36] e.g. U.S. Patent 7,003,500 B1, Col. 3 line 46; Col. 4 line 16;Col. 5 line 7,26-28, 43-48;Col. 9 line 23-27. Other embodiments may also apply.  The patent owner currently licenses two products called the *Apple Digital Release Album* and the *Symtio Digital Media Product Card* (a Harper-Collins Company). The Sony Platinum Music Pass is another example of Retail Tagging in that the Platinum Music Pass card is the single instrumentality which is sold at retail for the transfer of ownership of a specific online asset. Unlike other stored value gift cards or other internet prepaid minutes or cash – retail tagged vouchers represent only the ownership of a very specific online asset or itemized list of assets.

operated by or under the control of a person or entity desiring to accomplish the act of

transferring property from one person to another for a price."

## 12. "transaction location of said product"

Defendants evidently wish to revisit "transaction location of said product" to include

only: "the precise location (including the directory and file name) on the network where the

networked merchandise or downloadable media material objects are stored." In this case, the

Defendants proposed construction is another deliberate attempt to make unclear the ordinary

meanings of the terms and into thinking a voucher directed in-person *retail sale* of a pre-

determined and itemized *online sale*[37] must be media and it must located in only one place

including a directory and file name. The transaction location related to vouchers for specific

itemized merchandise or downloadable media material objects can exist in many places "in the

cloud."[38] Focusing on the item for sale does not help construe the meaning of the *transaction*

*location*. The transaction location is the place on the internet where the predetermined

transaction exists, which may include a location to the actual merchandise or media. Plaintiffs

maintain that the terms "transaction" "location" and "product" should only receive their ordinary

and accustomed meanings. If the court still feels it must construe the terms, then "transaction

location of said product" should be taken to mean "a position or site occupied or available for

occupancy on a network for something transacted, especially an exchange or transfer of goods,

---

[37] e.g. U.S. Patent 7,003,500 B1, Col. 3 line 46; Col. 4 line 16;Col. 5 line 7,26-28, 43-48;Col. 9 line 23-27. Other embodiments may also apply. The patent owner currently licenses two products called the *Apple Digital Release Album* and the *Symtio Digital Media Product Card* (a Harper-Collins Company). The Sony Platinum Music Pass is another example of Retail Tagging in that the Platinum Music Pass card is the single instrumentality which is sold at retail for the transfer of ownership of a specific online asset. Unlike other stored value gift cards or other internet prepaid minutes or cash – retail tagged vouchers represent only the ownership of a very specific online asset or itemized list of assets.
[38] Cloud computing is a style of computing in which dynamically scalable and often virtualized resources are provided as a service over the Internet. ...en.wikipedia.org/wiki/Cloud_computing

services, or funds such as electronic transactions where something produced is marketed or sold as a commodity or service"

## 13. "payment message"

Defendants wish to limit the meaning of "payment message" to include only: "an electronic message indicating that payment was received" In this case, the Defendants proposed construction is probably sufficient for most embodiments of the invention, but as a more correct construction, the payment message need not be limited to only electronic formats. Plaintiff proposes the proper construction is "a communication in writing, in speech, or by signals that the act of paying something (or the something that is paid) has been completed."

## 14. "authorization message"

Defendants wish to limit the meaning of "authorization message" to include only: "an electronic message authorizing access to merchandise that includes a specification of the product using cryptographic keys" In this case, the Defendants proposed construction is probably sufficient for most embodiments of the invention, but as a more correct construction, the authorization message need not be limited to only electronic formats and the cryptographic keys are a separate element having to do with whether the authorization message is delivered in a secure manner or open manner. Plaintiff proposes the proper construction is "a communication in writing, in speech, or by signals that the act of establishing authority as if by a person or entity in power to influence or command has been completed."

## 15. "cryptographic keys"

The construction of cryptographic keys is agreed upon by the parties to mean, "Electronic codes that are used in an encryption algorithm to encipher/decipher a message with the purpose

28

that it is unreadable by anyone except the intended recipient (who possess the electronic codes to decrypt the message).

## CONCLUSION

As the nature of internet systems and services become clearer, our world is realizing that although the internet (or "world-wide-web" as it has been called) is a service; it is also a machine. Formulas may drive the internet, but the two-way data communications infrastructure runs it. Likewise, commerce can be both service and a machine. Once a court concludes that a claim limitation has means-plus-function limitations, two steps of claim construction remain: 1) the court must first identify the function of the limitation; and 2) the court must then look to the specification and identify the corresponding structure for that function. *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003).

An internet voucher system is not something "virtual and untouchable." The Defendant's proposed arguments which say the specification failed to identify structure – are without merit. These arguments have failed in copyright intellectual property law[39] and they must also fail here in the patent intellectual property law forums. We do not abandon our legal system simply because one of the claimed systems happens to involve the internet. The *In re Bilski*[40] case at U.S. Supreme Court has already heard oral argument. The issues in *Bilski* do not include whether computer related business systems can use means-plus-function language to draw claims to computerized systems. Any patent that could pass the "machine or transformation test" (offered by the lower court) has already rejected this notion that claims to the physical aspects a computerized two-way data communications network such as the internet can or cannot be drawn to systems and structures.

