**JAMES L. DRIESSEN, PRO SE,** jd@driessenlaw.com**, USB #09473**
MARGUERITE A. DRIESSEN, PRO SE, mad@driessenlaw.com
305 N 1130 E, LINDON, UT 84042
PHONE (801)796-6924
FAX (801)785-2744

# UNITED STATES DISTRICT COURT

### District of Utah, Central Division

| | | |
|---|---|---|
| James L. Driessen and Marguerite A Driessen<br>Plaintiffs | ) ) ) ) | |
| | ) ) ) | PLAINTIFFS JAMES AND MARGUERITE DRIESSEN'S RESPONSIVE CLAIM CONSTRUCTION BRIEF |
| V. | ) ) ) | |
| Sony BMG Music Entertainment et.al.<br>Defendants | ) ) ) | |
| | ) | CASE NUMBER: 2:09-cv-00140<br>Judge: Dale A. Kimball |

TABLE OF CONTENTS
TABLE OF AUTHORITIES ............................................................................................ i
Preliminary Statement.................................................................................................... ii
Preliminary Matters ...................................................................................................... iv
Argument ........................................................................................................................ 1
  What is sufficient to constitute structure corresponding to function – to satisfy 112 ¶6?...... 1
Response to Defendants' Proposed Constructions ........................................................ 4
a. "means for accepting payment through an in person transaction with a customer" .............. 4
  FIG 1 ............................................................................................................................. 5
  FIG 2 ............................................................................................................................. 6
  FIG 3 (Original) ............................................................................................................ 7
  FIG 4 ............................................................................................................................. 8
b. "means for storing and retrieving a record on or in a physical medium" ............................. 8
  FIG 5 ............................................................................................................................. 9
c. "means for transfer of said physical medium from said retail point of sale establishment to said customer." ............................................................................................................................. 11
d. "means for internet transaction authorization on, in, or actuated from said physical medium" .................................................................................................................................. 11
  FIG 6,7,8 ..................................................................................................................... 13
e. "other means of customer interaction with said retail point of sale establishment ............... 14
f. "other physical means of recordation without requiring access to a public computer network (internet) during the recording process whether or not access is actually made".................... 15
  To what degree does the written description render the claim as a whole consistent?......... 15
g. "retail point of sale establishment" and "customer access point"........................................ 15
h. "internet transaction location" .......................................................................................... 16
i. "buyer computer" and "selling computer".......................................................................... 16
j. Transaction Location of Said Product ................................................................................ 16
k. "payment message" and "authorization message".............................................................. 17
CLAIM CONSTRUCTION CHART FOR THE COURT ...................................................... 18

## *TABLE OF AUTHORITIES*

35 U.S.C. 112 ¶ 2 ........................................ 1

35 USC § 112 ¶6 ........................................ 2

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (Ninth Circuit, 2001) ........... 17

*Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003) ........... 14, 15

*Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374 (Fed. Cir. 1999) ...... 1

*Benjamin Menu Card Co. v. Rand, McNally & Co. et al.*, 210 F. 285, 286 (N.D. Ill. 1894) ...................................................... 8

*Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369 (Fed. Cir. 2001) ............................... 2

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 144 F.App'x 106 (Fed. Cir. 2005) . 11

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371 (Fed. Cir. 2004) .... 10

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106 (Fed. Cir. 2002) ...................................................... 15

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002) ............................................... 11

*CyberSource Corp. v. Retail Decisions, Inc.*, 620 F.Supp.2d 1068 (N.D.Cal. 2009) ... 13

DUCivR 7-1 (3)(A) .................................... iv

*Feldman v. United States*, 322 U.S. 487, 64 S.Ct. 1082; 88 L.Ed. 1408 (1944) ........... 4

*Graham & Norton Co. v. Elevator Supplies Co.*, 49 F.2d 268 (3rd App. Cir. 1931).. 12

*Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384, 231 USPQ 81,

94 (Fed. Cir. 1986), cert. denied, 480 U.S. 947 (1987) ................................................. 2

*In re Bilski*, 545 F.3d 943, 88 U.S.P.Q.2d 1385 (Fed. Cir. 2008) ............................ iii

*In re Buchner*, 929 F.2d 660, 661, 18 USPQ2d 1331, 1332 (Fed. Cir. 1991)..... 2

*In re Cardiac Pacemakers, Inc.*, 183 F.App'x 967 (Fed. Cir. 2006) ................ 11

*In re Hiniker Co.*, 150 F.3d 1362, 1369, 47 USPQ2d 1523, 1529 (Fed. Cir. 1998)... 15

*In re Hyatt*, 708 F.2d 712 (Fed. Cir. 1983) . 3

*Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1463, 221 USPQ 481, 489 (Fed. Cir. 1984) ................................................ 2

*Medtronic Inc. v. Advanced Cardiovascular Systems Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001) ............................................... 12

MPEP 2106, Interim Guidelines for Examination of Patent Applications for Patent Subject Matter Eligibility (2005) 15

*Network Commerce, Inc. v. Microsoft, Corp.*, 422 F.3d 1353 (Fed. Cir. 2005) .. iii

*Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106 (Fed. Cir. 2002) ............ 12

*Phillips v AWH Corp.* 415 F.3d 1303 (Fed. Cir. 2005) ............................................ iii, 1

*Safeguard Account Co. v. Wellington*, 86 F. 146, 147 (D. Mass. 1898) ...................... 8

*Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555 (Fed. Cir. 1991) ................................. 2, 8

*Waring v. Johnson*, 6 F. 500, 502 (S.D.N.Y. 1881) ................................................... 8

## *Preliminary Statement*

Plaintiff James and Marguerite Driessen submit this Rebuttal Claim Construction Brief in further support of the ordinary and accustomed construction of terms from the asserted claims of the 7,003,500 (hereafter, '500) patent. Plaintiffs object generally to dictionary editions or other published documents which were not published at the time or before the time of invention.