---

[39] *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (Ninth Circuit, 2001)
[40] *In re Bilski, 545 F.3d 943, 88 U.S.P.Q.2d 1385 (Fed. Cir. 2008)*

Once the basics of patentability for the '500 patent are correctly understood, the ordinary and customary meanings of the words in the claims will best instruct the court as to proper claim construction.  For this and all the reasons stated above, Plaintiffs request no claim construction for all claim terms and that the terms shall receive only their ordinary and accustomed meanings. In the alternative if a decision must be rendered on the 14 disputed groups of terms, then Plaintiffs would ask that the Claim Construction Chart as proposed by Plaintiffs in Exhibit 2 should be adopted.

Respectfully submitted this 8th day of February, 2010

BY:  ____/James L. Driessen/_____
        for James L. Driessen and Marguerite A. Driessen
        Plaintiffs, Pro Se

30

# EXHIBIT 1

**Store-Value Card Comparison with Tagged Voucher Card**



↑ Tagged Voucher / Enter – Redeem

↓ Pre-paid Stored Value / Browse – Select – Purchase – Debit



# EXHIBIT 2

**Plaintiffs' Proposed Claim Construction Chart**

### TABLE: PLAINTIFF'S PROPOSED CONSTRUCTION OF DISPUTED CLAIMS

| Claim Terms | Proposed Construction |
|---|---|
| "retail point of sale establishment" | "a physical piece of real estate, including but not limited to a public or private institution or any place of business that may include its furnishings and staff, which operates for the purposes of interacting with customers and transferring goods or services to a customer for a price." |
| "customer access point" | "a particular place or locality where the person or entity who may desire to purchase a commodity or service has permission, liberty, or ability to enter, approach, or pass to and from, or to communicate with another person or thing wishing sell that commodity or service." |
| "internet transaction location" | "a position or site occupied or available for occupancy on a network that connects communication devices, computers, networks, or organizational computer facilities around the world where something is transacted, especially an exchange or transfer of goods, services, or funds such as electronic transactions" |
| "means for accepting payment through an in person transaction with a customer" | Function: "to receive willingly by being able or designed to take or hold (something applied or added) as in accepting a payment through means, agency, or relationship with one or more person in the bodily appearance of one or more human beings, especially in relation to a transfer of a commodity or services with one or more customer entity that purchases any such commodity or service"<br><br>Structures:  automated kiosks, self check outs (bill acceptors), card readers, check-out registers, check stands, cashier's station, cash registers, vending machines, self-service, or other means of customer interaction with said retail point of sale establishment. |
| "means for storing and retrieving a record on or in a physical medium" | Function: Physical medium recited as a structural limitation; must be capable of storing and retrieving a record.<br><br>Structure: can be embodied as plastic cards, paper tickets, disks, magnetic strips, bar codes, and any means for recording information as described in the specification |

| | |
|---|---|
| "means for transfer of said physical medium from said retail point of sale establishment to said customer" | Function:  transferring the physical medium to the customer<br><br>Structure: any shelf, package, counter, vending system, or really any other physical location inside the retail establishment in which to place the physical medium, fulfills the structure requirement. |
| "means for Internet transaction authorization on, in, or actuated from said physical medium" | Function: Physical medium recited as a structural limitation; capable of providing a code<br><br>Structure: any scratch off, bar code, magnetic strip, or really any other means to relay information which is on, in, or actuated from the physical medium, fulfills the structure requirement |
| "other means for customer interaction with said retail point of sale establishment" | Function: retail point of sale recited as a structural limitation; capable of interacting with customers<br><br>Structure: automated kiosks, self check outs (bill acceptors), card readers, check-out registers, check stands, cashier's station, cash registers, vending machines, or self-service machines are all means of customer interaction with said retail point of sale establishment. |
| "other physical means of recordation without requiring access to a public computer network (Internet) during the recording process whether or not access is actually made" | Function: Physical means recited as a structural limitation; capable of recording information with or without access to the internet.<br><br>Structures:  print, memory devices, bar codes, magnetic strips and any device capable of recording information with or without internet access. |
| "buyer computer" | "a programmable usually electronic device that can store, retrieve, or process data which is operated by or under the control of a person or entity desiring to acquire possession, ownership, or rights to the use of products or services of by way of payment." |
| "selling computer" | "a programmable usually electronic device that can store, retrieve, or process data which is operated by or under the control of a person or entity desiring to accomplish the act of transferring property from one person to another for a price." |

| "transaction location of said product" | "a position or site occupied or available for occupancy on a network for something transacted, especially an exchange or transfer of goods, services, or funds such as electronic transactions where something produced is marketed or sold as a commodity or service" |
|---|---|
| "payment message" | "a communication in writing, in speech, or by signals that the act of paying something (or the something that is paid) has been completed." |
| "authorization message" | "a communication in writing, in speech, or by signals indicating that the act of establishing authority as if by a person or entity in power to influence or command has been completed." |
| "cryptographic keys" | "Electronic codes that are used in an encryption algorithm to encipher/decipher a message with the purpose that it is unreadable by anyone except the intended recipient (who possess the electronic codes to decrypt the message) |