In its brief, Sony, Best Buy, Target, and FYE (hereafter "Defendants") cited legal principles of claim construction, but then consistently violated and/or misinterpreted them. A summary of the issues raised in Defendants' brief were:  1) "claim elements [in] the specification fail to disclose any associated structure and, as a result, the claims are rendered invalid as indefinite."[1];  2) "Plaintiffs have not identified any associated structure disclosed in the specification that allegedly corresponds to the means-plus-function claim[s]"[2];  3)  "claims are a confused jumble of concepts that appear both inoperative and have no support in the specification."[3];  4)  "the meaning of the phrase[s] must be derived from the claims themselves."[4];  5)  "it is erroneous to construe the words individually and also does not result in a construction that will enable the jury to intelligibly evaluate the evidence."[5];  and lastly,  6) "various definitions [of words] cannot even be strung together to result in an intelligible construction"[6]

In order for the court to accept any of the above arguments (as presented in Defendants' brief as reasons for special claim construction) the court would first have to allow itself to fall victim to two major mistakes in patent claim construction, namely: 1) importing limitations from

---

[1] *Defendants' Opening Claim Construction Brief*, pg. 11, ¶ 1, 2:09-cv-00140-DAK Doc. 50 Filed 02/08/2010
[2] *Defendants' Opening Claim Construction Brief*, pg. 11, ¶ 1, 2:09-cv-00140-DAK Doc. 50 Filed 02/08/2010
[3] *Defendants' Opening Claim Construction Brief*, pg. 19, ¶ 1, 2:09-cv-00140-DAK Doc. 50 Filed 02/08/2010
[4] *Defendants' Opening Claim Construction Brief*, pg. 21, last ¶ , 2:09-cv-00140-DAK Doc. 50 Filed 02/08/2010
[5] *Defendants' Opening Claim Construction Brief*, pg. 24, last ¶ , 2:09-cv-00140-DAK Doc. 50 Filed 02/08/2010
[6] *Defendants' Opening Claim Construction Brief*, pg. 25, ¶ 2, 2:09-cv-00140-DAK Doc. 50 Filed 02/08/2010

the specification; or 2) not deliberating on the meaning of terms in relation to the rest of the specification and claims as a whole – when interpreting and/or distinguishing very fact specific Federal Circuit Court of Appeals holdings (which are still good law).[7]

Defendants' Brief attacks the English language generally suggesting that words can *never* be "strung together to form meanings."   Federal Circuit panels, post *Phillips* cases such as the *Network Commerce* case, clearly show us that there is a burden upon the party (whether plaintiff or defendant) that in order to deny a construing of the ordinary and accustomed meanings of terms (or meanings generally understood by those of ordinary skill in the art) the burden placed upon the party wishing to bend the claim term according to its litigation goals is to show that the words would simply have no meaning to one of ordinary skill in the art or that the subject matter had been clearly disclaimed during the prosecution.[8] In order to deny the claim terms receiving their ordinary and accustomed meanings, Defendants would first have to show the file wrapper disavowed that meaning or that it is impossible to construe a claim term by applying either a "particular meaning in a field of art" or "the widely accepted meaning of commonly understood words." *Network Commerce, Inc. v. Microsoft, Corp.*, 422 F.3d 1353 (Fed. Cir. 2005) at1359 quoting from *Phillips*.

Defendants cannot merely recite that since they are confused – that one of ordinary skill in the art must also necessarily be confused.[9]  This is not a proceeding of summary motion for

---

[7] Prior to more recent *en banc* decisions such as *Phillips* or *In Re Bilski* which offer further light and understanding to the meanings of those prior decisions, those cases are still good law in the context for which they were given.  See *Phillips v AWH Corp.* 415 F.3d 1303 (Fed. Cir. 2005) and *In re Bilski*, 545 F.3d 943, 88 U.S.P.Q.2d 1385 (Fed. Cir. 2008)

[8] *Network Commerce*, at 1360. The terms "download component" were at issue in the *Network Commerce* case. It is also noteworthy that the Plaintiffs in *Network Commerce* needed to show a "merchandise-specific … download component." *Id.* at 1357, ln 12, but could not. This case is distinguishable (among other things) because a "merchandise-specific" transaction was disclosed in the '500 patent specification.

[9] For example, Defendants argue that an element of claim 13 – "wherein said specifying a price wherein said price is specific to said product on said selling computer" – is completely unintelligible.  But of course, only a portion of only one claim, if taken completely out of context, can be unintelligible.  Claims are to be interpreted "as a whole"

invalidity prior to claim construction – and treating this claim construction proceeding as if the claims were already invalidated, will not assist the court in coming to a proper construction of the claims.

## *Preliminary Matters*

**15 Pages Exclusive**: Although a modified scheduling agreement has not yet received "approval of the Court and on a showing of good cause"[10] – Defendants had first requested (and Plaintiffs had ultimately stipulated to) "responsive briefs are due on or before February 22, 2010" and "[n]o reply briefs are allowed."[11]  Defendants had also requested and Plaintiffs stipulated to the responsive briefs being limited to 15 pages exclusive of face sheet, table of contents, short opening statement, and exhibits must be limited to rebuttal of matters raised in the opening briefs with no additional memoranda considered without leave of court.[12]

In accommodating Defendants' request, Plaintiffs Responsive Claim Construction brief, herein, will be limited to 15 pages of argument (excluding 2½ pages worth of figures) and deal only with issues raised in Defendants opening brief.  Since it is apparent now that neither Defendants nor Plaintiffs had properly made this request before the Court, yet Plaintiffs have agreed, we submit to the court that "fairness" should be the basis for good cause shown (parties are already acting accordingly) and that the 15 page exclusive limitations to the responsive briefs should be entered and approved on the record.[13]

---

and a competent reading of dependant claim 13 clearly shows a required recitation of an "antecedent basis" for its referenced independent claim.

[10] *Scheduling Order,* Case 2:09-cv-00140-DAK Document 45 Filed 09/30/2009
[11] *Joint Hearing Statement,* Case 2:09-cv-00140-DAK Document 48 Filed 01/08/2010
[12] Generally limited to 10 pages, see DUCivR 7-1 (3)(A)
[13] *Sua Sponte* (with no further prompting required) less the court deem that a written motion is required, then an order that either party may submit such a motion.

## <u>*Argument*</u>

### <u>What is sufficient to constitute structure corresponding to function – to satisfy 112 ¶6?</u>

It is not that the cases cited by Defendants are no longer good law; it is simply that cases prior to the 2005 *Phillips* decision must be considered in light of the further knowledge and understandings as recited in *Phillips*.[14]  The so-called "*quid pro quo*"[15] of means plus function claiming (afforded the applicant in the negotiation process of seeking and incorporating good and clear scope of patentable subject matter) is not a job for a district court to micromanage after the fact; it is a job for the court to interpret and to see if in fact the written description contains at least some recitation of such structure and function, so that one of ordinary skill in the art would appreciate what is meant by the language of the claims.[16 ; 17]

In 1999, prior to the *Phillips* decision, the Federal Circuit in the *Atmel* case stated, "The written description does not have to explicitly describe the structure (or material or acts) corresponding to a means- (or step-) plus-function limitation to particularly point out and distinctly claim the invention as required by 35 U.S.C. 112 ¶ 2. Rather, disclosure of structure corresponding to a means-plus-function limitation may be implicitly connected in the written description if it would have been clear to those skilled in the art that the recited structure must perform the function recited in the means-plus-function limitation."[18]

The *Atmel* Court went on to say, "112, ¶ 6, however, does not have the expansive purpose of ¶ 1. It sets forth a simple requirement, a *quid pro quo*, in order to utilize a generic means expression. All one needs to do in order to obtain the benefit of that claiming device is to recite

---

[14] *Phillips v AWH Corp.* 415 F.3d 1303 (Fed. Cir. 2005)
[15] *Defendants' Opening Claim Construction Brief*, Pg. 8, Case 2:09-cv-00140-DAK Doc. 50 Filed 02/08/2010
[16] Encarta online dictionary defines micromanage as: "attend to small details in management: to control a person or a situation by paying extreme attention to small details" – meaning yes, the court should pay attention to details, but should not get so caught up in details that the specification must reinvent every concept known to man prior to its writing.
[17] See also *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374 at 1382 ¶4 (Fed. Cir. 1999)
[18] *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374 at 1380 ¶3 (Fed. Cir. 1999)

some structure corresponding to the means in the specification, as the statute states, so that one can readily ascertain what the claim means and comply with the particularity requirement of ¶ 2. The requirement of specific structure in § 112, ¶ 6 thus does not raise the specter of an unending disclosure of what everyone in the field knows that such a requirement in § 112, ¶ 1 would entail."[19] So if §112 ¶6 is less restrictive than both ¶1 and ¶2, then Defendants' arguments on written description are just lacking merit.

Now post *Phillips*, *if* there is an easily understandable structure and function connection that can be made out, found in a drawing, read in the specification as a whole, read in the claim as a whole, or even if the structure that would be employed is one commonly used and well understood in the art, *then* that same knowledge taught in the specification as a whole can fulfill the requirements of 35 USC § 112 ¶6, because the structure-function correspondence is either apparent or incorporated into the specification as general knowledge in the art.[20]

This is not an interference proceeding at the patent office and the claim construction proceedings here should not proceed as if it were. The structures and functions for shopping – such as shopping malls, retail stores, doorways, store isles, kiosks, display counters, sales counters, cash registers, self-check outs, vending machines, coin slots, hanging tags, hooks, end-caps, cash registers, bill acceptors, check stations, card readers, key pads, bar codes, bar code readers, magnetic strips, scratch-offs … etc. – are all very well known structures. The functions of these structures are such that one of ordinary skill would see and understand how they work in

---

[19] *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374 at 1382 ¶2 (Fed. Cir. 1999)
[20] For example, a picture of an *automobile* in a patent drawing would be all that is necessary to impart structures such as steering wheels or gas pedals into a recited claim element for support. See also *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369 (Fed. Cir. 2001); *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555 (Fed. Cir. 1991); If the court requires further language about what you do not need to disclose: "[a] patent need not teach, and preferably omits, what is well known in the art." *In re Buchner*, 929 F.2d 660, 661, 18 USPQ2d 1331, 1332 (Fed. Cir. 1991); *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384, 231 USPQ 81, 94 (Fed. Cir. 1986), cert. denied, 480 U.S. 947 (1987); and *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1463, 221 USPQ 481, 489 (Fed. Cir. 1984).

retail sales – and as such may be incorporated into a written description only where inherently taught by the specification and only where specifically appropriate.[21]

In essence, Defendants are unreasonably trying to change the level of skill in the art to be so low that one of ordinary skill in the art would not associate a particular structure recited in the specification to its normal and recited function. The overall patent file wrapper clearly shows that a negotiation process between applicant and patent examiner took place. Both the Retail Point of Sale ("RPOS") systems and online systems were included into the claims for clarity. The file wrapper also clearly indicated that the ordinary level of skill in the art needs to be high enough for one to understand at least some of the aspects associated with online payment systems. The Defendants should not now be able to simply claim ignorance as to some of retailing's most simple systems and structures merely as invalidation or non-infringement strategies.

Defendants' arguments are a fairly transparent attempt on their part to assert the patent claims as less than what they are (here on the one end) by referring only to selective embodiments – and then of course if that strategy fails, they move to the next phase of summary motion of invalidity, using all Plaintiffs' arguments herein to expand the meaning of the claims (on the other end) – it is only an exercise in the absurd.[22]

---

[21] "Black Box" claiming -- stating that a means could be a "microprocessor" (e.g., a flowchart showing a black box labeled "microprocessor" for the means) – this might be held indefinite, so alternatively suggesting more specific means is also recommended – attention should be paid to the "single means rule," barring the use of means-plus-function language to specify an invention as a single means ("apparatus for shaking articles in a container, which comprises: means for oscillating the container to shake the articles"; see *In re Hyatt*, 708 F.2d 712 (Fed. Cir. 1983)); this may arise as a problem in a Jepson-style claim, where the improvement consists of a single novel component claimed in means-plus-function form: this is probably okay, but not necessarily – a means clause may include another means clause (U.S. Pat. No. 1,971,193: "means for causing oscillations… said means including means for producing a magnetic field")

[22] *Absurd*: inconsistent with reason or logic or common sense, such as including in an argument, or demonstrating, the very disaster you are previously warning against.

Plaintiffs' desire for ordinary and accustomed meanings created large lists of terms for construction purposes only when Defendants' served up large groupings of phrases that should not need to be construed to begin with. Claim construction must not serve to thwart the basic legal principle in the construction process that the issued claims first receive the presumption of validity; claims are to be interpreted based only on proper use of evidence and narrow enough *not* to read on any of the prior art of record unless such a reading would *eviscerate* all meaning from the claim.[23]

## Response to Defendants' Proposed Constructions

On the other hand, Plaintiffs must take Defendants at their word and assume that they really are confused about the simple constructions of the means plus function claim terminology of the '500 patent. To assist the Defendants and the court, Plaintiffs will again go through each disputed claim term to more distinctly point out what and how one of ordinary skill in the art would perceive the claimed invention.

### a. "means for accepting payment through an in person transaction with a customer"

The Figure labeled FIG. 1, below, also in light of the written specification, shows two different types of *cash accepting or electronic payment machines*[24] – one LCD/CRT type cash register signifying to one of ordinary skill in the art that a computerized system at the establishment level is indicated; the second type of machine is a generic less than automated system. Any person of ordinary skill in the art would recognize that the claim terms "means for

---

[23] *Feldman v. United States*, 322 U.S. 487, 64 S.Ct. 1082; 88 L.Ed. 1408 (1944). "eviscerate" or disembowelment – the act of removing the vital organs, was a term used a dozen or more times by the Supreme Court until 1944 where it adopted a new usage, meaning to "make meaningless" or remove the entire operative meaning of a statute, rule, or claim.
[24] Merriam-Webster, *Cash Register*: a business *machine* that usually has a money drawer, indicates the amount of each sale, and records the amount of money received.

accepting payment through an in person transaction" is not a complicated structure or function, but that the claim language as a whole recites such a system to make it clear what specific types of payment accepting mechanisms are to read upon the claim as a whole.



FIG 1

Perhaps there was some strategy in Defendants placing this particular group of claim terms ahead of others such as "retail point of sale" or "customer access" or "URL" but Plaintiffs must assume that Defendants really are confused about structures and functions that common cash registers embody and perform. To be clear, Plaintiffs assert that the figure labeled FIG 1 displays embodiments of such structure and function which a person of ordinary skill in the art, in light of the written descriptions, would readily recognize and attribute the subject matter related to the "means for accepting payment" element of the claim.

The figure labeled FIG 2, below, is similar, but with some finer details. Plaintiffs incorporate here by reference all the above arguments concerning FIG 1, but include the notion that not all "accepting payment through an in person transaction" must necessarily involve cash.

A person of ordinary skill in the art would recognize the "dollar" sign added between the

LCD/CRT cash register and the man standing by a computer shows that regardless of the

electronic money transactions, a separate retail transaction can happen with the ultimate place or

production of the actual voucher card not germane to means for accepting in-person payment

(payment could include cash, credit card, prepaid or other).  Adding an extra transaction to an

RPOS transaction does not change the nature of the voucher directed in-person *retail sale* of a

pre-determined itemized *online sale*.[25] But that the voucher card (in this embodiment) is still

germane to the entire voucher directed system.



**FIG 2**

---

[25] e.g. U.S. Patent 7,003,500 B1, Col. 3 line 46; Col. 4 line 16;Col. 5 line 7,26-28, 43-48;Col. 9 line 23-27. Other embodiments may also apply.  The patent owner currently licenses two products called the *Apple Digital Release Album* and the *Symtio Digital Media Product Card* (a Harper-Collins Company). The Sony Platinum Music Pass is another example of Retail Tagging in that the Platinum Music Pass card is the single instrumentality which is sold at retail for the transfer of ownership of a specific online asset. Unlike other stored value gift cards or other internet prepaid minutes or cash – retail tagged vouchers represent a very specific online asset or itemized list of assets.



**FIG 3 (as submitted)**

The copy of the original submission of FIG. 3 is better than the black line drawings, although still not as clear as the original color pictures themselves (rejected by the patent office as non-conforming to the rule)[26] but one of ordinary skill in the art would recognize the machine on the right middle as a "coin for bill" changer suggesting that automated technology to accept and dispense money was well known in the pertinent art at the time of invention.

While FIG. 4, below, provides little more structure than did FIG(s) 1,2, and 3 – one of ordinary skill in the art would appreciate and gain more insights into the types of functions which

---

[26] 37 CFR § 1.84 Standards for drawings.
(Excerpted from General Information Concerning Patents print brochure)
(a) Drawings. There are two acceptable categories for presenting drawings in utility patent applications:
(1) Black ink. Black and white drawings are normally required. India ink, or its equivalent that secures solid black lines, must be used for drawings, or
(2) Color. On rare occasions, color drawings may be necessary as the only practical medium by which to disclose the subject matter sought to be patented in a utility patent application or the subject matter of a statutory invention registration. The Patent and Trademark Office will accept color drawings in utility patent applications and statutory invention registrations only after granting a petition filed under this paragraph explaining why the color drawings are necessary.

are connected with the retail transaction structures (and while not particularly relevant, it does

seem that the content dealer on the lower right is just a little bit meaner than the rest.)[27]



FIG 4

### b. "means for storing and retrieving a record on or in a physical medium"

While the human elements of storing and retrieving electronic or written information are not

themselves patentable subject matter,[28] a computer or paper business system related invention

that is useful (i.e. useful by humans) is not only patentable subject matter, but usefulness by

humans is actually a requirement.[29]   The recording devices depicted in FIG 5 are all useful

apparatuses which at some point will be monitored or checked by a human – either directly or

through another machine reading device. [30] "Card" and computer "diskette" are recited structures

---

[27] The finer nuances found in a patent drawing may or may not be important. See *Vas-Cath Inc. v. Mahurkar,* 935 F.2d 1555 (Fed. Cir. 1991)

[28] Diamond v. Chakrabarty, 447 U.S. 303 (1980), was a United States Supreme Court case dealing with whether genetically modified micro-organisms can be patented.

[29] A purely business system or method claim differs from a computer program or logic claim. Patent laws do not limit business model patents to computer programs or code.  The patent office has long been granting patents on business methods and payment systems that can be practiced with simple devices, such as printed business forms, coupon bond forms, and restaurant menus.  See *Waring v. Johnson*, 6 F. 500, 502 (S.D.N.Y. 1881); *Safeguard Account Co. v. Wellington*, 86 F. 146, 147 (D. Mass. 1898); *Benjamin Menu Card Co. v. Rand, McNally & Co.* et al., 210 F. 285, 286 (N.D. Ill. 1894).

[30] 35 U.S.C. 112 ¶2-5.  ¶6 uses the permissive term "may" as to using the means-plus function construction but does not require it.  See *In re Beauregard*, 53 F.3d 1583, 35 U.S.P.Q.2d 1383 (Fed. Cir. 1995), in the wake of *In re Bilski* it is important to remember that the question of "claim construction" was not before the *en banc* panel in *Bilski*. PTO Board of Appeals (BPAI) has challenged the validity of Beauregard claims and has held that they are not directed to

in dependant claim 4.  Those devices and others are shown here.  Number 5 in the drawing is

easily recognizable by one of ordinary skill in the art as a smart-chip memory card.



**FIG 5**

A person of ordinary skill in the art would appreciate that the '500 patent claim element is a

useful "means for storing and retrieving a record *on or in* a physical medium."  One of ordinary

skill in the art would recognize and appreciate that any one of these devices (physical media)

above as a structure with a function to record.[31]  The word "record" in and of itself denotes the

capability of "recording" for the purpose of creating a "record" which in turn has the purpose of

later retrieving that record.  i.e. a record is not a record without its corresponding human

---

statutory subject matter as a non-precedential decision of the BPAI.  The Board had previously considered In Ex
Parte *Comea-Hasegan* 89 U.S.P.Q.2d 1557 (B.P.A.I. 2009) a "method" claim in Beauregard form concerning a
method of performing "mathematical calculations" when the outcome was likely to be "tiny." The question was not
whether there was Beauregard type element in the claim, but whether a "Beauregard method claim only" renders the
patent not to statutory subject matter.
[31] As a voucher card, perhaps any one of the above devices could also be an instrumentality if matched with
functions that would  read upon any of the '500 patent claims as a whole.  In comparison, each element of a claim
need not be §101 patentable subject matter so long as at least one element of the claim is patentable subject matter.

interpretation.   Defendants' problem raised in their brief, however, was their perceived lack of "retrieving" means structures in the specification.  Again this is not a useful exercise.[32]

The word "store" is used within the file wrapper and specifically in the specification as either a noun (like a retail store where people go to shop) or as the verb store (like in storing information in electronic or other formats.)[33]  Likewise, the word "record" is used both as a noun, as in keeping a record, and as a verb, as in recording the information.  Every machine for "storing" or "recording" (or every machine known to man that performs a function for that matter) will at some point require human interaction (but human beings are unpatentable subject matter).[34] The proscribed structures of the claim "means for storing and retrieving …" is any device capable of storing and retrieving a record – and one of ordinary skill in the art would both appreciate the capability of every device shown in FIG 5 to store as well as retrieve a record– and they would connect it to those functions.  Then, the fact that there is ultimately direct or indirect human interaction with every "useful" invention known to man – should not be used to the absurd in an attempt to confuse the term construction.[35]

---

[32] The earliest known invention of a phonographic recording device was the phonautograph, invented by Frenchman Édouard-Léon Scott de Martinville and patented on March 25, 1857. It could transcribe sound to a visible medium, but had no means to play back the sound after it was recorded. In 2008, phonautograph recordings were for the first time played back as sound by American audio historians, using computers to decode the transcribed waveforms. Jody Rosen (March 27, 2008). "Researchers Play Tune Recorded Before Edison". New York Times http://www.nytimes.com/2008/03/27/arts/27soun.html;  Thomas Alva Edison conceived the principle of recording and reproducing sound between May and July 1877 which led him to try a stylus on a tinfoil cylinder, which, to his great surprise, played back the short message he recorded, "Mary had a little lamb." Scientific American July 25, 1896| http://www.machine-history.com/The%20Phonograph.%201877%20thru%201896

[33] U.S. Pat. 7,003,500 col 2, ln 39

[34] 35 USC §101

[35] The "rest of the story" in *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc*., 296 F.3d 1106, 1113 (Fed. Cir. 2002) was that there was a claim 15 added to the 14 being litigated over U.S. Patent  4,572,191 (the "2C191 patent").  Claim 15 was a dependant claim identifying a "display" as the third "monitoring means" which would have removed the "human being" (physician) monitoring means problem considered in a non-party requested reexamination after rejecting all 14 existing claims. See *Id.* at 1112 ¶1. Apparently, claim 15 would have been allowable by the examiner if simply rewritten as an independent claim with all the limitations of the both the independent and dependent claims is the case.  The entire litigation under this panel of the Federal Circuit was merely about a patent applicant not wishing the other 14 claims going to waste.  Several more infringement cases in other patents by *Cardiac Pacemakers* for the same invention against the same defendants followed, the most recent in August 2009, see also *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc*., 381 F.3d 1371 (Fed. Cir. 2004) ; *Cardiac*

### c. "means for transfer of said physical medium from said retail point of sale establishment to said customer."

Defendants would have a drafter of the patent application read into his crystal ball to see that in the future at some point an alleged infringer would one day challenge the functionality shown in his drawings of the CARD without showing embodiments of the cards stacked in a vending machine, on a shelf, on a counter, or hanging from a tag on a hook in a store.

Although Plaintiffs would contend that simply reciting in the written description that the CARD is sold through "normal retail" adequately includes all those structures and functions that would go along with retail – fortunately specific structures were also supplied in the written descriptions to tie those functions to the structures.  Not only are those retail store devices well known in the art, any person of ordinary skill in the art would immediately recognize and appreciate the function and structures disclosed in the written specification as something "sold as a retail item" described as an "off the shelf" item, "over the counter", or through a "vending machine" "issued to the customer" as various means for the customer to take possession of the voucher card.[36]

### d. "means for internet transaction authorization on, in, or actuated from said physical medium"

The specification (including its claims and drawings) teaches many functions used to deliver a "security access key" which is "provided in the form of a prepaid card sold as a retail item."  The authorization "*on, in, or actuated from*" function was claimed as a separate element from the recording and retrieving element – not in a single means claim; lest a potential infringing device might have simply designed around by placing multiple data recording

---

*Pacemakers, Inc. v. St. Jude Med., Inc.*, 144 F.App'x 106 (Fed. Cir. 2005) ("2005 Reassignment Order"); *In re Cardiac Pacemakers, Inc.*, 183 F.App'x 967 (Fed. Cir. 2006) ("2006 Writ Order").   .
[36] U.S. Pat 7,003,500 col. 3 last ln - col 4 ln 1; col. 5, line 3-4; col 8, ln 53-4, 57-8; col 9, ln 4-5, 15-17, 39-41, 51-53. Other embodiments may apply to other claims or in other related patent applications.

structures for each function.  The recording and authorizing are distinct functions.[37] As is even proposed by the Defendants, "a unique serial number" also called "personal identification number (PIN)" is one example of a particular embodiment for "means for internet transaction authorization on, in, or actuated from said physical medium."[38]

However, the "number" portion of the PIN is the function part of the system, whereas devices capable of providing PIN codes are the structures.  Many structures were known in the art as "capable of providing a code" and were disclosed in the specification as a whole.[39]

FIG(s) 5 (shown above) along with FIG(s) 6,7, 8 and along with the written specification and claims as a whole will convey to a person of ordinary skill in the art at the time of the invention that providing codes (of authorization, authentication, messages, secret messages, hidden BCB, messages, visible codes, audible codes, coded licenses, marks, software codes, encoding, decoding, signal sequences, etc.) were more sophisticated, complicated, yet fully understood functions in light of the teachings in the '500 patent disclosures. Authorization has more options than merely providing a PIN.[40]

Some of the functions taught in the specification were disclosed as new in the art and others were disclosed as old in the art.  Claim construction, however, is not about deciding which of the claim elements are novel and which are not, so long as the claim as a whole is novel.  The below figures and written disclosures show functional ways for delivering key codes.

---

[37] Multiple means plus function claiming for a single structure performing multiple functions turns out to be preferred for clarity. US Patent 7,003,500 disclosed and claimed CARD functions individually, but did not rule out the one voucher CARD preferred embodiment: col 2, ln 21; col 4, ln 36; col 5, ln 3; col 6, ln 21; col 8, ln 27, 49-51. *Cardiac Pacemakers* held "a structure may perform two functions, and a single function may be performed by two structures" Cardiac *Pacemakers, Inc. v. St. Jude Medical, Inc.,* 296 F.3d 1106 (Fed. Cir. 2002); See also *Graham & Norton Co. v. Elevator Supplies Co.*, 49 F.2d 268 (3rd App. Cir. 1931);*Medtronic Inc. v. Advanced Cardiovascular Systems Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001)
[38] A change in approach here by Defendants in that they are the ones suggesting a "PIN" which is a less than physical embodiment can serve as the required §112¶6 structure.
[39] US Pat. 7,003,500 B1, col. 5 ln 56-60; col 6 ln 21; col 7 ln 12-14; FIG 5,6,7,8.
[40] Although a Personal Identification Number is a function sophisticated enough to read on the claim.  A URL, although not secure, could also be the code needed to direct the system to the merchandise.



FIG 6,7,8

It is the Court's responsibility to construe what functions "transaction authorization" entailed such as delivering "keys" "messages" or "codes." Then the court must look for associated structures which were: a) disclosed; b) were well known in the pertinent art at the time of invention; or c) were understood implicit in the authorization function by one of ordinary skill in the art at the time of invention.  Structures, like those in FIG 5, would help one of ordinary skill understand precisely the meaning of the claim as a whole and the claimed subject matter. The "keys, messages, and codes" are the *functions* of authorization, but the written or data storage, retrieving, and transfer devices embodied as the physical media are the *structures*.

> e.g. The entire case in <u>*CyberSource Corp. v. Retail Decisions*</u> boiled down to only one question, "whether recitation of  'over the Internet' suffices to tie a process claim to a particular machine."[41]

---

[41] See *CyberSource Corp. v. Retail Decisions, Inc.*, 620 F.Supp.2d 1068 (N.D.Cal. 2009) Even though the US Supreme Court still has a decision to come in *Bilski*, the decision in *CyberSource* is still right, the "internet" is merely a service; it is the telecommunications structures that are the machines. The voucher directed in-person retail sale of a pre-determined and itemized online sale is distinguishable in that the'500 patent specification, with claims and prosecution history, stand for a transformation of itemized merchandise into a sale which is performed by specific physical and/or machine structures within the wired, wireless and electronic memory realms that broadband

### e. "other means of customer interaction with said retail point of sale establishment

First we must recognize *where* these claim terms appear in the claims – as a dependant claim).[42] And, secondly, we recognize that the numerous structures recited in the claim element prior to these terms would not alone render it a 112 6¶ claim.[43]

Further, since the word "or" appears before the term group, it need not be interpreted as a separate element requirement; it merely has the import that the claim as a whole suggests for it and helps the reader of ordinary skill in the art recognize and better understand the nature of the structures previously recited. While this is a dependant claim and not necessarily limited only to the recited structures, any recited structures after the word "or" can limit the dependant claim, but not necessarily.[44]   An invocation of "or equivalents" is not a limiting claim format.

However, such claim language is not "classical" in the sense that this construction is not commonly used by patent practitioners and there are no hard and fast requirements that claims must conform to a particular format used by practitioners.[45] Claim *types* are permissive in that a particular type or format "may" be used, so long as a patent claim meets all the other statutory requirements; it must be examined for its ordinary and accustomed meanings.[46]

---

[telecommunications] provide on which the internet services run. The internet should never be the full embodiment of the only patentable subject matter, but the internet can be recited in an element that includes other patentable subject matter.

[42] This claim is a dependant claim reciting context for the "or other" structures already named within the same claim element.  We do not have the *Cardiac Pacemakers* problem where an elusive "3rd monitoring means" could not find a structure in the specification other than the monitoring physician (human means). *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106 (Fed. Cir. 2002). Also see footnote #33, pg 11, in this brief.

[43] *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003). "This presumption can be rebutted when the claim, in addition to the functional language, recites structure sufficient to perform the claimed function in its entirety."

[44] See *Id.* see also MPEP 2106, Interim Guidelines for Examination of Patent Applications for Patent Subject Matter Eligibility (2005, still included in MPEP 2106) "Language that suggests or makes optional but does not require steps to be performed or does not limit a claim to a particular structure does not limit the scope of a claim or claim limitation."

[45] *Id.* e.g. Beauregard; exhausted combination; Jepson; Markush; means-plus-function; product-by-process; programmed computer; and the more controversial omnibus, reach-through; signal; and swiss-type

[46] See In re Hiniker Co., 150 F.3d 1362, 1369, 47 USPQ2d 1523, 1529 (Fed. Cir. 1998)

### f. "other physical means of recordation without requiring access to a public computer network (internet) during the recording process whether or not access is actually made"

Again the claim format is preceded by the word "or."  All the arguments listed above are hereby incorporated by reference.  The claim element appears in a dependant form.  Once again, the claim element format is non-classical in the sense that it is not of a form typically utilized by patent practitioners.  This element is not subject to §112¶6.  The structures recited in the claim element are card or computer diskette.

Unlike, in the above analysis, however, in this claim element, the language does create a restriction (limitation) on the recited structures in the claim, in that the card, computer diskette, or other means of recordation, must not *require* access to a public computer network (Internet, for example) while the recordation takes place.  It is silent on the requirement (or no requirement) for internet access during a possible retrieving of the recordation, but that fact alone should not render the claim indefinite when the entire claim is read as a whole.[47]

<u>To what degree does the written description render the claim as a whole consistent?</u>

### g. "retail point of sale establishment" and "customer access point"

All arguments above are herein incorporated by reference.  See Plaintiffs Opening Claim Construction Brief and claim construction chart attached.  These terms must receive their ordinary and customary meanings and therefore do not require construction by the court.  If however, the court is going to construe them, then Plaintiffs proposed construction which does not unreasonably broaden or limit the scope of the claims should be used.[48]

---

[47] See analyses above for *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106 (Fed. Cir. 2002); *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003).; MPEP 2106, Interim Guidelines for Examination of Patent Applications for Patent Subject Matter Eligibility (2005),*In re Hiniker Co.*, 150 F.3d 1362, 1369, 47 USPQ2d 1523, 1529 (Fed. Cir. 1998)

[48] e.g. Ordinary and customary meanings are taken in light of the patent specification.  Defendants' proposed, "a physical place where merchandise is sold to consumers" is so broad as to include even a bedroom with an internet connected computer on a desk – which is a place where consumers purchase merchandise online.

### h. "internet transaction location"

All arguments above are herein incorporated by reference. See Plaintiffs Opening Claim

Construction Brief and claim construction chart attached. These terms must receive their

ordinary and customary meanings and therefore do not require construction by the court. If

however, the court is going to construe them, then Plaintiffs' proposed construction which does

not unreasonably broaden or limit the scope of the claims should be used.

### i. "buyer computer" and "selling computer"

Defendants proposed construction of "selling computer" reveals that Defendants have

been taught by the specification that (in at least some embodiments of a digital *transaction*)

ownership "rights to download purchased media [are] transferred to the customer." All

arguments above are herein incorporated by reference. See Plaintiffs Opening Claim

Construction Brief and claim construction chart attached. These terms must receive their

ordinary and customary meanings and therefore do not require construction by the court. If

however, the court is going to construe them, then Plaintiffs proposed construction which does

not unreasonably broaden or limit the scope of the claims should be used.

### j. Transaction Location of Said Product

It is important to note that the '500 patent claims extend to *physical merchandise* as well

as digital media content. If the court were to accept Defendants' arguments, the construction of

the terms "transaction location of said product" (for physical merchandise) would have to be "the

precise location (including directory and filename) on the network" where the physical

warehouse stores physical products for drop shipments. This would result in an improper

construction of the claim.

The '500 patent teaches of three distinct transactions, the first distinct transaction: 1) the

retail transaction of selling the voucher was disclosed as old in the art; 2) the new electronic

transaction of transferring ownership in online merchandise was also taught in the disclosure;[49]

and the third transaction, 3) is the hybrid, namely the voucher directed in-person *retail sale* of a

pre-determined and itemized *online sale*, and was disclosed as an inventive step.[50]

A "transaction location of said product" is where the "transaction" for transferring

ownership takes place on the network – not where the content file is stored.  This may be

complicated for one of ordinary skill in the art who *has not read* the disclosures of the '500

patent to appreciate, but once the disclosures are read, the "transaction location of said product"

is quite simple and would easily be appreciated and understood as "a position or site occupied or

available for occupancy on a network for something transacted, especially an exchange or

transfer of goods, services, or funds such as electronic transactions where something produced is

marketed or sold as a commodity or service".  Plaintiffs proposed construction is precise and

does not unreasonably broaden or limit the scope of the claims.

### k. "payment message" and "authorization message"

All arguments above are herein incorporated by reference.  See Plaintiffs Opening Claim

Construction Brief and claim construction chart attached.  These terms must receive their

ordinary and customary meanings and therefore do not require construction by the court.  If

however, the court is going to construe them, then Plaintiffs proposed construction which does

not unreasonably broaden or limit the scope of the claims should be used.

---

[49] The *problem* was later articulated in – *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (Ninth Circuit, 2001) "…space-shifting of MP3 files not a fair use even when previous ownership is demonstrated before a download is allowed"—but the problem was not solved.

[50] e.g. U.S. Patent 7,003,500 B1, Col. 3 line 46; Col. 4 line 16;Col. 5 line 7,26-28, 43-48;Col. 9 line 23-27. Other embodiments may also apply.  In addition to the Platinum Music Pass, there are currently at least two competing products in Retail Tagging called the *Apple Digital Release Album* and the *Symtio Digital Media Product Card* (a Harper-Collins Company). The Sony Platinum Music Pass is another example of Retail Tagging in that the Platinum Music Pass card is the single instrumentality which is sold at retail for the transfer of ownership of a specific online asset. Unlike other stored value gift cards or other internet prepaid minutes or cash – retail tagged vouchers represent very specific online assets.

17

## CLAIM CONSTRUCTION CHART FOR THE COURT

| *Disputed Terms* | *Plaintiffs Proposed Construction* | *Defendants Proposed Construction* | *Court Ordered Claim Construction* |
|---|---|---|---|
| 1. "retail point of sale establishment" | "a physical piece of real estate, including but not limited to a public or private institution or any place of business that may include its furnishings and staff, *which operates for the purposes of interacting with customers* and transferring goods or services to a customer for a price." | "a physical place where merchandise is sold to consumers" | |
| 2. "customer access point" | "a *particular place* or locality where the person or entity who may desire to purchase a commodity or service *has permission*, liberty, or ability to enter, approach, or pass to and from, or to *communicate with another person or thing wishing sell* that commodity or service." | "a place within a retail point of sale establishment where money is exchanged for merchandise" | |
| 3. "internet transaction location" | "a position or site occupied or available for occupancy on a network that connects communication devices, computers, networks, or organizational computer facilities around the world where *something is transacted, especially an exchange or transfer of goods, services, or funds such as electronic transactions*" | "the precise location on the Internet where the itemized Internet merchandise or itemized downloadable media material objects is stored" | |

| | | | |
|---|---|---|---|
| 4. "means for accepting payment through an in person transaction with a customer" | Function: "to receive willingly by being able or designed to take or hold (something applied or added) as in accepting a payment through means, agency, or relationship with one or more person in the bodily appearance of one or more human beings, especially in relation to a transfer of a commodity or services with one or more customer entity that purchases any such commodity or service"<br><br>Structures: automated kiosks, self check outs (bill acceptors), card readers, check-out registers, check stands, cashier's station, cash registers, vending machines, self-service, or other means of customer interaction with said retail point of sale establishment. | 35 U.S.C. § 112(6)<br>Function: accepting payment through an in person transaction with a customer<br><br>Structure: No disclosed structure. | |
| 5. "means for storing and retrieving a record on or in a physical medium" | Function: Physical medium recited as a structural limitation; must be capable of storing and retrieving a record.<br><br>Structure: can be embodied as plastic cards, paper tickets, disks, magnetic strips, bar codes, and any means for recording information as described in the specification | 35 U.S.C. § 112(6)<br>Function: storing and retrieving a record on or in a physical medium corresponding to said URL information that is an Internet transaction | |

| | | location of said itemized Internet merchandise or itemized downloadable media material objects

Structure: No disclosed structure. | |
|---|---|---|---|
| 6. "means for transfer of said physical medium from said retail point of sale establishment to said customer" | Function:  transferring the physical medium to the customer

Structure: any shelf, package, counter, vending system, or really any other physical location inside the retail establishment in which to place the physical medium, fulfills the structure requirement. | 35 U.S.C. § 112(6) Function: transfer of said physical medium from said retail point of sale establishment to said customer

Structure: No disclosed structure. | |
| 7. "means for Internet transaction authorization on, in, or actuated from said physical medium" | Function: Physical medium recited as a structural limitation; capable of providing a code

Structure: any scratch off, bar code, magnetic strip, or really any other means to relay information which is on, in, or actuated from the physical medium, fulfills the structure requirement | 35 U.S.C. § 112(6) Function: "Internet transaction authorization on, in, or actuated from said physical medium wherein ownership rights in said itemized Internet merchandise | |

| | | or itemized downloadable media material objects are preselected and transferred to said customer through said transfer of said physical medium"<br><br>Structure: Unique Serial Number or Personal Identification Number (PIN). | |
|---|---|---|---|
| 8. "other means for customer interaction with said retail point of sale establishment" | Function: retail point of sale recited as a structural limitation; capable of interacting with customers<br><br>Structure: automated kiosks, self check outs (bill acceptors), card readers, check-out registers, check stands, cashier's station, cash registers, vending machines, or self-service machines are all means of customer interaction with said retail point of sale establishment. | 35 U.S.C. § 112(6) Function: "Customer interaction with said retail point of sale establishment"<br><br>Structure: No disclosed structure. | |
| 9. "other physical means of recordation without requiring access to a public | Function: Physical means recited as a structural limitation; capable of recording information with or without access to | 35 U.S.C. § 112(6) Function: "Physical means of | |

| | | | |
|---|---|---|---|
| computer network (Internet) during the recording process whether or not access is actually made" | the internet.<br><br>Structures: print, memory devices, bar codes, magnetic strips and any device capable of recording information with or without internet access. | recordation without requiring access to a public computer"<br><br>Structure: No disclosed structure. | |
| | | | |
| 10. "buyer computer" | "a programmable *usually electronic device* that can store, retrieve, or process data which is operated by or *under the control of a person or entity desiring to acquire possession, ownership, or rights* to the use of products or services of by way of payment." | "a computer operated by the consumer on which the media is downloaded" | |
| 11. "selling computer" | "a programmable *usually electronic device* that can store, retrieve, or process data which is operated by or *under the control of a person or entity desiring to accomplish the act of transferring property* from one person to another for a price." | "a computer operated by the retail point of sale establishment on which rights to download purchased media is transferred to the customer" | |
| | | | |
| 12. "transaction location of said product" | "a position or site occupied or available for occupancy on a network *for something transacted, especially an exchange or transfer of goods, services, or funds* such as electronic transactions where something produced is marketed or sold as a commodity or | "the precise location (including the directory and file name) on the network where the networked merchandise or | |

| | | | |
|---|---|---|---|
| | "service" | "downloadable media material objects are stored" | |
| | | | |
| 13. "payment message" | "a communication *in writing, in speech, or by signals* that *the act of paying something* (or the something that is paid) has been completed." | "an electronic message indicating that payment was received" | |
| | | | |
| 14. "authorization message" | "a communication in *writing, in speech, or by signals* indicating that *the act of establishing authority* as if by a person or entity in power to influence or command has been completed." | "an electronic message authorizing access to merchandise that includes a specification of the product using cryptographic keys" | |

Respectfully submitted this 22nd day of February, 2010

BY:___/s/James L. Driessen_____
     For James and Marguerite Driessen
     Plaintiffs, Pro Se

NOTICE OF ELECTRONIC FILING

ECF will electronically transmit the Notice of Electronic Filing to the attorneys and parties to the case who have registered for e-filing with the court.


___/s/James L. Driessen_____