**JAMES L. DRIESSEN, PRO SE,** jd@driessenlaw.com, USB #09473

MARGUERITE A. DRIESSEN, PRO SE, mad@driessenlaw.com

305 N 1130 E, LINDON, UT 84042

PHONE (801)796-6924

FAX (801)785-2744

# UNITED STATES DISTRICT COURT

## District of Utah, Central Division

| | |
|---|---|
| James L. Driessen and Marguerite A Driessen<br>Plaintiffs<br><br><br><br>V.<br><br>Sony BMG Music Entertainment et.al.<br>Defendants | **PLAINTIFFS' REPLY MEMORANDUM ON MOTION FOR LEAVE OF COURT TO AMEND COMPLAINT**<br><br>CASE NUMBER:  2:09-cv-00140<br>Judge: Clark Waddoups<br>Judge: Brook Wells (non-dispositive matters) |

## Table of Authorities

*Akazawa v. Link New Technology Intern., Inc.*, 86 U.S.P.Q.2d 1279, 520 F.3d 1354 (Fed. Cir. 2008), 6

Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007), 9

*Broadcast Employees v. International Brotherhood of Teamsters*, 419 F.Supp. 263 (E.D.Pa.1976), 2

*Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), 9

*Enovsys LLC v. Nextel Communications, Inc.,* 2009-1167 (currently unpublished, decided August 3, 2010, Fed Cir.) quoting from *MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1375-76 (Fed. Cir. 2007); (*Enovsys* decision attached Exhibit 3), 5

*Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1471 (Fed. Cir. 1998), 6

*H.M. Stickle v. Heublein, Inc*., 716 F.2d 1550 (Fed. Cir. 1983), 6

*Israel Bio-Engineering Project v. Amgen, Inc.*, 475 F.3d 1256, 1264-65 (Fed. Cir. 2007), 5

*Jim Arnold Corp. v. Hydrotech Sys., Inc*., 109 F.3d 1567, 1572 (Fed. Cir. 1997), 6

*Kadylak v. O'Brien*, 32 F.Supp. 281 (W.D.Pa.1940), 2

*Leigh Furniture & Carpet Co. v. Isom*, Utah, 657 P.2d 293 (1982), 6

*Orange Theatre Corp. v. Rayherstz Amusement* Corp., 139 F.2d 871, 874 (CA3 1944), cert. denied 322 U.S. 740, 64 S.Ct. 1057, 88 L.Ed. 1573, 2

*Phonometrics, Inc. v. Hospitality Franchise Sys., Inc*., 203 F.3d 790, 794 (Fed.Cir.2000), 2

*Prima Tek II, LLC v. ARoo Co.*, 222 F.3d 1372, 1377 (Fed Cir. 2000), 5

*SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1325 (Fed. Cir. 2010), 5

*Skrtich v Thornton*, 280 F.3d 1295, 1306 (11th Cir. 2002), 1

*Vassardakis v. Parish*, 36 F.Supp. 1002 (S.D.N.Y.1941), 2

*Waterman v. Mackenzie*, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1891), 6

*Woodward v. Woodward*, 656 P.2d 431, 432-33 (Utah 1982), 6

## SUMMARY OF ARGUMENT

In support of DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT (hereafter, "D's Opposition"), Defendants raise seven arguments:  1) failure to specify the accused infringing device or method; 2) failure to name the proper parties; 3) failure to specify declaratory relief requested; 4) failure to allege ownership of the patent(s) asserted; 5) that plaintiff Marguerite Driessen lacks standing; 6) failure to clearly state a cause of action regarding SSO allegations; and 7) that the proposed amendments would be futile.

D's opposition is primarily an attack on the sufficiency of Plaintiff's pleadings, asserting that the absence of, or errors in, particular "magic words" renders the proposed amended complaint fundamentally deficient.  Because the Proposed Amended Complaint clearly meets the requirements for properly alleging a "short and plain statement" of patent infringement under the Federal Rules of Civil Procedure, Rule 8(a), and because D's Opposition is based almost entirely upon items in the Proposed Amended Complaint that were not amended from the Original complaint, leave to amend the complaint should be granted.

## ANALYSIS

It should be noted at the outset that the first five of D's Opposition arguments listed as 1-7 above, assert deficiencies in the Proposed Amended Complaint regarding items that are unchanged from the Original Complaint, and therefore have not been the subject of amendment. (see Exhibit 1, "Markup Copy to Show Changes").  Under FRCP, R. 12(h-i), it could be argued that 1-5 should be deemed waived[1] as Defendants have failed to raise them at any time prior in

---

[1] See *Skrtich v Thornton*, 280 F.3d 1295, 1306 (11th Cir. 2002).  There could be an absolute bar to a motion brought after an answer is filed and making any of the enumerated defenses. *Orange Theatre Corp. v. Rayherstz Amusement*

nearly 18 months of litigation on the Original Complaint.  Fundamentally however, denying

leave to amend the complaint based on any of Defendants' arguments 1-5 would be futile

because Defendants would still have to continue to address all of them under the Original

Complaint which would be unaffected by the Court's decision on this matter.  Nevertheless,

because arguments 1-5 also fail on the merits, they will be addressed in turn below.

### *The Accused Devices/Methods are Sufficiently Identified*

Under *Phonomentrics*, the Federal Circuit has held that it is sufficient to allege that the

patent is infringed by defendant's sale of a particular product.[2]  Both the Original and Proposed

Amended Complaint assert that the Sony "Platinum Music Pass" is the "product" made, sold,

and offered by Defendants (*See Exhibit 1 at 17, 19*), and thus is the accused device for the

purposes of this litigation.[3]  The Proposed Amended Complaint also names "UltraViolet" (*See

Exhibit 1 at 33*).[4]  UltraViolet is simply a new name for the same product.  The argument that

Plaintiffs claim that "Defendants have infringed three U.S. patents … through the use of

*unnamed* products or methods" (*D's Opp., Doc. 81, pg.2, emphasis added*), is simply

unfounded.

### *Named Defendants*

Defendants assert that Plaintiffs must "properly name Best Buy Stores L.P." as a

defendant instead of Best Buy Co., Inc**.**  (See *D's. Opp. Doc. 81, pg. 3)*.  Yet, the business entity,

---

Corp., 139 F.2d 871, 874 (CA3 1944), cert. denied 322 U.S. 740, 64 S.Ct. 1057, 88 L.Ed. 1573; *Broadcast Employees v. International Brotherhood of Teamsters*, 419 F.Supp. 263 (E.D.Pa.1976); *Vassardakis v. Parish,* 36 F.Supp. 1002 (S.D.N.Y.1941); *Kadylak v. O'Brien*, 32 F.Supp. 281 (W.D.Pa.1940).

[2] *Phonometrics, Inc. v. Hospitality Franchise Sys., Inc*., 203 F.3d 790, 794 (Fed.Cir.2000). It is not necessary to specify which specific claims are alleged to be infringed or the features of the accused device that satisfy the limitations of these claims. see also F.R.C.P., *Illus.Civ. R. Forms 18*.

[3] The exact words of the complaint are:  "a prototype of a product displayed by Sony BMG, Target, Best Buy, and FYE named the 'Platinum Music Pass… the new digital card,' specimen attached herein as Exhibit B." *Amd. Compl. at 19*.  Thereafter, wherever the words "product" or "Defendants' product" appear in the complaint, the Platinum Music Pass in Exhibit B is specified by that initial reference.  Amd Compl. at 7,8,9, 10, 19, 20, 21, 22, 23, 24, 25, 28.

[4] A specimen of Ultra Violet is included as Exhibit B in the *Amd. Compl.* also indicating identity of product).

"Best Buy Stores L.P.," is listed as "expired" since 2005 by the Utah Division of Corporations and Commercial Code. (Attached as Exhibit 5.)   The only Best Buy business entity listed as doing business in the state of Utah now and at the time of the alleged infringement is Best Buy Co., Inc.  Thus, Best Buy Co., Inc. is presumptively the only proper entity that can be named in this action.

Defendants also assert that Plaintiffs must substitute Sony Music Entertainment ("SME") in place of Sony BMG Music Entertainment but provide no reason why SME is the proper party to respond to the litigation.  Business restructuring in the music industry is rampant, but "Sony BMG" was the entity who had announced the introduction of the Sony Platinum Music Pass product at the time of filing this litigation.

Beyond those presumptions, however, Plaintiffs do not take a position on joinder of parties as Defendants have not responded to discovery, and thus Plaintiffs lack full information. Without discovery, and in the absence of a supported motion to implead or dismiss for misjoinder, Defendants' arguments on this basis are premature.

Notwithstanding the foregoing, Plaintiffs would not oppose a stipulated amendment to substitute parties under Rule 21 consistent with Defendants' assertions[5]  provided that Defendants: 1) contact and advise Plaintiffs how and why Best Buy Stores L.P. and Sony Music Entertainment are the proper entities to respond to the allegations; 2) provide information that the dismissed entities were not connected to (or have not directed or controlled in) any matter

---

[5] F.C.R.P., R. 21. D's Opposition has capitulated, "Defendants would not oppose amending the Complaint to: (1) name James Driessen and Joshua Akers[sic] as Plaintiffs (if they are the owners of the named patents); (2) remove Marguerite Driessen as a Plaintiff; (3) properly name Sony Music Entertainment as a Defendant; (4) properly name Best Buy Stores L.P. as a Defendant; (5) properly assert alleged infringement of the '500 patent; (6) properly assert alleged infringement of the '695 patent; and (7) properly assert alleged infringement of the '993 patent." Ds Opp. Doc. 81, pgs. 1-2

alleged and 3) agree that any dismissal of Best Buy Co. Inc. or Sony BMG Music Entertainment is to be without prejudice.

### *Requested Declaratory Relief is Sufficiently Specified*

Defendants assert that leave to amend the complaint should be denied because the declaratory relief sought is unspecified.  The Proposed Amended Complaint contains a request for declaratory relief that the Court: 1) enter a Judgment that Defendants have infringed the asserted patents; 2) enjoin Defendants from any and all acts in infringement; 3) order Defendants to provide an accounting of proceeds from any infringing acts; 4) order that all items infringing the asserted patents be delivered to Plaintiff for destruction; 5) enter a declaratory judgment regarding Plaintiffs' F/RAND rights; and 6) enjoin Defendants Sony and Best Buy from managing and directing a Standards Setting Organization (SSO) to reject Plaintiffs attempts to engage in F/RAND offerings. *Amd. Compl. at 31.*  That these requests are specific is abundantly clear.

### *Ownership of the Asserted Patents*

Defendants assert that leave to amend should be denied because Plaintiffs failed to allege ownership of the asserted patents, apparently because something like the specific phrase "owned by James Driessen" does not appear in connection with the asserted patents.  However, sufficient pleading under Rule 8 of the Federal Rules of Civil Procedure does not require particular "magic words" to present a justiciable claim, but rather requires only sufficient disclosures so that a defendant is on notice as to who the owner allegedly is.  Both the Original and the Proposed Amended Complaints contain an assertion of ownership in the allegation that Plaintiff, James Driessen, named inventor on each patent, licenses the patent(s) (See Mark up version, *Exhibit 1 at 17, 20-23, and 36*).  Because one must have some ownership to license, all parties are on

notice that Plaintiffs have asserted ownership of all of the identified patents.  Since ownership

has been asserted, Defendants' argument on this basis is unfounded.  Notwithstanding the above,

Plaintiffs would not oppose including an unequivocal statement that "James Driessen" is the

owner of record of the three asserted patents in their amended complaint.[6]

### *Standing*

A party's standing to sue for patent infringement derives from the Patent Act, which

provides that "[a] *patentee* shall have remedy by civil action for infringement of his patent." 35

U.S.C. § 281 (emphasis added). "Patentee" includes not only the party to whom the patent was

issued, but also the successors in title to that party. *35 U.S.C. § 100.* When a patent is co-owned,

a joint owner must join all other co-owners to establish standing. *Israel Bio-Engineering Project*

*v. Amgen, Inc.*, 475 F.3d 1256, 1264-65 (Fed. Cir. 2007); see also *Prima Tek II, LLC v. ARoo*

*Co.*, 222 F.3d 1372, 1377 (Fed Cir. 2000); *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d

1319, 1325 (Fed. Cir. 2010).   The issue of whether Marguerite Driessen was properly named as a

Plaintiff turns on whether she had any ownership interest in the asserted patents at the time this

suit was filed.  A spouse may have standing to sue on behalf of her personal ownership rights

through legal and constitutionally correct marriage or through marriage dissolution if "[wife] had

any ownership interest in the asserted patents at the time this suit was filed." *Enovsys LLC v.*

*Nextel Communications, Inc.,* 2009-1167 (currently unpublished, decided August 3, 2010, Fed

Cir., attached hereto as Exhibit 3) (quoting from *MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d

1372, 1375-76 (Fed. Cir. 2007).

Plaintiffs alleged in the Original and in the Proposed Amended Complaint that

Marguerite Driessen is the wife of James Driessen and that she fully financed the prosecution of

---

[6] See *Exhibit 2* showing common ownership of all patents.  Due to legal agreements of which Defendants are not aware, naming both James Driessen and Josh Aker as requested by Defendants, would *not* assert proper ownership.

the relevant patent applications, *Exhibit 1. at 12*.  This gives Mrs. Driessen equitable ownership rights under Utah law.[7]  Under *Waterman v. Mackenzie*, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1891), it was determined that standing in a dispute among an inventor's spouse and various assignees turned on ownership, not inventorship, of the asserted patent." *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1471 (Fed. Cir. 1998) (citing *Waterman*).  Since *Waterman*, courts have consistently held that only state law determines whether joint ownership of a patent occurs through marriage, and /or follows other rights to sue over property.[8]

Utah is not a "community property" state or "common law" state, but rather is an "equitable distribution" state.  Thus, Utah's "equitable distribution" jurisprudence is controlling. In Utah, Courts "have … recognized a plaintiff's right to recover for the loss of prospective economic relations," meaning that the spouse of an inventor has standing to sue on her own behalf to protect interests in the patents of that inventor.  (See  *H.M. Stickle v. Heublein, Inc*., 716 F.2d 1550 (Fed. Cir. 1983); see also *Jim Arnold Corp. v. Hydrotech Sys., Inc*., 109 F.3d 1567, 1572 (Fed. Cir. 1997) (" the question of who owns the patent rights and on what terms typically is a question exclusively for state courts")  Although James Driessen, the inventor and presumptive patent owner in this case, is neither dead nor divorced from Marguerite Driessen, as was the case with the inventors/owners in *Stickle* and *Arnold*, both the Original and Proposed Amended Complaints allege that while James Driessen was an unemployed law student, Mrs. Driessen provided all "monetary support" for the prosecution of the parent application.  Thus,

---

[7] *Leigh Furniture & Carpet Co. v. Isom*, Utah, 657 P.2d 293 (1982); see also *Woodward v. Woodward,* 656 P.2d 431, 432-33 (Utah 1982) ("The essential criterion is whether a right to the benefit or asset has accrued in whole or in part during the marriage. To the extent that the right has so accrued it is subject to equitable distribution.").
[8] See also *Akazawa v. Link New Technology Intern., Inc.*, 86 U.S.P.Q.2d 1279, 520 F.3d 1354 (Fed. Cir. 2008)  "Our case law is clear that state law, not federal law, typically governs patent ownership." See *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1572 (Fed. Cir. 1997) (stating "the question of who owns the patent rights and on what terms typically is a question exclusively for state courts").

simply through a quirky effect of Utah Law, Mrs. Driessen has present equitable ownership (and constructive ownership under the common law) of all of the asserted patents, and has standing to sue on her own behalf.

### *Plaintiffs' SSO Allegations Support a Cause of Action for Indirect Infringement*

Defendants argue that leave to amend should be denied because the allegations in the Proposed Amended Complaint relating to Fair and Reasonable Non-Discriminatory (hereafter "F/RAND") rights and Defendants' involvement with an important Standard Setting Organization (hereafter "SSO") are unintelligible and irrelevant because Plaintiffs failed to include a cause of action to which those new allegations relate.[9]   For the record, the Proposed Amended Complaint contains multiple causes of action that are unchanged from the Original Complaint.  (See Exhibit 1).  The new allegations simply provide more specific detail in support of the cause of action for Indirect Infringement.  Rule 8 notice pleading does not require detailed facts for each allegation of direct or indirect patent infringement, or to tie allegations to only a specific cause of action in the complaint, or be accompanied by an analysis of how facts are connected.[10]  Thus, failure to do so is no basis for denying leave to amend a complaint.

### *Indirect, Induced, or Contributory Infringement*

In the Proposed Amended Complaint, Plaintiffs provide additional support for the claim of indirect infringement by alleging that Defendants are inducing retailers to include a "retail tagging" element as part of the digital rights storage locker system (through standards currently under development).  Indirect, induced, or contributory infringement occurs when a party instructs, directs, or advises a third party as to how to carry out a direct infringement or to sell or

---

[9] The operation of an SSO and US Federal Trade Commission regulation of F/RAND was explained in PLAINTIFFS' MOTION TO AMEND at pg. 6

[10] "Asking for plausible grounds does not impose a probability requirement at the pleading stage … enough fact to raise a reasonable expectation … only enough facts to state a claim to relief that is plausible on its face… " *Bell,* 550 U.S. 544 *at 545-47*

offer to sell a material component of a patented invention with knowledge that such a component has been especially made for use in the infringement.[11]

Among other things, the new matter in the Proposed Amended Complaint alleges: that the DECE is an SSO; that the Sony Chief Technology Officer is the director of the DECE and that Best Buy is a member of the DECE and thus both parties exercise significant influence over the DECE; that the DECE has proposed the Ultra Violet standard; that the Ultra Violet standard includes a "retail tagging" component; that retail tagging infringes one or more of the identified Driessen patents; that including retail tagging in the standard essentially is "instructing, directing, or advising" that retailers similarly infringe those identified patents; and that the promulgation of that standard is essentially an offer to sell infringing devices.  These allegations present a prima facie case for indirect infringement because inducing the organization to adopt standards, for which the asserted patents in this litigation would be essential, is the equivalent of inducing the SSO and thereby all participating entities to infringe.

To the extent that Defendants have construed the new matter as some kind of request for declaratory judgment of *non*-infringement, it is clear that Defendants misapprehend the nature of the claim.  The most likely source of the confusion is that a *typical* case in which F/RAND rights are claimed regarding a party's alleged influence over an SSO arises when a party holding patents inserts itself into the standard-generating process and incorporates technologies or methods embodied by those patents into the standard, thereby making the patents essential to the standard and increasing their value.  In the absence of F/RAND protections, the party holding patents could basically extort any person or entity wishing to meet the announced standard, giving rise to a claim of unfair trade practices against the patent holder.  In those circumstances a

---

[11]Under 35 U.S.C. § 271(a); 35 U.S.C. (b); or 35 U.S.C. § 271(c).

party might seek a declaratory judgment of *non*-infringement to avoid F/RAND pricing limitations.

The instant case presents a reversal of a typical F/RAND fair trade claim because it is not the patent holder, but parties against whom the patent holder would seek to enforce the patents who are influencing the SSO to make those patents essential to the standard.  Thus, if Defendants do not succeed in invalidating the patents through direct litigation, Defendants can devalue those patents because F/RAND rules may operate to prevent Plaintiffs from asserting them.

### *Granting Leave to Amend Would Not be Futile*

In asserting that leave to amend would be futile, Defendants essentially argue for the first time that Plaintiffs have not adequately asserted a case for patent infringement of the '500 patent. Although most of these arguments should be deemed waived because they relate to items in the Proposed Amended Complaint that are unchanged from the Original Complaint and should have been raised before Defendants answered,[12] all of these arguments can summarily be addressed with a two-fold response.  First, The United States Supreme Court spelled out the general "plausibility" standard in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)[13] whereby "plausible" allegations to make out patent infringement requires only the following elements: 1) an allegation of jurisdiction; 2) a statement that the plaintiff owns the patent; 3) a statement that defendant has been infringing the patent "by

---

[12] *Skrtich v Thornton*, 280 F.3d 1295, 1306 (11th Cir. 2002)  ("… because a responsive pleading--an answer--had been filed, under the plain language of Rule 12(b), a motion to dismiss would have been inappropriate. Rule 12(b) provides that all defenses must be asserted either (1) in a responsive pleading, or (2) by motion under Rule 12(b) before interposing a responsive pleading if one is due. Furthermore, Rule 12(g) specifically prohibits a party that has previously filed a motion to dismiss from filing a second pre-answer motion to dismiss raising an omitted defense that could have been presented in the first motion to dismiss, except a motion as provided in subdivision (h)(2) hereof on any of the grounds there stated.") internal quotations omitted.

[13] Quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); coupled with Fed.R.Civ.P. Form 18 (2008), attached as Exhibit 4.

making, selling, and using [the device] embodying the patent"; 4) a statement that the plaintiff

has given the defendant notice of its infringement; and 5) a demand for an injunction and

damages.[14]  Thus, a patentee need only plead facts sufficient to place the alleged infringer on

notice as to what he must defend.[15]

     Second, the allegations in both the Original and Proposed Amended Complaint clearly

contain the necessary pleading requirements to make out a case of patent infringement, namely:

1) An allegation of jurisdiction in a short and plain statement *(Exhibit 1 at 6-11)*;
2) An assertion of ownership in a statement that the Plaintiff James Driessen "licenses" the patent *(Exhibit 1 at 17, 20, 21, 22, 23, 36)*;
3) A statement that defendant has been infringing the patent through "manufacturing, selling, offering to sell, and/or using" the "Sony Platinum Music Pass" constituting the embodying the patent under "35 U.S.C.A. § 271" *(Exhibit 1 at 19-20, and 30)*;
4) A statement that the plaintiff has given the defendant notice by sending letters of its infringement and copies of the claims, *(Exhibit 1 at 16-24)*; and
5) A demand for an injunction and damages. (*Exhibit 1. at 31 A-H*).

Accordingly, the Proposed Amended Complaint contains enough detail to allow the defendants

to answer and thus meets the notice pleading required to survive a Rule 12(b)(6) motion. See

*Conley*, 355 U.S. at 47-48, 78 S.Ct. 99; *Phonometrics*, 203 F.3d at 794.  Nothing more is

required.

### CONCLUSION

     Based upon the foregoing, Plaintiffs Proposed Amended Complaint contains sufficient

detail to allow Defendants to answer and thus meets the notice pleading required to survive a

Rule 12(b)(6) motion.  Consequently, amendment would not be futile and Plaintiffs motion to

amend the complaint should be granted.

---

[14] *Conley v. Gibson*, 78 S. Ct. 99, 355 U.S. 41 (1957) (stating that "[the] illustrative forms appended to the Rules plainly demonstrate [the pleading requirements]").
[15] See *Bell Atlantic*, 127 S.Ct. at 1971 n. 10 (stating "[a] defendant wishing to prepare an answer in the simple fact pattern laid out in Form 9 [in the Federal Rules of Civil Procedure] would know what to answer).

Respectfully submitted this _____ day of _____, 2010

By: ____/s/James L. Driessen_____
     James L. Driessen, Plaintiff Pro Se

NOTICE OF ELECTRONIC FILING
ECF will electronically transmit the Notice of Electronic Filing to the attorneys and parties in the case who have registered for e-filing with the court.

___/s/James L. Driessen_____

**EXHIBIT 1**
**PROPOSED AMENDED COMPLAINT**
**(MARKUP COPY TO SHOW CHANGES)**



JAMES L. DRIESSEN, PRO SE, jd@driessenlaw.com, USB #09473
MARGUERITE A. DRIESSEN, PRO SE, mad@driessenlaw.com
305 N 1130 E, LINDON, UT 84042
PHONE (801)796-6924
FAX (801)785-2744

# UNITED STATES DISTRICT COURT

## District of Utah, Central Division

| | | |
|---|---|---|
| James L. Driessen and Marguerite A Driessen | ) ) ) ) | |
| Plaintiffs | ) ) | PLAINTIFFS' FIRST AMENDED COMPLAINT (PROPOSED) |
| v. | ) ) | |
| Sony BMG Music Entertainment et.al. | ) ) | CASE NUMBER: 2:09-cv-00140 |
| Defendants | ) ) | Judge: Clark Waddoups |
| | ) | |

NOW COMES James L. Driessen, Margurite A. Driessen, Plaintiffs in the above

numbered cause and for cause of action against Sony BMG Entertainment, Target

Corporations, Best Buy Co. Inc., and FYE. Plaintiffs would show as follows:

I. Parties

1.   Plaintiff, James L. Driessen and Marguerite A. Driessen, husband and wife,

(hereinafter "Plaintiffs") are individuals with their residence at 305 N 1130 E, Lindon,

UT 84042.

2.   Defendant, Sony BMG Music Entertainment (hereinafter "Sony BMG") is a

Delaware Corporation with its principal place of business at 550 Madison Ave., New

Deleted: ¶
Formatted Table
Deleted: ATTORNEY FOR PLAINTIFF¶

Formatted: Underline

Deleted: 305 N 1130 E
Formatted: Right
Formatted: Centered
Deleted: Lindon, UT 84042
Plaintiff
Formatted: Centered
Deleted: COMPLAINT IN A CIVIL CASE
Formatted: Widow/Orphan control
Deleted: V.
Formatted: Left
Formatted: Widow/Orphan control
Deleted: ¶
¶
¶
¶
¶
¶
¶
)
Deleted: Sony BMG Music Entertainment¶
550 Madison Ave.¶
New York, NY 10022-3211¶
Registered Agent: Corporation Service Co.¶
2711 Centerville Road Suite 400¶
WILMINGTON, DE 19808
Defendant
Formatted: Right

... [1]

York, NY 10022-3211. Sony BMG can be served with process by serving its

registered agent for service of process at Corporation Service Co., 2711 Centerville

Road Suite 400, Wilmington, DE 198086.

3.      Defendant, Target Corporation (hereafter "Target") is a Minnesota Corporation its

principal place of business at 1000 Nicollet Mall, Minneapolis, MN 55403.  Target can

be served with process by serving its registered agent for service of process at CT

Corporation System, 136 East South Temple Ste 2100, Salt Lake City, UT 84111.

4.      Defendant, Best Buy Co., Inc. (hereafter "Best Buy") is a Minnesota Corporation

its principal place of business at 7601 Penn Ave S, Richfield, MN 55423.  Best Buy

can be served with process by serving its registered agent for service of process at CT

Corporation System, 136 East South Temple Ste 2100, Salt Lake City, UT 84111.

5.      Defendant FYE, upon information and belief that it is operating as a fully owned

and independent subsidiary of Trans World Entertainment (hereafter "FYE") is a New

York State Corporation with its principal place of business at 38 Corporate Cir.,

Albany, NY 12203.  FYE can be served with process by serving its registered agent for

service of process at CT Corporation System, 136 East South Temple Ste 2100, Salt

Lake City, UT 84111.

II. Jurisdiction and Venue

6.      This complaint involves claims for patent infringement arising under the patent

laws of the United States, Title 38, United States Code and this court has jurisdiction

over those claims under 28 U.S.C.A. § 1338 (2005) which directs that District Courts shall have original jurisdiction of any civil action arising under any act of Congress relating to patents.

7.    This court has personal jurisdiction over Sony BMG because Sony BMG has advertised and sold infringing products within the boundaries of the Federal District Court of Utah, Central Division of the state of Utah.

8.    This court has personal jurisdiction over Target because Target has advertised and sold infringing products within the boundaries of the Federal District Court of Utah, Central Division of the state of Utah.

9.    This court has personal jurisdiction over Best Buy because Best Buy has advertised and sold infringing products within the boundaries of the Federal District Court of Utah, Central Division of the state of Utah.

10.    This court has personal jurisdiction over FYE because FYE has advertised and sold infringing products within the boundaries of the Federal District Court of Utah, Central Division of the state of Utah.

11.    Venue is proper in this district pursuant to 28 U.S.C.A. §§ 1391 and 1400(b).

III. Facts

12.    After considerable effort by Plaintiff James L. Driessen, an invention for a new utility called Retail point of sale (RPOS) apparatus for internet merchandising was conceived and reduced to practice. After successfully building and testing the new

invention Plaintiff James Driessen (with the monetary support from his wife, Plaintiff

Marguerite Driessen) prepared and filed U.S. Patent Application Serial No.

09/630,272, on August 1, 2000 in the U.S. Patent and Trademark Office to protect the

new Retail point of sale (RPOS) apparatus for internet merchandising.

13.     After a thorough examination by a patent examiner in the U.S. Patent and

Trademark Office and a subsequent interview with the examiner, amendment of the

claims, and mandatory second examination, the application has been issued by the

U.S. Patent and Trademark Office on February 21, 2006 as U.S. Letters Patent No.

7003500 (hereinafter the "'500" patent or just "patent"). A copy of the Issued Patent is

attached hereto as **Exhibit A**.

| Deleted: 3 |
| --- |

14.     On October 31, 2005, Plaintiff James Driessen filed patent application 11/262,855

which issued as patent number 7,636,695 ('695 patent) on December 22, 2009.

15.     On January 11, 2006, Plaintiff James Driessen filed patent application 11/329,526

which issued as patent number 7,742,993 ('993 patent) on June 22, 2010.

16.     After the '500 (parent) patent application was filed, but prior to patent issuance, on

or about August 9, 2000, Plaintiff James Driessen created and sent out via U.S. postal

services an identical "mail merge" form to various parties including BMG

Entertainment, Sony Music Entertainment ("SME"), Columbia, EMI, and many

others under either the BMG or SME umbrella.

17.   After the <u>above</u> filing of the applications, but prior to <u>their</u> issuance, on or about

February 21, 2006, Plaintiff wrote another letter to Defendant Sony notifying them

that Plaintiff had received a notice of issue and again discussing the "Platinum Music

Pass" by inviting Defendants to license under the "Vibme" brand owned by Plaintiffs.

18.   After the issuance of the <u>'500</u> patent and Sony Music Entertainment having joined

with BMG Entertainment to form a new Company under the "Sony Group," on or

about October 16, 2006, Plaintiff James Driessen wrote to various executives at Sony

Group and sought online registration under the <u>Sony Procurement Integrated and</u>

<u>Rationalized Internet Trading System</u> ("SPIRITS") user ID: 437832 and password:

669242.

19.   After the issuance of the <u>'500</u> patent, on or about January 15, 2008, Plaintiffs

discovered a prototype of a product displayed by Sony BMG, Target, Best Buy, and

FYE named the "Platinum Music Pass … the new digital music card," specimen

attached herein as **Exhibit B**.

20.   After examining the prototype of the invention, Plaintiffs determined that it was a

copy of its product. On March 17, 2008, Plaintiff, James L. Driessen, sent a letter to

Best Buy requesting that they license the invention. Plaintiff also sought business

development with Best Buy through their online vendor portal via

<u>NewVendorInquiry@BestBuy.com</u> submitting similar information.

**Deleted:** its

21.     After examining the prototype of the invention, Plaintiffs determined that it was a

copy of its product. On March 17, 2008, Plaintiff, James L. Driessen, sent a letter to

Target requesting that they license the invention.

22.     After examining the prototype of the invention, Plaintiffs determined that it was a

copy of its product. On May 12, 2008, Plaintiff, James L. Driessen, sent a letter to

FYE requesting that they license the invention.

23.     After receiving correspondence from Sony, Best Buy, Target, and FYE confirming

that they had reviewed Plaintiff's letter, Plaintiff found that Defendants had not pulled

their infringing products in the US nor did they seek to license.

24.     All Defendants continue to market and sell infringing products in the United

States.

25.     Based upon information and belief that all Defendants have an inventory of

infringing products and that they have sold and will continue to sell the product to

distributors and customers across the United States, to include its own distributors, all

Defendants are knowingly infringing. In turn, these distributors and customers have

resold and/or used the infringing product.

26.     Defendants were allowed a copy of the allowed claims of the '500 patent.

| Deleted: 3 |
| --- |

27.     The claims of the '695 and '993 patents are attached herein as Exhibit C.

28.     The current versions of the Defendant's products continue to infringe the claims of

| Deleted: 3 |
| --- |

the '500 patent, the '695 patent and the '993 patent.

29.    Based upon information and belief, All Defendants are manufacturing and/or

selling the invention to distributors and customers across the United States and

particularly there are at least 7 FYE stores in the State of Utah, 5 Best Buy Stores, and

at least 11 Target Stores including cities of Salt Lake City, Centerville, Layton, Orem,

Riverdale, Saint George, Fort Union, Sandy (North), Sandy (South), West Jordan, and

West Jordan (SW).

IV. Infringement of the '500, '695, and '993  Patents

**Deleted:** 3500 Patent

30.    Defendant's acts in manufacturing, selling, offering to sell, and/or using the

invention constitute infringement of the '500, '695, and/or '993 patent and/or

**Deleted:** 3500

contribute or induce infringement of the '500, '695, and/or '993 patents pursuant to

**Deleted:** 3500 patent

35 U.S.C.A. § 271 (2005).

31.    Announced in September, 2008 by consortium President and Sony Pictures

entertainment CTO, DECE was chartered to develop a set of standards for the digital

distribution of premium Hollywood content.

32.    The DECE consortium announced their intention to create a set of rules and a

back-end system for management of those rules that will enable consumers to share

purchased digital content between a domain of registered consumer electronics

devices.

33.    DECE's proposed "digital locker" system is now known as UltraViolet.

34.   On October 21, 2009, The Walt Disney Company announced their development of a competing service called Keychest.

35.   DECE has since announced that it intends its logo to appear on movies for sale (designed for digital downloads and DVDs/Blu-ray Discs), in retailers' stores.

36.   Plaintiffs by and through their agent for licensing, Vibme LLC, has contacted the DECE and several of its members, which members initially expressed great interest in business development and/or licensing.  But Plaintiffs herein allege that once the Sony litigation was discovered, all communications were cut off as a result of Defendant Sony and Best Buy's influence.

37.   Defendant's acts are deliberate and willful and will continue unless enjoined by this court.

38.   As a result of Defendant's acts, Plaintiffs will be damaged in an amount in excess of the jurisdictional limit of this court. Due to the deliberate and willful nature of Defendant's acts, such damages should be increased to the maximum amount allowed by law including an award of attorney's fees.

V. Demand for Jury Trial

30. Plaintiffs hereby demand trial by a jury.

VI.  PRAYER

31. WHEREFORE, Plaintiffs, James L. Driessen and Marguerite A. Driessen, respectfully pray that this court enter judgment against Defendants as follows:

A. Finding that Defendant has infringed Plaintiff's U.S. Letters Patent

COUNT I, Patent No. 7003500 as to all Defendants;

COUNT II, Patent No. 7,636,695 as to all Defendants;

COUNT III, Patent No. 7,742,993 as to all Defendants; and

COUNT IV, Contributory or induced infringement of the asserted patents (as raised in COUNTS I through III) by Defendants Sony and Best Buy (through at least their acts of membership in and influence over a Standards Setting Organization SSO) to instruct, direct or advise the third party as to how to carry out a direct infringement or to sell or offer to sell a material component of a patented invention, with knowledge that such component has been especially made for use in the infringement of the above listed patents.

B. That Plaintiffs be awarded damages against Defendants as a result of the acts complained of herein;

C. That Defendant's acts be determined to be willful and as a result, damages be increased to the maximum amount allowed by law to include triple damages according to 35 U.S.C.A. § 284.

D. That Plaintiffs be awarded their attorneys fees and costs;

E. That Plaintiffs be awarded prejudgment and postjudgment interest;

F. That an injunction issue enjoining Defendants, its officers, agents, servants,

employees, attorneys, and all of the persons in active concert of participation with it

during the pendency of this action and permanently thereafter as follows:

    i.   From any and all acts in infringement of the '500, '695, and '993 patents;

    ii.  Requiring an accounting for profits received by Defendant as a result of the

       acts complained of herein;

    iii. Directing that all items infringing the '500, '695, and '993 patents,

       complete with their instructions, technical data sheets, and other written

       literature delivered to Plaintiff for destruction;

G. Declaratory relief regarding F/RAND rights, and injunctive relief that Defendants

   Sony and Best Buy must desist in their actions of inserting a managing director into a

   Standards Setting Organization (SSO) and thereby operating to reject Plaintiffs

   attempts to engage in F/RAND offerings or commitments with Defendants or other

   consortium members; and

H. For such other and further relief to which Plaintiffs show themselves to be justly

   entitled.

Respectfully submitted this _____ day of _____, 2010

By: _____   By: _____
    James L. Driessen, Plaintiff Pro Se      Marguerite A. Driessen, Plaintiff Pro Se

**Deleted:** 3500 patent

**Deleted:** 3500 patent

**Deleted:** and

**Deleted:** G.

**Formatted:** Indent: Before: 0", Hanging: 0.25", Tabs: 0.25", Left

**Deleted:** 2009

# EXHIBIT A

## USPTO Patent 7003500

### "'500 patent"

Deleted: 3

US007003500B1

(12) **United States Patent** (10) Patent No.: **US 7,003,500 B1**

Driessen (45) Date of Patent: **Feb. 21, 2006**

(54) **RETAIL POINT OF SALE (RPOS) APPARATUS FOR INTERNET MERCHANDISING**

(76) Inventor: **James Leonard Driessen**, 305 N 1130 E, Lindon, UT (US) 84042

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1068 days.

(21) Appl. No.: **09/630,272**

(22) Filed: **Aug. 1, 2000**

(51) Int. Cl.
*G06F 17/60* (2006.01)
*H04K 1/00* (2006.01)
*H04L 9/00* (2006.01)

(52) U.S. Cl. ...................................... **705/74**; 705/64

(58) Field of Classification Search ................ 705/26, 705/51, 58, 64, 70, 74; 380/201, 202
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,033,184 A | 7/1991 | Tandai et al. | 29/603.06 |
| 5,339,239 A | 8/1994 | Manabe et al. | 705/1 |
| 5,530,751 A * | 6/1996 | Morris | 380/202 |
| 5,568,550 A | 10/1996 | Ur | 382/306 |
| 5,629,770 A * | 5/1997 | Brassil et al. | 358/426.12 |
| 5,699,427 A | 12/1997 | Chow et al. | 705/58 |
| 5,745,569 A | 4/1998 | Moskowitz et al. | 705/98 |
| 5,777,305 A | 7/1998 | Smith et al. | 235/380 |
| 5,899,700 A * | 5/1999 | Williams et al. | 434/308 |
| 5,905,248 A | 5/1999 | Russell et al. | 235/462.15 |
| 5,920,878 A | 7/1999 | DeMont | 715/513 |
| 5,933,829 A * | 8/1999 | Durst et al. | 707/10 |
| 5,940,135 A | 8/1999 | Petrovic et al. | 348/493 |
| 5,943,423 A | 8/1999 | Muftic | 705/67 |
| 5,949,885 A | 9/1999 | Leighton | 380/54 |
| 5,953,415 A | 9/1999 | Nielsen | 705/58 |
| 6,002,772 A | 12/1999 | Saito | 705/58 |
| 6,005,643 A | 12/1999 | Morimoto et al. | 375/240.26 |
| 6,006,200 A | 12/1999 | Boies et al. | 705/26 |

| | | | |
|---|---|---|---|
| 6,018,720 A | 1/2000 | Fujimoto | 705/26 |
| 6,035,177 A | 3/2000 | Moses et al. | 725/22 |
| 6,175,823 B1 * | 1/2001 | Van Dusen | 705/26 |
| 6,434,535 B1 * | 8/2002 | Kupka et al. | 705/24 |
| 6,487,663 B1 * | 11/2002 | Jaisimha et al. | 713/193 |
| 6,615,247 B1 * | 9/2003 | Murphy | 709/217 |
| 6,708,157 B1 * | 3/2004 | Stefik et al. | 705/59 |
| 2001/0001854 A1 * | 5/2001 | Schena et al. | 705/27 |
| 2001/0032878 A1 * | 10/2001 | Tsiounis et al. | 235/379 |
| 2001/0037316 A1 * | 11/2001 | Shiloh | 705/74 |

(Continued)

FOREIGN PATENT DOCUMENTS

JP    11-66152 A  *  3/1999

OTHER PUBLICATIONS

Prosise, J., "How to Keep it a Secret," PC Magazine, vol. 13, No. 13, p. 315, Jul. 1994.*

(Continued)

*Primary Examiner*—Nicholas D. Rosen

(57) **ABSTRACT**

The present invention is an apparatus for the money transactions required in the selling of merchandise or media content on the Internet and uses at least one in-person contact with the buyer. A predefined transaction originating at a real place of business authorizes access to web content or merchandise from a place off the web. Purchasers (end-users) must physically go to a retail location to choose the Internet media or merchandise shopping cart they wish to acquire where age can be verified if necessary and payment can be made with or without a credit card. Content security using a non-audible or invisible code signal sequence(s) can provide traceability as well as absolute anonymity for the purchaser. This apparatus can be used to conduct transactions off the web so that business can be done on the web.

**15 Claims, 8 Drawing Sheets**



**US 7,003,500 B1**

Page 2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2002/0029241 | A1 * | 3/2002 | Yokono et al. | 709/202 |
| 2003/0093335 | A1 * | 5/2003 | Silverbrook et al. | 705/26 |
| 2003/0142035 | A1 * | 7/2003 | Immega et al. | 713/186 |
| 2003/0158790 | A1 * | 8/2003 | Kargman | 705/26 |
| 2003/0200179 | A1 * | 10/2003 | Kwan | 705/65 |
| 2004/0015404 | A1 * | 1/2004 | McCarthy | 705/26 |
| 2005/0192896 | A1 * | 9/2005 | Hutchison et al. | 705/40 |

### OTHER PUBLICATIONS

Remus, P.C. et al., "Digital Signatures: The Next Step in Electronic Commerce," New hampshire Business Review, vol. 19, No. 10, p. 15, May 1997.*

Gentry, C.R., "Chain Cultivates Farming Niche," Chain Store Age, vol. 76, No. 3, pp. 67-77, Mar. 2000.*

Anon., "Appearing Soon at a Store Near You: An A.T.M. for the Ears," New York Times, vol. CXLIX, No. 51,364, P. D7, Apr. 2, 2000.*

Anon, "Mala Powers: Hollywood Star Still Shines on Walk of Fame," Business Wire, Sep. 27, 1994.*

Dyson, P., "MiliCent: Digital Equipment's Scrip for Selling Content by the Slice," Seybold Report on Internet Publishing, vol. 2, No. 3, p. 37, Nov. 1997.*

Oser, K., "Wells Fargo Launches ATM Advertising," Direct, vol., 11, No. 5, p. 22, Apr. 1999.*

Buelva, A.J., "Philippines: Union Bank Launches 'Net Banking Initiative," Computerworld (Philippines), Dec. 15, 1999.*

Muhammad, T.K. "Pointing the Way to Cyber-Success," Black Enterprise, Nov. 1996 vol. 27 No. 4 pp 44-46.

Goldstein, A., "Computer City Opens Prototype, in Mesquite, Texas," Dallas Morning News, Nov. 22, 1997, pp 11-12, Regarding Internet.

Microsoft Press Computer Dictionary, 3rd Edition, Microsoft Press, 1997, See p. 82, Definitions. & CD Rom Burner & Recorder.

* cited by examiner

FIG. 1



FIG. 2



FIG. 3



*FIG. 4*



FIG. 5



1. LOG ONTO INTERNET TRHOUGH ISP OR LAN
2. DIRECT YOUR BROWSER TO
   http://www.anycontent.com/URL/media.mp3
3. Click on Cache Back/Cookie Free if desired

4. Scratch off and Enter your PIN access Code
5. Download your media

FIG. 6



Base Font          Font Aberrations

FIG. 7

 

Zoom of Selected Area                    Pixel Selection



Normal Pixel                          Example: After hidden pixilization



FIG. 8



| Courier 10 BT | Courier New |
|---|---|
| A | A |
| B | B |
| C | C |

US 7,003,500 B1

1

### RETAIL POINT OF SALE (RPOS) APPARATUS FOR INTERNET MERCHANDISING

#### RELATED APPLICATIONS

Priority is claimed to provisional patent application submitted on Jun. 30, 2000 under same inventor's name, entitled Access Card for Internet Content (ACARD), provisional application No. 60/215,673.

#### FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

Not Applicable

#### SEQUENCE LISTING, TABLE, OR COMPUTER PROGRAM ON CD

Not Applicable

#### BACKGROUND OF INVENTION

(1) Field of the Invention

This invention relates generally to purchasing systems via a public computer network system (Internet or World-Wide-Web). While the products sold on the Internet are often real and tangible, the market place exists in a virtual realm. To conduct the business of selling in the virtual realm of the Internet, a virtual transaction had to take place; or so it has been thought. This Invention requires non-virtual transactions that take place at a retail point of sale for a means of virtual merchandising.

(2) Related Prior Art

Retail industries can exist anywhere. The historical version of retail was the actual retail point of sale. A retailer established a store where customers could visit, look at merchandise and make purchases. The customer had to visit the store in order to purchase the products. Other forms of retailing have existed like local street vendors, door-to-door salesmen, shop-by-telephone, mail order catalogs, informercial shop-by telephone, and most recently, the Internet.

To understand the difference between this invention and prior art, one must first be able to understand the differences between retail point of sale and other methods of sale. There is always a time variable involved with merchandising transactions, but one should not make the mistake of assuming that time is the essential element that distinguishes between direct purchases and those on account. The basic formula for establishing a credit account is where the purchase price (P) of a product can be paid at a later time (T), an interest rate (R) can be assessed, and the amount paid $(A)=P(I+R)^T$.

A person may gain extra time to pay for a purchase by using credit, but it is the agreement between parties that one will extend credit to the other that creates a credit account. Time has no meaning in the direct purchase formula (A)=P. For that matter, there is always some lag between the time payment is tendered and possession takes place even if for just split seconds. Sometimes a lag between payment and possession requires a voucher so that the purchaser has some proof that payment has been made. The voucher is usually just a simple sales receipt. Other times it can be a ticket such as for attending a theater or other engagement. The voucher in this case does not represent an account or value of money. The voucher merely represents that the transaction has been

2

completed and the merchandise, whether physical merchandise or simply entertainment, has been authorized.

Retail points of sale transactions involve at least one in-person contact with the buyer. On the Internet, it has always been assumed that this transaction must be conducted virtually on the Internet; after all, the Internet is a virtual realm. With the huge rise in popularity the Internet, there are rising concerns from the public about who should and who should not be able to access certain Internet content such as but not limited to: materials with copyrights such as music, content that is adult in nature, or other restricted access material.

Regulatory authorities and web masters have made attempts to control access through the selling of access rights over the Internet itself. These services are often called subscription based I.D. or age verification services. User names and passwords or other means of secure access have been delivered to consumers after they entered credit card information. This has become an accepted means of control, particularly with Adult Verification systems.

Public Key infrastructure (PKI) is one method that has evolved into a secure and anonymous means of handling web transactions through the uses of encryption, trusted vendors, and trusted banking institutions. PKI methods of Web transactions involve digital signature and money transactions over the Internet. They require a customer, a bank, a merchant, a public archive such as an Internet web site, Certificate Authorization servers, and encryption and decryption of the data.

Most secure web transactions require cookies and Web delivered applets (such as JAVA). A cookie is information that a Web site puts on an end-users hard disk so that it can use the information at a later time.

Using the Web's Hypertext Transfer Protocol (HTTP), each request for a Web page is independent of all other requests. For this reason, the Web page server has no memory of what pages it has sent to a user previously or anything about previous visits. A cookie is a mechanism that allows the server to store its own information about a user on the user's own computer. For example, some browsers store cookies in a file subdirectory and others store cookies as a single text file. Some computers employ programs to ensure that cookies are not used and that the browser caching system will not keep a record of websites visited. A programming sequence flow diagram for a cookie free cache back mini-application may look something like this:

```
Secure On Routine
Make directory/temp/cachebak
Change directory/cachebak
Copy fat.db cachebak
Folder Copy Temporary Internet Files cachebak
Disable cookies in Internet Options settings
Disable JAVA
Secure Off Routine
Prompt user "download complete"
Compare fat.db to fat.db/cachebak
Compare Temporary Internet Files to Temporary Internet
    Files cachebak
Delete fat.db
Delete Temporary Internet Files
Copy cachebak fat.db to fat.db
Copy cachebak/Temporary Internet Files to Temporary
    Internet Files
Enable JAVA
END
```

Retail Point of Sale Apparatus (RPOS) For Internet Merchandising is a return to the simplistic approach of pre-

US 7,003,500 B1

**3**

Internet ways of doing business, but it is not an obvious approach. As malicious attackers of Internet communications become more common, the Internet security measures become increasingly sophisticated. The RPOS takes away some of the sophistication and uses much simpler yet effective technology in its place. The predefined transaction authorizes access to web content from a place off the web, originates at a real place of business, and is a concept that a trained Internet professional may not be able to grasp immediately; they have been conditioned towards more complicated means of accomplishing the tasks directly on the Internet.

RPOS would not negatively affect any electronic commerce as it currently operates. It would primarily be used in conjunction with current methods. A return to a retail establishment for conducting Web business may hold great promise for Internet security in the future. A search of past practices and inventions reveals a great deal of effort spent on avoiding over-the-counter transactions for Internet e-commerce rather than embracing it as does the RPOS technology.

There are three key questions to be asked when attempting to differentiate the technology:

   i. Do they take cash?

   ii. Is there an establishment that acts on behalf of the customer for payment that employs non-virtual (Retail point of sale) to complete the transaction?

   iii. Does the customer have to physically go to the establishment to buy it?

The field of Internet e-commerce has numerous existing patents. A complete search for prior history was not done prior to this filing but a few similar patents were found through a most basic search of the on-line USPTO patent databases. They are reference below to help set the stage for one skilled in the art of Internet commerce to understand the differences between RPOS and previous methods.

This invention is not a Prepaid Internet Access Card, such as used to supply the purchaser of minutes on an Internet Service Providers (ISP) system, see examples U.S. Pat. Nos. 5,749,975; 5,987,612; 5,749,075, 5,987,430.

This invention is not merely a method for recording information on a card, computer disk, or other means of recording, see example U.S. Pat. No. 6,076,733. The method of recording might be bar code, magnetic tape, smart card, written inscription, or any means of recording information. This invention is not used to locate a specific URL, but is used to divine the predetermined transaction that provided access to a particular URL location.

This invention is not an organizational Internet access security system whereby business organizations control access to web content of their own employees or to others on a closed network or to generate personalized content pages for specific business purposes, see U.S. Pat. No. 6,076,166.

This invention is not an Internet cash token system used as an anonymous means to get money to spend on the Internet. See examples U.S. Pat. No. 6,076,078; 6,072,870; 6,061,660; 6,042,149.

This invention is not electronic-voucher system, which places a third party URL as the guarantor of funds. See example U.S. Pat. No. 6,058,381.

This invention is not a mobile Internet media content delivery device in which the device itself carries the content. See examples U.S. Pat. No. 6,018,720.

This invention is not a means to preview merchandise and set up an account to purchase—as in U.S. Pat. No. 5,918, 213, where the merchandise merely previewed at the point of sale, but then the transaction is conducted as an off the

**4**

shelf purchase, through typical Internet methods, or phone-in-sale automated means. The retail point of sale apparatus for Internet Merchandising is a new means for conducting the actual transaction that could be added to such a system.

This invention is not a device for delivering media content through on-line programmable smart card authorization such as used in satellite television programming, or Web TV devices, where a home user of the system can call in on the telephone to order Pay-per-view programming. In these systems the smart card both receives and supplies data to the system over a private network. RPOS does not require programming after the initial over-the-counter transaction.

Although the user of the RPOS may be known, it can also be used completely anonymously.

This invention is much like an event ticket to a movie theater or music concert except that the RPOS is specifically used for access (entrance) to Internet merchandising.

While RPOS can facilitate Secure Web Transactions, it is not a method of the transaction, merely an apparatus of divining the existence of a predetermined web transaction. It does not require a trusted vendor, trusted bank, or buyer authentication. While RPOS may facilitate some of the same types of functions mentioned above, it uses a completely new method.

BRIEF DESCRIPTION OF THE INVENTION

This invention is essentially retail point of sale for the Internet. In order to best set the stage for a reader of this patent application to best understand the background of this invention and distinguish it from prior art, several descriptive names of the invention are listed below. This is not intended to be an exhaustive list but merely illustrates some of the ways such an invention can be used. After this list, for the remainder of this document, the Invention will be referred to as the RPOS. Although it involves a voucher system, the voucher need not exist in all circumstances. RPOS can use a disk, paper ticket, memory stick, or any other means of supplying an access key and utility program.

  Descriptive Names

   1. Internet Content Voucher System

   2. Cookie Free Cache Back System Card

   3. Prepaid Card for Internet Content Media

   4. Web Content Ticket

   5. Over-the-counter Internet Sale

   6. Simple Anonymity for Internet Content Delivery

   7. Face-to-Face Verification System for Divining of Anticipated Internet Transaction

   8. Non-Virtual Point of Sale for the Internet

   9. Retail Point of Sale Card for Internet Content

   10. Internet Authentication Card

   11. Internet Adult Verification Card

   12. Internet Allocation Card

The RPOS is an "actual point of sale" device for Internet content. Previous waves of invention attempting to satisfy the needs of secure web content on the Internet have delivered many "virtual point of sale" techniques and emphasis has been on the transaction itself and how to exchange money over the Internet.

When considering prior art, the RPOS invention differs most noticeably from previous methods in the way it does not follow the trend to do everything on the Internet and uses "actual point of sale" as the place where a predefined Internet sales transaction takes place. The information provided by web delivered cookies or applets is not required by RPOS because the information is already included; it is hand delivered to the computer by the user.

US 7,003,500 B1

| 5 | 6 |

### DESCRIPTION OF INVENTION

A security access key is provided in the form of prepaid card sold as a retail item. The access key has a one time or multiple Internet session use as provided by the seller of the card. Through obtaining the CARD, the purchaser gains access to the website or specific web page(s) intended by the seller for either a defined duration of time or an indefinite duration of time. Any time the end-user (customer) of the CARD is on the Internet, a very simple utility program may be deployed to ensure that there are no changes to the cache content of the customer's computer and no cookies are accepted or transmitted during the delivery of the media content. The utility of the invention is that it provides a method of controlling web access that requires at least one transaction be completed in person. No connection to a banking system for credit referencing is required, no vast system of computer networks is needed to verify anonymity and account status. The actual transaction takes place over-the-counter. The delivery takes place on a computer of the users choice.

The CARD is a voucher system that is used only to authenticate that the user of the card is in fact the one in possession of it. The user of the CARD uses the card to access the content or merchandise from the computer of their choice. As the time required for the user holding the card to receive the desired content is decreased, the need for the CARD itself may become unnecessary. The content itself may be recorded to disk compact disk, cassette, VHS tape, or other recording media: the media may be recorded at the point of sale location.

The content that is recorded may be Internet content media or the content may be the purchase agreement for merchandise. When the content is a purchase agreement for merchandise, the payment can be made for the merchandise by the RPOS. The RPOS assumes responsibility for payment to the Internet vendor and the purchaser specifies the shipping address of such merchandise.

Unlike any previous method of payment for Internet commerce in the past, there is no account, credit, or other means of electronic payment required for the buyer in the transaction. The proof is within the content itself. The content becomes the verification of a sale. Internet merchandisers may provide a verification page for each sale, which they intend to be printed by the user. These types of verification pages are excellent examples of specific URL information that can be determined ahead of time and sold whether it is for merchandise or content media.

When the purchase is for non-prepackaged merchandise such as Content media, the media may be individually licensed with a unique serial number for protection against counterfeiting. Content fingerprinting is one of the methods used. Traditional digital signature may also be used.

#### Content Fingerprinting

Content fingerprinting could be used for printing secure documents, discouraging unauthorized use, sending secret encoded messages, authentication of modification of documents, counterfeit detection, or other application requiring secure distribution of Internet materials. Content fingerprinting differs from digital signature or digital watermark in that the fingerprinting is not on the file itself but on the content of the file.

In the Industry of Internet publishing, one of the problems has been unauthorized copying, posting or otherwise revealing of sensitive materials for wide distribution. Millions of dollars in uncollected royalties are lost each year. Publishers have no way of detecting the responsible parties who willfully post the materials or otherwise "leak" the materials for wide distribution. The answer to the problem is a mechanism or way to "mark" individual copies of recorded material for licensing so the publishers can feel confident that appropriate royalties are being paid. The "mark" should be something not easily detected or removed.

This document suggests just some basic methods of fingerprinting Internet content: Font fingerprinting, hidden pixelization, concealed ASCII and non-visible/inaudible codification.

#### Font Fingerprinting

Bar codes are typically comprised of black and white stripes, yet all that a bar code really represents is a binary code. For Font Fingerprinting of Internet content, hidden binary codes are placed into documents so that a specific record of the content travels with the document. It is much different from digital signature for example where the file itself is tagged and encrypted and can't be read unless the proper keys are used to decrypt the message. For fingerprint marking of the document, the mark stays with the document even after it is properly received and possibly changed.

A base font is modified only slightly so as to not be immediately noticeable to the human eye, yet enough for machine recognition. The base font becomes the "0" of the binary and the modified font is the "1". Any text string can be modified to imprint a binary coded binary (BCB). The decoding is later accomplished using a scanner with a character recognition system capable of distinguishing the font differences.

Font fingerprinting is particularly designed to be most readily used for printed media, but the fingerprinting could also follow a soft copied document provided the file format remains Rich Text Format (.RTF) or better, giving access to the font aberrations. The font set used for printing the "fingerprinted" document must also be available to the computer that receives the document. Future developments could include a highly compressed file format capable of self-decompression that would mask the fact that the Distributed font set is traveling with the document.

Another method of sending a font generated BCB with a softcopy document, not requiring a font subset file, mixes two available fonts that are a close match such as Courier New with 11 point font and Courier 10 BT with a 10 point font. While this combination is readily visible to the naked eye, the text is not noticeably different unless you know what you're looking for. It was just an attempt at finding a good match, but there may be other good system fonts that are a close enough match.

#### Hidden Pixelization

The format of choice for delivery of images over the Internet has been the jpeg, formally the ISO standard 10918, which keeps the file size for delivery fairly small. All digital images of this type are made up of tiny pixels. For hidden pixelization, a jpeg image is converted to a similar image of a higher resolution (more pixels). In other words any single pixel in the original image is recreated as multiple pixels all of the same color. For example a 320×240=76,800-pixel image becomes a 640x480=307,200 pixel image, or roughly four pixels per one pixel of the original image.

Several of the pixels from these new higher resolution images can then be encoded with a BCB by varying the shades within the 4 pixels only slightly—leaving the neutral color of the original larger pixel essentially unchanged. Any documents delivered over the Internet that contain these images are thereby permanently marked.

US 7,003,500 B1

**7**

This re-pixelization creates four available binary codes in the original pixel. The original color is the "0" code and the slightly changed shade is the "1" of the binary. One of the keys to making this system less detectable is to disguise the encoding by causing the encoded jpeg file to still report to the user that it is still a 320×240 image when in fact it has been changed to a 640x480 image and then report back to the viewing system the proper resolution. If the user resaves the image into a different format such as GIF, the code may or may not be transferred, but as long as images in documents are untouched, the document remains fingerprinted.

Concealed ASCII

ASCII stands for American Standard Code for Information Interchange. ASCII was developed a long time ago and the characters are not always used in the same way on different computer systems. ASCII was originally designed for teletypes and the first 31 characters in today's applications are no longer used as originally intended. Concealed ASCII finger printing takes advantage of the fact that several of them act the same as the ASCII character "032" in many applications. ASCII 32 is the code for a blank space.

ASCII characters 0, 10, and 13 do not display anything on most applications. Character 9 will move to a tab, making a long blank space. 16–25 and 27–31 produce a black area on the screen in some applications and a blank area in others. So do 1–9, 11, 12, 14, and 15 on some applications; however, they often cause error messages in the compiler for many applications.

Concealed ASCII can create a BCB by using the standard ASCII 32 in spaces as the "0" character of the binary and an alternate ASCII 0, 10, or 13 with ASCII 32 as the "1" character of the binary. Example: The quick gray fox jumps over the lazy brown rabbit.

There are nine spaces to use for the BCB in the preceding phrase. The code in the example above could read 010000111. The code for the 2nd, 7th, 8th, and 9th spaces in the phrase could be ASCII 10 followed by ASCII 32. The remaining spaces could simply use ASCII 32. While the concealed ASCII fingerprinting is not printable, it can be used to travel with text of a printable document.

Concealed ASCII can easily be lost when transmitted as plain text over the Internet and other systmes, but many documents are transmitted over the Internet in specific file formats that would maintain specific ASCII sequences not visible to the reader without looking to the particular codes that generated the text.

Non-visible or Inaudible Codification

Analog signals of non-discernable frequencies for human ears or eyes are individually dubbed into audio recordings, which can later identify the origin of the recording. The sights or sounds are created using a frequency, signal generator, or other means of creating analog signals. The analog signals, which cannot be heard by humans on the recording, can be used for distribution of copyright materials such as mp3 music or dubbed into the soundtrack of a video that is distributed on the World-Wide-Web (Internet).

Identical songs or videos by the same artist can become individual versions that are licensed to individuals. Using sensitive digital software and computer sound editing tools available from a number of manufacturers the sights and sounds outside the range of human discernment can later be detected to verify if the recording is in fact licensed and who is the owner of the license. The analog signals essentially encode any individual identification to a song, video, or other media that contains audio or video tracks.

**8**

The human sound range is between 20 and 20,000 hertz for a young person and much less for an old person. The human visual range for light lies within a range around 10$^9$ MHz. Visual analog signals can also be dubbed into digital video recordings. The key to non-visible or Inaudible Codification is merely that that signals are dubbed into the content and not just on the file itself.

Content Fingerprinting Usefulness

Fingerprinting documents is a useful and new idea. The usefulness of the specific methods shown here is greatly diminished when patented and the PTO discloses to the public. The actual methods of fingerprinting really should be kept as "Trade Secrets". The above methods are not fool proof or even sophisticated enough to hold up against even the least sophisticated of hackers. They are merely offered here as examples of how to individually license Internet materials. As industry looks to the Internet for delivery of every kind of copyrighted material, there will be other specific methods of fingerprinting. Fingerprinting Internet delivered media may involve documents, images, videos, sound tracks, or any other type of media that can be produced for the Internet.

Content fingerprinting is not just for watermarking content, it is capable of providing a level of security for transfer of ownership for prepaid media content over a public computer network (Internet). For example, Public Key Infrastructure (PKI) for secure and anonymous means of handling web transactions can be enhanced by variations of hidden content digital signature fingerprinting using visible or audible codes on a first mark on the content that is a first key of a first public/private key pair to indicate that said merchandise is authentic and a second label that is noticeable only by a machine as a second private key of a private/public key pair used to authenticate the delivery of merchandise.

DETAILED DESCRIPTION OF INVENTION

The following drawings provide examples of different applications and construct specifications for the RPOS technology. They are not meant to be inclusive of all uses, they are merely examples.

FIG. 1 uses a flow chart to illustrate a use of the RPOS. The process begins with web content dealers who have content posted to a public computer network (Internet) and have chosen to use RPOS for distribution. The web content dealers may manufacture the card themselves or use a third party. The type of security system used for placing the access key on the card is only important as to the particular level of security that is desired. The web content dealer then distributes the CARD, directly or through distribution channels, to a retail establishment. The retail establishment sells the CARD over the counter to the customer. The dealer, distributor, and retail establishment may use whatever profit margins or price mark-ups as they choose or is agreed upon. The CARD is delivered to the customer like any other retail product. Continuing along the flow chart in FIG. 1 to the customer, the CARD is used to access only the web content that is predefined by the CARD. The purpose of the CARD in this transaction is only to ensure that the user is in possession of it. The transaction takes place through an over-the-counter sale.

FIG. 2 uses a flow chart to illustrate an alternate use of the RPOS The process again begins with Web Content Dealers. In this application the Web Content Dealers may or may not subscribe to the RPOS system (i.e. make their own CARDs).

US 7,003,500 B1

| 9 | 10 |

To facilitate the creation of a CARD for the WEB Content Dealers, a retail establishment supplies a computer or terminal as a customer access point, which provides Internet access, and issues a CARD to a customer upon entering the retail establishment. The customer browses the web and looks for content to purchase. Whenever a Web Content Dealer requires some sort of payment and the customer agrees, the customer authorizes payment from the retail establishment and by default the retail establishment agrees to the purchase. The customer is not required to enter his or her own name, credit card payment information, address, or any other information that they do not choose. Upon leaving the establishment, the customer pays the retail establishment the amount required for content received or to be received. The purpose of the CARD in this transaction is only to ensure that the user is in possession of it. The actual transaction takes place through an over-the-counter sale.

The system described in FIG. 2 illustrates a subtle yet important difference from prior art used in Internet commerce, in that Internet access is only required for the customer to choose which media content to purchase and to later retrieve on whatever computer the customer chooses. Internet access is not required during the recording of specific media content locations (URLs); they can be simply written down, picked out from a written menu after having seen the web dealers preview pages, or retrieved as a menu item from the local computer at the check out. Internet access is also not required during the recording of the specific access information, or during the retail transaction. While Internet Access during these processes may be used to facilitate the RPOS processes, it is not required. While the CARD holds some intrinsic value it does not hold any dollar amount information, account information, or other means of payment; the transaction is completed in person at the checkout.

FIG. 3 uses a flow chart to illustrate an alternate use of the RPOS. The process again begins with Web Content Dealers. A Vending Machine Dealer purchases CARDs through normal product distribution channels. Customer purchases the CARD from the vending machine acquiring the ability to access the desired web content. This type of system is not capable of age verification as with over-thecounter sales. Again, the purpose of the CARD in this transaction is only to ensure that the user is in possession of it. The actual transaction takes place through a vending machine.

FIG. 4 illustrates how CARD is used as an age verification system (Adult Check). The process begins with dealers of adult materials on the Internet. A retail establishment (such as video rental store, convenience store, bookstore, adult merchandiser, or other type of store) obtains CARDs through typical distribution channels. Customers purchase the CARD over the counter provided they can prove they are of legal age to do so. Customer physically transports the CARD to a location where customer has access to a computer that is capable of receiving Web content. The customer uses the CARD to obtain access to those specific materials the seller of the CARD intended.

FIG. 5 shows some examples of recording devices that are used or could be modified for use as the media delivery method, access CARD, or to deliver a small cookie-free-cache-back application. Some of these examples have also been patented previously. All that is required for use with the CARD is the ability to deliver Personal Identification Number (PIN) information or other form of security used for access. For optional added anonymity, the CARD may also deliver a small amount of software code to run the mini-Application for Cookie Free Cache Back system. Reference 1 shows an example of a Low-level security access key. Reference 2 shows an example of how a mini-application (applet) can be delivered on floppy prior to accessing content. Reference 3 shows a better security system using a scratch off access key. Reference 4 shows a smart card which could be used to deliver both an access key and mini-application applet. In all of these examples the CARD is not used as money, credit, or cash.

FIG. 6 is an example of Font Fingerprinting where a font subset file must be delivered to the user.

FIG. 7 is an example of Hidden Pixelization for Content Fingerprinting. The hidden pixelization binary fingerprinting or encoded message can be divined using a scanning device capable of detecting the differences.

FIG. 8 illustrates the similarities between the New Courier font and the Courier 10BT font.

What is claimed is:

1. A payment system for itemized Internet merchandise or itemized downloadable media material objects, comprising:
   a retail point of sale establishment;
   a customer access point at said retail point of sale establishment;
   URL information that is an Internet transaction location of said itemized Internet merchandise or itemized downloadable media material objects;
   means for accepting payment through an in person transaction with a customer wherein said payment is designated for purchase of said itemized Internet merchandise or itemized downloadable media material objects;
   means for storing and retrieving a record on or in a physical medium corresponding to said URL information that is an Internet transaction location of said itemized Internet merchandise or itemized downloadable media material objects;
   means for transfer of said physical medium from said retail point of sale establishment to said customer; and
   means for Internet transaction authorization on, in, or actuated from said physical medium wherein ownership rights in said itemized Internet merchandise or itemized downloadable media material objects are preselected and transferred to said customer through said transfer of said physical medium.

2. The payment system of claim 1, wherein the retail point of sale establishment further comprises:
   a retail store, convenience store, vending machine, parking lot, hallway, lobby, or other physical place to conduct business.

3. The payment system of claim 1, wherein said customer access point at retail point of sale establishment, further comprises:
   a checkout, kiosk, cashier's station, cash register, self-check out, self-service, or other means of customer interaction with said retail point of sale establishment.

4. The payment system of claim 1, wherein said means for storing and retrieving a record further comprises:
   writing, inscribing, programming, or otherwise placing access information on a card, computer diskette, or other physical means of recordation without requiring access to a public computer network (Internet) during the recording process whether or not access is actually made.

5. The payment system of claim 1, wherein said means for Internet transaction authorization further comprises means to embed a public/private cryptographic key pair corresponding to said Internet transaction authorization on or in said itemized Internet merchandise or itemized downloadable media material objects comprising:

11

means for embedding a first coded license, serial, or other identifying mark through content fingerprinting on or in said itemized Internet merchandise or itemized downloadable media material objects that uses a code visible, audible, or otherwise noticeable only by machine on a first mark that is a private key of said public/private key pair; and

means for embedding a second coded license, serial, or other identifying mark through content fingerprinting on or in said itemized Internet merchandise or itemized downloadable media material objects that uses a code visible, audible, or otherwise noticeable by human or machine on a second mark that is a public key of said public/private key pair.

**6.** The payment system of claim **1**, wherein said means for Internet transaction authorization on, in, or actuated from said physical medium wherein ownership rights in said itemized Internet merchandise or itemized downloadable media material objects is transferred, further comprises:

user access terminal on a computer network;

means for retrieval of said itemized Internet merchandise or itemized downloadable media material objects by said user access terminal wherein retrieval is carried out without transmission of or use of cookies on said user access terminal or electronic disclosure, presently or previously, of user information other than IP address of said user access terminal.

**7.** The payment system of claim **1** wherein said payment further comprises a price wherein said price is at least zero comprising a free sample or any positive amount of payment from said customer to said retail point of sale establishment.

**8.** Anonymous Internet transaction authorization system or other secure purchase to facilitate the transfer of ownership rights in itemized Internet merchandise or itemized downloadable media material objects, comprising:

itemized Internet merchandise or itemized downloadable media material objects offered by a seller or other distributor on the Internet through an Internet connection;

user access terminal means connected to the Internet, said user access terminal having an IP address; and

means for payment or otherwise completing an Internet sale of said Internet merchandise or media from said seller or other distributor to the user of said user access terminal with no presently or previously required disclosures of user information from said user or said user access terminal other than said IP address.

**9.** The anonymous Internet transaction authorization system or other security to facilitate the transfer of ownership or rights in Internet merchandise or media of claim **8**, wherein means for payment further comprises:

payment without transmission, reception, or use of cookies on said user access terminal; or without disclosure of user information from or to said seller or distributor other than said IP address; or without disclosure of user information from or to any third party or third party terminal other than said IP address; or without transfer of funds or promise for payment of funds presently from or to said seller or distributor; or without transfer of funds or promise for payment of funds presently from or to any third party or third party terminal.

**10.** A method of merchandise transfer on a computer network comprising at least one buyer computer on a network for operation by a user desiring to buy at least one product and at least one selling computer on said network operating for a purpose to sell said product, the method comprising the steps of:

creating specific information that is a transaction location of said product, said product comprising networked

12

merchandise or downloadable media material objects represented on said selling computer;

specifying a price wherein said price is specific to said product on said selling computer;

receiving payment of said price through an in person transaction with said user at a retail point of sale location wherein said payment amount is associated to said product;

sending a payment message as a response to said in person transaction either directly or through other computers on said network to said selling computer on said network;

causing an authorization message to be created on said selling computer in or as a result of said payment message that comprises at least said specification of said product and authorization based on cryptographic key(s), said selling computer being programmed to receive said authorization message for verification of said authentication;

causing selling computer, as a result of said selling computer being programmed, to ensure that said authorization message was created using said cryptographic key(s); and

causing transfer of ownership rights in said product to said user desiring to buy said product by granting access or rights to said user on said buyer computer either directly or through other computers on said network, as a result of said authorization message on said selling computer.

**11.** The method of merchandise transfer on a computer network in claim **10**, wherein said authentication further comprises a method of self authenticating merchandise wherein said method of self authenticating merchandise comprises:

recording a representation of said access message authenticator or or in said product, said representation comprising

a first coded license, serial number, or other identifying mark comprising a public key on or in said product that uses a code visible, audible, or otherwise noticeable by human or machine on a first mark that is a public key of said public/private key pair; and

a second coded license, serial number, or other identifying mark through content fingerprinting on or in said product comprising a private key that uses a code visible, audible, or otherwise noticeable only by machine on a second mark that is a private key of said public/private key pair.

**12.** The method of merchandise transfer on a computer network in claim **10**, wherein said specific information that is a transaction location of said product further comprises a Uniform Resource Locator (URL).

**13.** The method of merchandise transfer on a computer network in claim **10**, wherein said specifying a price wherein said price is specific to said product on said selling computer, further comprises a price set to at least zero, comprising a price of free or any positive amount.

**14.** The method of merchandise transfer on a computer network in claim **10**, wherein said in person transaction at a retail point of sale location further comprises selling a prepaid card wherein said prepaid card is also specific to said product.

**15.** The method of merchandise transfer on a computer network in claim **10**, wherein said retail point of sale location further comprises a retail store, convenience store, vending machine, parking lot, hallway, lobby, or other physical place to conduct business.

* * * * *

**EXHIBIT B**

**"Sony BMG's Platinum Music Pass"**

**Sample of Marketing Materials**





# EXHIBIT C

# Claims, '695 and '993 Patents

Formatted: Centered

**United States Patent**                                          **7,636,695**

**Driessen**                                            **December 22, 2009**

*Claims*

---

The invention claimed is:

1. A method of virtual Internet based merchandise or media exchange for payment, comprising: creating specific information that is a transaction location of a product, said product comprising line itemized networked merchandise or line itemized download-to-own media material objects on a selling computer on a network; creating specific information that is a transaction location of said product on a selling computer operating for a purpose to sell said product; specifying a price wherein said price is specific to said product; providing customer access to a retail point of sail location; accepting payment of said price through an in-person transaction at said retail point of sale location wherein said payment is designated for said product through said in-person transaction; associating said payment to a purchase of said product for said price; establishing an electronic communication between at least one user owned device on a network, wherein said user owned device is operated by a user desiring to buy at least one said product, and said selling computer on said network; sending a payment message as a response to said in person transaction either directly or through other computers on said network to said selling computer on said network; causing an authorization message to be created on said selling computer in or as a result of said payment message; and causing transfer of ownership rights in said product to said user desiring to buy said product by granting access or rights to said user on said user-owned device either directly or through other computers on said network, as a result of said authorization message on said selling computer.

2. The method of virtual Internet based merchandise or media exchange for payment in claim 1, wherein said retail point of sale establishment further comprises: a retail store, convenience store, vending machine, parking lot, lobby, self-service, hallway, gymnasium, concert hall, street vendor, or other physical place to conduct business.

3. The method of virtual Internet based merchandise or media exchange for payment in claim 1, wherein said providing customer access to a retail point of sale location, further comprises: providing customer access to a checkout, kiosk, cashier, cash register, self-check out, self-service, traveling sales person, or any other means of in-person contact with said customer by said retail point of sale establishment directly or through representative.

4. The method of virtual Internet based merchandise or media exchange for payment in claim 1, wherein said specific information that is a transaction location of said product, further comprises a Uniform Resource Locator (URL).

5. The method of virtual Internet based merchandise or media exchange for payment of claim 1,

wherein said authorization message comprises at least said specification of said product and authentication based on cryptographic key(s), said selling computer being programmed to receive said payment message for verification of said authorization message; and causing said selling computer, as a result of said selling computer being programmed, to ensure that said authorization message was created using said cryptographic key(s).

6. A method of vending a voucher to a purchaser, the method comprising: providing customer access to a customer at a retail point of sail location; creating a voucher containing specific information on, in, or actuated from said voucher where said information is a transaction location of a product, said product comprising line itemized networked merchandise or line itemized download-to-own media material objects on a selling computer on a network; specifying a price wherein said price is specific to said product; accepting payment of said price for said voucher through an in-person transaction at said retail point of sale location wherein said payment is at least zero; vending said voucher at said retail point of sale to said customer, wherein vending the voucher to the customer transfers ownership of said product comprising line itemized networked merchandise or line itemized download-to-own media material objects to said customer wherein said transferred ownership is only redeemable on a network; associating said payment to a purchase of said product for said price; establishing an electronic communication between at least one user owned device on a network, wherein said user owned device is operated by a user desiring to buy at least one said product, and said selling computer on said network; sending a payment message as a response to said in person transaction either directly or through other computers on said network to said selling computer on said network; causing an authorization message to be created on said selling computer in or as a result of said payment message; and redeeming said transferred ownership through an end-user device.

7. The method according to claim 6, wherein the network comprises the world wide web.

8. The method according to claim 6, wherein the network comprises a telephonic network.

9. The method according to claim 6, wherein the network comprises items selected from the group consisting of satellites, cable television, and digital wireless.

10. The method according to claim 6, wherein the voucher comprises a physical object.

11. The method according to claim 10, wherein the physical object is selected from the group consisting of a card, ticket, disk, or receipt.

12. The method according to claim 11, wherein a network location of the line itemized network merchandise or line itemized download-to-own media material objects is recorded on or in the physical object.

13. The method according to claim 6, wherein the voucher comprises an access key.

14. The method according to claim 13, wherein the access key comprises a physical object.

15. The method according to claim 14, wherein the physical object is selected from the group consisting of a card, ticket, disk, or receipt.

16. The method according to claim 6, wherein the vending a voucher at retail point of sale comprises a face to face interaction between two or more persons.

17. The method according to claim 6, wherein the retail point of sale comprises a checkout, kiosk, cashier's station, cash register, self-check out, self-service, or other means of customer interaction within an establishment.

18. The method according to claim 17, wherein the establishment comprises a retail store, convenience store, vending machine, parking lot, hallway, lobby, or other physical place to conduct business.

19. The method according to claim 6, wherein the retail point of sale comprises a means for accepting a payment through an in-person transaction with a customer wherein said payment is designated for the purchase of the line itemized network merchandise or line itemized downloadable media material objects.

20. The method according to claim 6, wherein the retail point of sale comprises a means for accepting a payment through an in-person transaction with a customer wherein said payment is designated for the purchase of a license for the itemized network merchandise.

21. The method according to claim 6, wherein the retail point of sale comprises a means for accepting a payment through an in-person transaction with a customer wherein said payment is designated for the purchase of the voucher.

22. The method according to claim 6, wherein the itemized network merchandise comprises a physical object.

23. The method according to claim 6, wherein the voucher is only redeemable at a network location separate from the retail point of sale.

24. The method according to claim 6, wherein redemption of the voucher allows the purchaser to record the itemized network merchandise.

25. The method according to claim 24, wherein recording the itemized network merchandise comprises recording the itemized network merchandise to a memory device, disk, compact disk, cassette, VHS tape, or other recording media.

26. The method according to claim 6, wherein the vending comprises receiving a payment for the voucher wherein the payment is at least zero.

27. The method according to claim 6, wherein the voucher is a free sample.

**United States Patent**                                        **7,742,993**

**Driessen ,   et al.**                                        **June 22, 2010**

The invention claimed is:

1. A method of virtual Internet based merchandise or media exchange for payment, comprising: creating specific information that is a computerized network transaction location of a product, said product comprising line itemized networked merchandise or line itemized downloadable media material objects on a selling computer on a network wherein a barcode or other identifier information of said product is scanned or stored as memory; transmitting said memory to a point of sale terminal; calculating or otherwise determining a price based on said transmitting that is specific to said product wherein payment of said price is through an in-person transaction at said retail point of sale location and said payment is designated for said product through said in-person transaction; and sending a message of said payment over said network causing transfer of ownership rights in said product to a buyer computer on said network through authorization on said selling computer on said network as a result of said payment.

2. A payment system for Internet merchandise or media, comprising: a retail point of sale establishment; a customer access point at said all point of sale establishment; URL information that is an Internet transaction location of said merchandise or media on a selling computer on a network; means for accepting payment through an in person transaction with a customer; means for storing and retrieving a record on or in one or more physical media corresponding to said Internet transaction location or to said merchandise or media; means for transfer of said one or more physical media from said retail point of sale establishment to said customer; means for Internet transaction authorization or other Internet transaction security on, in, or actuated from said physical media to facilitate transfer of ownership or rights in said Internet merchandise or media to said customer; and means to activate said authorization at point of sale, wherein said means to activate comprises: a physical medium with a first identification number that identifies said product and associates said product with said URL information that is an Internet transaction location of said merchandise or media and a second identification number that identifies said physical medium solely; means for reading of said first identification number to complete an activation or deactivation of said physical medium; means for reading said second identification number to transfer ownership of a product from a physical retail point of sale location to a consumer; and means for causing said selling computer on said network as a result of activation of said physical medium to authorize means for reading of said second identification number to transfer ownership.

3. A transaction authorization method for virtual network based merchandise or media over a public or private network comprising: placing specific information on a plurality of distribution nodes on a distribution network that comprises a specific product offered through said distribution network, said product comprising line itemized networked merchandise or line itemized downloadable media material objects on said distribution network; specifying a price wherein said price is specific to said product wherein payment of said price is through an in-

person transaction at a retail point of sale location wherein said payment is designated for said product through said in-person transaction; and sending a message of said payment over said network causing transfer of ownership rights in said product to an end-user device on said network through authorization said network as a result of said associating of said payment.

4. The transaction authorization method in claim 3 wherein said price further comprises: setting said price to at least zero, comprising a price of free or any positive amount.

5. A method of vending a voucher to a purchaser, the method comprising: providing customer access to a customer at a retail point of sale location; creating a voucher containing specific information on, in, or actuated from said voucher where said information is a specification of a product, said product comprising line itemized networked merchandise or line itemized downloadable media material objects on a selling computer on a network; accepting payment for said voucher through an in-person transaction at said retail point of sale location wherein said payment is at least zero; sending a payment message as a response to said in-person transaction either directly or through other computers on said network to said selling computer on said network; causing an authorization message to be created on said selling computer in or as a result of said payment message; and vending said voucher at said retail point of sale to said customer; wherein vending the voucher to said customer transfers ownership of said product comprising line itemized network merchandise or line itemized downloadable media material objects to said customer.

6. A method of virtual Internet based merchandise or media exchange for payment, comprising: providing customer access to a customer at a retail point of sale location; specifying a product, said product comprising line itemized networked merchandise or line itemized downloadable media material objects on a selling computer on a network; accepting payment for said product through an in-person transaction at said retail point of sale location wherein said payment is at least zero; sending a payment message as a response to said in-person transaction either directly or through other computers on said network to said selling computer on said network; causing an authorization message to be created on said selling computer in or as a result of said payment message; and transferring ownership of said product to said customer wherein said product can be engaged by a customer device on said network.

7. The method according to claim 6, wherein the network comprises the world wide web.

8. The method according to claim 6, wherein the network comprises a telephonic network.

9. The method according to claim 6, wherein the network comprises items selected from the group consisting of satellites, cable television, and digital wireless.

10. The method according to claim 6, wherein the authorization comprises an access key.

11. The method according to claim 10, wherein the access key comprises a code.

12. The method according to claim 6, wherein the in-person transaction at said retail point of sale comprises a face to face interaction between two or more persons.

13. The method according to claim 6, wherein the retail point of sale comprises a checkout, kiosk, cashier's station, cash register, self-check out, self-service, or other means of customer interaction within an establishment.

14. The method according to claim 13, wherein the establishment comprises a retail store, convenience store, vending machine, parking lot, hallway, lobby, or other physical place to conduct business.

15. The method according to claim 6, wherein the retail point of sale comprises a means for accepting a payment through an in-person transaction with a customer wherein said payment is designated for the purchase of the line itemized network merchandise or line itemized downloadable media material objects.

16. The method according to claim 6, wherein the retail point of sale comprises a means for accepting a payment through an in-person transaction with a customer wherein said payment is designated for the purchase of a license for the itemized network merchandise.

17. The method according to claim 6, wherein the retail point of sale comprises a means for accepting a payment through an in-person transaction with a customer wherein said payment is designated for the purchase of a voucher.

18. The method according to claim 6, wherein the itemized network merchandise comprises a physical object.

19. The method according to claim 6, wherein said engaged by a customer device on said network is at a network location separate from the retail point of sale.

20. The method according to claim 6, wherein said selling computer on said network is at a network location separate from the retail point of sale.

21. The method according to claim 6, wherein retrieving said product allows said customer to record the itemized network merchandise.

22. The method according to claim 21, wherein recording the itemized network merchandise comprises recording the itemized network merchandise to a memory device, disk, compact disk, cassette, VHS tape, or other recording media.

23. The method according to claim 6, wherein the product is a free sample.

24. A method of virtual Internet based merchandise or media exchange for payment, comprising: specifying a product, said product comprising line itemized networked merchandise or line itemized downloadable media material objects on a selling computer on a network wherein payment for said product is through an in-person transaction at a retail point of sale location wherein said payment is at least zero; receiving a payment message on said selling computer on said network as a response to said in-person transaction either directly or through other

computers on said network; causing an authorization message to be created on said selling computer in or as a result of said payment message; and transferring ownership of said product to said customer.

25. The method according to claim 24, wherein the network comprises the world wide web.

26. The method according to claim 24, wherein the network comprises a telephonic network.

27. The method according to claim 24, wherein the network comprises items selected from the group consisting of satellites, cable television, and digital wireless.

28. The method according to claim 24, wherein the authorization comprises an access key.

29. The method according to claim 28, wherein the access key comprises a code.

30. The method according to claim 24, wherein the in-person transaction at said retail point of sale comprises a face to face interaction between two or more persons.

31. The method according to claim 24, wherein the retail point of sale comprises a checkout, kiosk, cashier's station, cash register, self-check out, self-service, or other means of customer interaction within an establishment.

32. The method according to claim 31, wherein the establishment comprises a retail store, convenience store, vending machine, parking lot, hallway, lobby, or other physical place to conduct business.

33. The method according to claim 24, wherein the retail point of sale comprises a means for accepting a payment through an in-person transaction with a customer wherein said payment is designated for the purchase of the line itemized network merchandise or line itemized downloadable media material objects.

34. The method according to claim 24, wherein the retail point of sale comprises a means for accepting a payment through an in-person transaction with a customer wherein said payment is designated for the purchase of a license for the itemized network merchandise.

35. The method according to claim 24, wherein the retail point of sale comprises a means for accepting a payment through an in-person transaction with a customer wherein said payment is designated for the purchase of a voucher.

36. The method according to claim 24, wherein the itemized network merchandise comprises a physical object.

37. The method according to claim 24, wherein said engaged by a customer device on said network is at a network location separate from the retail point of sale.

38. The method according to claim 24, wherein said selling computer on said network is at a network location separate from the retail point of sale.

39. The method according to claim 24, wherein retrieving said product allows said customer to record the itemized network merchandise.

40. The method according to claim 29, wherein recording the itemized network merchandise comprises recording the itemized network merchandise to a memory device, disk, compact disk, cassette, VHS tape, or other recording media.

41. The method according to claim 24, wherein the product is a free sample.

**Formatted:** Centered

| Page 1: [1] Deleted | JD | 9/12/2010 7:29:00 PM |
|---|---|---|

CASE NUMBER:

Target Corporation
1000 Nicollet Mall
Minneapolis, MN 55403
Registered Agent: CT Corporation System
136 East South Temple Ste 2100
Salt Lake City, UT 84111          Defendant
                                                     )
Best Buy Co., Inc.                                   )
7601 Penn Ave S                                      )
Richfield, MN 55423                                  )
Registered Agent: CT Corporation System              )
136 East South Temple Ste 2100                       )
Salt Lake City, UT 84111          Defendant          )
                                                     )
FYE (a.k.a. "Trans World Entertainment")             )
38 Corporate Cir.                                    )
Albany, NY 12203                                     )
Registered Agent: CT Corporation System              )
136 East South Temple Ste 2100                       )
Salt Lake City, UT 84111          Defendant          )

===============Section Break (Next Page)===============

# EXHIBIT 2
# TERMINAL DISCLAIMER
# (INDICATING COMMON OWNERSHIP)

| *Application Number* | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|
| | 11/329,526 | DRIESSEN ET AL. |
| | | |

| Document Code - DISQ | Internal Document – DO NOT MAIL |
|---|---|

| TERMINAL DISCLAIMER | ☒ APPROVED | ☐ DISAPPROVED |
|---|---|---|
| **Date Filed : Both tds 02/25/2010** | **This patent is subject to a Terminal Disclaimer** | |

**Approved/Disapproved by:**

Dorethea Lawrence

U.S. Patent and Trademark Office

To: Commissioner @ 571-273-8300        From: Driessen                Pg 8/10 02/25/10  9:44 am   RECEIVED
                                                                                         CENTRAL FAX CENTER

                                                                                          FEB 2 5 2010

PTO/SB/96 (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## STATEMENT UNDER 37 CFR 3.73(b)

Applicant/Patent Owner: James L. Driessen

Application No./Patent No.: 11/329,526          Filed/Issue Date: 01/11/2006

Titled:

James L. Driessen                          , a    Assignee

(Name of Assignee)                              (Type of Assignee, e.g., corporation, partnership, university, government agency, etc.)

states that it is:

1. ☐   the assignee of the entire right, title, and interest in;

2. ☐   an assignee of less than the entire right, title, and interest in
        (The extent (by percentage) of its ownership interest is _____ %); or

3. ☐   the assignee of an undivided interest in the entirety of (a complete assignment from one of the joint inventors was made)

the patent application/patent identified above, by virtue of either:

A. ☐   An assignment from the inventor(s) of the patent application/patent identified above.  The assignment was recorded in
        the United States Patent and Trademark Office at Reel _____ , Frame _____ , or for which a
        copy therefore is attached.

OR

B. ☒   A chain of title from the inventor(s), of the patent application/patent identified above, to the current assignee as follows:

        1. From: Driessen, James L. and Aker, Joshua R.          To: VIBME LLC

        The document was recorded in the United States Patent and Trademark Office at
        Reel 017484 _____ , Frame 0936 _____ , or for which a copy thereof is attached.

        2. From: VIBME LLC                              To: James L. Driessen

        The document was recorded in the United States Patent and Trademark Office at
        Reel 023405 _____ , Frame 0822 _____ , or for which a copy thereof is attached.

        3. From: _____          To: _____

        The document was recorded in the United States Patent and Trademark Office at
        Reel _____ , Frame_____ , or for which a copy thereof is attached.

        ☐   Additional documents in the chain of title are listed on a supplemental sheet(s).

☒   As required by 37 CFR 3.73(b)(1)(i), the documentary evidence of the chain of title from the original owner to the assignee was,
    or concurrently is being, submitted for recordation pursuant to 37 CFR 3.11.

    [NOTE: A separate copy (i.e., a true copy of the original assignment document(s)) must be submitted to Assignment Division in
    accordance with 37 CFR Part 3, to record the assignment in the records of the USPTO. See MPEP 302.08]

The undersigned (whose title is supplied below) is authorized to act on behalf of the assignee.

James L. Driessen                                   1-15-10
Signature                                          Date

James L. Driessen                                  Owner / Assignee
Printed or Typed Name                              Title

This collection of information is required by 37 CFR 3.73(b).  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to
process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14.  This collection is estimated to take 12 minutes to complete, including

**EXHIBIT 3**
**Enovsys LLC v. Nextel Communications, Inc.**
**2009**

**ENOVSYS LLC, Plaintiff-Appellee,**

**v.**

**NEXTEL COMMUNICATIONS, INC., NEXTEL OF CALIFORNIA, INC., NEXTEL COMMUNICATIONS OF THE MIDATLANTIC, INC., NEXTEL OF NEW YORK, INC., NEXTEL SOUTH CORPORATION, NEXTEL OF TEXAS, INC., NEXTEL WEST CORP., SPRINT NEXTEL CORPORATION, SPRINT COMMUNICATIONS COMPANY L.P., SPRINT SPECTRUM L.P., AND SPRINT SOLUTIONS, INC., Defendants-Appellants.**

**No. 2009-1167**

**United States Court of Appeals, Federal Circuit**

**August 3, 2010**

Appeal from the United States District Court for the Central District of California in case no. 06-CV-5306, Judge Ronald S.W. Lew.

Gregory S. Dovel, Dovel & Luner LLP, of Santa Monica, California, argued for plaintiff-appellee. With him on the brief was John Jeffrey Eichmann.

Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., of Washington, DC, argued for defendants-appellants. With him on the brief was Andrew J. Vance

Before Newman, Bryson, and Prost, Circuit Judges.

**OPINION**

PROST, Circuit Judge.

In this patent infringement case, we begin by deciding the effect of a state-court divorce decree on a patent owner's standing to sue. Because we conclude that the patent owner Enovsys LLC ("Enovsys") had standing, we reach the challenged claim constructions.

The allegations of infringement are based on two inventions that use global positioning satellites ("GPS") and ground control stations to determine the physical location of mobile devices, like pagers and cellular telephones. Depending on the security settings chosen by the user, the invention selectively discloses the physical location of the mobile device to certain users or entities, while blocking disclosure to others. Entities that might request a mobile device's location include programs that provide driving directions, updates on local weather, and restaurant suggestions. Enovsys brought this suit against Sprint Nextel

Corporation and its various subsidiaries (collectively "Sprint Nextel"), contending that Sprint Nextel's iDEN and CDMA wireless networks infringed two patents covering these inventions. After a nine-day trial, the jury found Sprint Nextel infringed both patents and awarded approximately $2.78 million in damages. The district court then denied Sprint Nextel's renewed motion to dismiss the case for lack of standing, motions for judgment as a matter of law ("JMOL"), and motions for a new trial.

Sprint Nextel now appeals. According to Sprint Nextel, this case should have ended long ago, because Enovsys is not the sole owner of the asserted patents and failed to join the other (alleged) part owner, Fonda Whitfield ("Whitfield"). Whitfield is the ex-wife of Mundi Fomukong ("Fomukong"); Fomukong is the manager of Enovsys and one of the patents' co-inventors. Sprint Nextel also argues that it is entitled to JMOL under the correct construction of various claim terms in the patents.

We affirm. The ownership issue, and thus the question of standing, is resolved by a state-court judgment&mdash; namely, a California divorce decree. Giving this divorce decree the preclusive effect required, we conclude that Whitfield had no ownership interest in the asserted patents at the time this case was filed, or anytime thereafter. At all relevant times, Enovsys alone owned both patents. Accordingly, Enovsys had standing to bring and maintain this suit without joining Whitfield. On the merits, we affirm the challenged claim constructions.

Background

Mundi Fomukong is manager and part owner of Enovsys. He is also the co-inventor of the two patents asserted in this case, U.S. Patent No. 5, 918, 159 ("'159 patent") and U.S. Patent No. 6, 560, 461 ("'461 patent"). Before conceiving of the inventions claimed in these patents, Fomukong married a woman named Fonda Whitfield in California. Fomukong and Whitfield were still married in 1997, when Fomukong and his co-inventor filed a patent application that later issued as the '159 patent. Two years later, Fomukong and his co-inventor filed a second patent application that issued as the '461 patent. This second application was styled as a continuation-in-part of the '159 patent.

The '159 patent issued in 1999. Approximately two years later, Fomukong and Whitfield filed for divorce in California. There are two different ways of getting a divorce in California, regular dissolution or summary dissolution. In a regular dissolution, either party may request a hearing or trial to settle disputed issues. Either party may appeal the court's decision or request a new trial. Summary dissolution, by contrast, is California's

version of a quickie divorce. In a summary dissolution, there is no hearing or trial before a judge. Both parties give up their right to appeal the court's decision, although either may later move to set aside the judgment for fraud, duress, accident or mistake.[1] Cal. Fam. Code §§ 2400, 2403, 2405. The streamlined summary dissolution procedure is only available to couples that meet certain requirements. Cal. Fam. Code § 2400. As relevant here, the couple must either (1) have no community property, or (2) have signed a property settlement agreement listing and dividing all community assets and liabilities. Any property settlement agreement must be attached to the couple's petition for summary dissolution. Under California law, all assets acquired during a marriage are presumptively community property. Cal. Fam. Code §§ 65, 760. Assets include any income earned or property created during the marriage.

Fomukong and Whitfield divorced by summary dissolution. In November 2001, they filed an official California form titled "Joint Petition for Summary Dissolution of Marriage" with the Los Angeles Superior Court. In signing and filing this petition, Fomukong and Whitfield declared that they had read and understood the booklet California publishes on summary dissolutions, aptly titled the "Summary Dissolution Information booklet." In response to the petition's question about community property, Fomukong and Whitfield checked the box next to the statement, "We have no community assets or liabilities, " certifying that the statement was true under penalty of perjury. They left the other option unchecked. That option read: "We have signed an agreement listing and dividing all our community assets and liabilities and have signed all papers necessary to carry out our agreement. A copy of our agreement is attached to this petition." Consistent with their declaration that they had no community property, Fomukong and Whitfield did not attach a property settlement agreement to their petition.

Under California law, the filing of Fomukong and Whitfield's joint petition for summary dissolution triggered a six-month waiting period. Cal. Fam. Code § 2403. During that period, either party could have stopped the divorce. *See* Judicial Council of Cal., Summary Dissolution Information Booklet, Form FL-810, § III, *available at* *http://www.courtinfo.ca.gov/forms/documents/fl810.pdf*. To officially end the marriage, at least one of them had to ask the court to enter judgment of dissolution after the six-month period expired. *Id.*; *see also* Cal. Fam. Code § 2403. In October 2002, Fomukong filed the requisite California form, titled "Request for Judgment, Judgment of Dissolution of Marriage, and Notice of Entry of Judgment" with the Los Angeles Superior Court. Whitfield's signature also appears on the form. Judgment was entered in October 2002; notice of the judgment was mailed to both Fomukong and Whitfield. Fomukong and Whitfield's divorce thus became final in

October 2002.

Several months after Fomukong and Whitfield's divorce was finalized, the '461 patent issued. Fomukong subsequently formed Enovsys for the purpose of managing patent-related licensing and litigation. In 2006, Fomukong and his co-inventor assigned their ownership interests in the '159 and '461 patents to Enovsys. Among the rights expressly assigned to Enovsys was the right to sue for past infringement.

Enovsys subsequently filed this action against Sprint Nextel Corporation. Enovsys alleged that Sprint Nextel infringed claim 1 of the '159 patent and claims 1, 2, 23, 25 and 28 of the '461 patent. The '159 patent covers a system for determining the physical location, or global position, of a call receiver, such as a cellular telephone or pager, using a network of space satellites and ground stations. '159 patent col.1 ll.53-55; *see also id.* at col.5 ll.44-47. This system allows a subscriber to obtain location information using his cellular phone or pager. Alternatively, the network may provide some entities with the location of the call receiver, while blocking others from receiving that information. *Id.* at col.1 ll.55-60.

The asserted claims of the '461 patent cover systems for disclosing a mobile device's physical location only to authorized requests. The invention maintains the security of a mobile device's location data through two authorization steps, one at the network level, the other at the individual subscriber level. First, the system verifies that the source is "pre-authorized" to obtain location information from the network. '461 patent col.4 ll.49-60; *see also id.* at col.11 ll.5-9. If the source is pre-authorized to access the network, the invention then determines whether the individual subscriber has authorized the network to disclose the mobile device's location. This preference is stored on the network as a "location information disclosure instruction." Based on this instruction, the invention either allows or blocks the request. If allowed, the invention obtains and sends the mobile device's location. Otherwise, the invention sends a message that the request has been blocked. *Id.* at col.5 ll.4-30.

According to Enovsys, Sprint Nextel infringed these patents by selling "location-enabled devices and location-based services." Specifically, these "location-enabled devices and location-based services" were Sprint Nextel's Integrated Digital Enhanced Network ("iDEN") and Code Division Multiple Access ("CDMA") systems. The iDEN and CDMA systems are separate wireless networks that use different technological standards to provide mobile devices, like cellular telephones, with a variety of services, such as voice communications, messaging, digital two-way radio, and data services. Sprint Nextel counter-claimed, seeking a declaratory judgment that the patents were

invalid and unenforceable.

Sprint Nextel also moved to dismiss the case, arguing that Enovsys lacked standing to sue because it failed to join Whitfield, Fomukong's ex-wife and co-owner of the patents-in-suit. According to Sprint Nextel, Whitfield acquired an ownership interest in the '159 and '461 patents because Fomukong filed both patent applications during their marriage and patents are community property under California law. The district court denied Sprint Nextel's motion to dismiss, concluding that Enovsys had full legal title to the patents and that any claims by Whitfield or Sprint Nextel had to be adjudicated first in California state court.

After resolving the threshold question of its jurisdiction, the district court construed various terms in the '159 and '461 patents. Two are relevant to this appeal: the "means to resolve" limitation in the '159 patent and the "pre-authorized" limitation in the '461 patent.

In its entirety, claim 1 of the '159 patent reads as follows:

A satellite paging communication system with means to locate the global position of a call receiver unit comprising:

space satellites and terrestrial stations, some of which are adapted for the purpose of transmitting paging information and some of which, are adapted for the purpose of transmitting positioning information;

ground control stations for processing the said information and controlling the actions of the paging network;

the call receiver or pager having *means to resolve* a global position from satellites or earth based communication means;

the system divulging to certain or all callers the global location of a callee in possession of the said call receiver while blocking such information from being divulged to certain or all other callers.

'159 patent col.8 ll.45-61 (emphasis added).

The district court found that "means to resolve" in the '159 patent invoked 35 U.S.C. § 112, ¶ 6. The court then proceeded to determine that the claimed function was "to resolve a global position from satellite or earth based communication means." Based on its examination of the specification, the court determined that the corresponding structure for this function was a "transceiver, *connecting circuitry*, CPU, satellite receiving means, terrestrial receiving means, decoders, and temporary storage." Neither party objected to how the district court construed this means-plus-function

limitation, or suggested a more specific definition of its structure was necessary. Sprint Nextel's pretrial briefs, proposed jury instructions, and pre-verdict JMOL were similarly devoid of any argument that the "connecting circuitry" portion of the structure should be limited to the specific embodiment in Figure 2 of the '159 patent. *See* '159 patent col.5 l.48-col.6 l.5.

The "preauthorized" limitation appears in claims 11 and 28 of the '461 patent. Claim 11 reads as follows:

A method for divulging or blocking the location information of a mobile remote receiving unit associated with a network comprising:

i) receiving a request at the network for location information of the mobile remote receiving unit; ii) identifying the source of request;

iv) verifying that the source of request is *pre-authorized* to access location information of the mobile remote receiving unit at the network;

v) querying at the network for location information disclosure instruction for the mobile receiving unit;

vi) using said instruction (v) to allow or block mobile remote receiving unit location information to the *pre-authorized* source of request.

'461 patent col.11 ll.1-16 (emphases added).

Similarly, claim 28 reads on:

A communication system comprising: a network of communication resources;

a first communication resource able to establish its location information at the network;

wherein at least a profile is maintained by the system, said profile containing the identity of a *preauthorized* resource, identity of the first communication resource and a location access field indicating whether said *preauthorized* resource identified in the profile should be allowed/disallowed to access the location information of the first communication resource identified in said profile;

the system able to use the location access field of a first profile to deny the location information of the first communication resource to the *preauthorized* resource identified in said first profile while allowing another *preauthorized* resource identified in a second profile to access the location information of the first communication resource during the time that access is being denied to the *preauthorized* resource identified in said first profile.

*Id.* at col.14 ll.6-27 (emphases added).

The district court construed "pre-authorized" in both

claims of the '461 patent to mean "authorized to submit a request in advance of determining whether the request will be granted." Sprint Nextel did not object to this definition. Similarly, at no time before or during the trial did Sprint Nextel ask the district court to clarify whether the preauthorization was for access to the network or only for access to a particular mobile device.

At trial, the dispute with respect to the '159 patent centered on whether Sprint Nextel's iDEN system con&shy;tained the structure corresponding to the "means to resolve" limitation. Enovsys presented the testimony of its expert, Dr. Christopher Rose ("Dr. Rose"). Dr. Rose opined that the handset used with the iDEN system contained "connecting circuitry, " which attached the handset's computer to "all the various pieces, " thus allow&shy;ing the handset to resolve its global position. Similarly, on cross-examination Sprint Nextel employee Kevin Butler ("Mr. Butler") admitted that the central processing unit ("CPU") in the handset had a means for receiving and decoding satellite signals to resolve the handset's global position. Mr. Butler also testified that the hand&shy;set's CPU was connected with other circuitry in the phone by microscopic wires. In response, Sprint Nextel offered the testimony of its expert, Dr. Robert Stevenson ("Dr. Stevenson"). Dr. Stevenson opined that the iDEN system lacked connecting circuitry because it did not have the same circuitry shown in Figure 2 of the '159 patent. On cross examination, however, Dr. Stevenson admitted that the district court's claim construction was "fine" and did not limit "connecting circuitry" to what was shown in Figure 2 of the '159 patent.

With regards to the '461 patent, the parties disputed whether Sprint Nextel's iDEN and CDMA systems satis&shy;fied the "preauthorized" limitation in the asserted claims. On behalf of Enovsys, expert Dr. Rose opined that both systems required an entity requesting a mobile device's location be "preauthorized" to submit the request because both the iDEN and CDMA systems require the requesting entity to provide a username and password to access their respective networks. Dr. Rose went on to explain that only those entities preauthorized to access the network could then request the location of a mobile device in that network. Enovsys also presented the deposition testi&shy;mony of Sprint Nextel employee Thomas Moore ("Mr. Moore"). Mr. Moore discussed an example of an entity that requests users' location data, an application called Location Studio. Mr. Moore testified that the iDEN network first checks whether Location Studio may access the network; only after confirming that the application is authorized to access the network is Location Studio then allowed to request a given user's location information.

The jury found that Sprint Nextel infringed claim 1 of the '159 patent and claims 11 and 28 of the '461 patent. The jury further found that both patents were not invalid. It awarded $1, 664, 036 in damages for the '159 patent

and $599, 958 in damages for the '461 patent. After trial, Sprint Nextel renewed its motion to dismiss. It also moved for post-verdict JMOL on the issue of infringement with respect to both patents. The district court denied Sprint Nextel's motions and entered judgment for Enovsys.

Sprint Nextel now appeals. We have jurisdiction un&shy;der 28 U.S.C. § 1291.

Analysis

Whether a party has standing to bring and maintain suit is a question of law reviewed de novo. *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378-79 (Fed. Cir. 2009). Any related factual findings will be disturbed only if they are clearly erroneous. *Id.*

Because reviewing denials of JMOL motions is an is&shy;sue not unique to patent law, we apply the law of the regional circuit in which this appeal would otherwise lie. *i4i Ltd. v. Microsoft Corp.*, 598 F.3d 831, 841 (Fed. Cir. 2010). The Ninth Circuit reviews denial of JMOL motions de novo. *Janes v. Wal-Mart Stores Inc.*, 279 F.3d 883, 886 (9th Cir. 2002). A jury verdict "must be upheld if it is supported by substantial evidence . . . even if it is also possible to draw a contrary conclusion." *Pavavo v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). In reviewing a verdict, the Ninth Circuit "disregard[s] evidence favorable to the moving party that the jury is not required to believe, and may not substitute its view of the evidence for that of the jury." *Id.* (citing *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001)).

In this case, whether JMOL was properly denied turns on whether the district court correctly construed certain claim terms. Claim construction is an issue of law we review de novo. *Cybor Corp. v. FAS Techs., Inc.* 138 F.3d 1448, 1454-55 (Fed. Cir. 1998) (en banc).

Because standing is a threshold jurisdictional issue, we address it first.

I. Standing[2]

A party's standing to sue for patent infringement de&shy;rives from the Patent Act, which provides that "[a] *pat&shy;entee* shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281 (emphasis added). "Pat&shy;entee" includes not only the party to whom the patent was issued, but also the successors in title to that party. 35 U.S.C. § 100. When a patent is co-owned, a joint owner must join all other co-owners to establish standing. *Israel Bio-Engineering Project v. Amgen, Inc.*, 475 F.3d 1256, 1264-65 (Fed. Cir. 2007); *see also Prima Tek II, Inc. v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed Cir. 2000); *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1325 (Fed. Cir. 2010).

In this case, we must decide whether Enovsys had

standing to bring and maintain this suit without joining Fomukong's ex-wife, Whitfield. This question turns on whether Whitfield had any ownership interest in the asserted patents at the time this suit was filed. *See MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1375-76 (Fed. Cir. 2007); *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003). Before the district court, Sprint Nextel argued that Whitfield acquired an interest in the patents during her marriage to Fomukong and that this interest survived their subsequent divorce because the divorce decree did not adjudicate their community property rights. Enovsys countered that the question of ownership was conclusively determined by a valid state-court judgment, namely, Fomukong and Whitfield's California divorce decree. In holding that Enovsys had standing, the district court gave effect to the judgment of dissolution, under which Whit-field retained no community property interest in the patents. For the following reasons, we agree.

Who has legal title to a patent is a question of state law. *Akazawa v. Link New Tech.*, 520 F.3d 1354, 1357 (Fed. Cir. 2008); *see also Int'l Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324, 1329-30 (Fed. Cir. 2001); *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1571 (Fed. Cir. 1997) ("It may seem strange at first blush that the question of whether a patent is valid and infringed ordinarily is one for federal courts, while the question of who owns the patent rights and on what terms typically is a question exclusively for state courts. Yet that long has been the law."). Accordingly, we look to California law to determine who had an ownership interest in the patents after Fomukong and Whitfield's divorce in 2002.

Sprint Nextel is correct that under California law, all property acquired by a married person during marriage is presumed to be community property. *Weingarten v. Superior Court*, 102 Cal.App.4th 268, 277 (Cal.Ct.App. 2002). This presumption applies here, because Fomukong filed the applications for the '159 and '461 patents while he was married to Whitfield. *See Lorraine v. Lorraine*, 48 P.2d 48, 54-55 (Cal. App. 3d 1935); *see also In re Marriage of Worth*, 195 Cal.App.3d 768, 773 (Cal.Ct.App. 1987). Prior to the divorce, the patents were thus presumptively community property in which Whitfield had an undivided half-interest.

That, however, is not the end of the story. Enovsys is correct that this presumption was overcome by what Fomukong and Whitfield declared in their joint petition for summary dissolution. Their petition affirmatively states that "we [Fomukong and Whitfield] have no community assets or liabilities." Fomukong and Whitfield both signed this petition, affirming under penalty of perjury that this statement was true and correct. On the basis of this petition, a California court subsequently entered judgment of dissolution, finalizing the divorce. We now turn to the thornier issue of whether

this state-court judgment is entitled to preclusive effect.

The preclusive effect of a state-court judgment in a subsequent federal lawsuit is generally determined by the full faith and credit statute, 28 U.S.C. § 1738. *See Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985); *see also In re Nourbakhsh*, 67 F.3d 798, 800 (9th Cir. 1995); *cf. Taylor v. Sturgell*, 128 S.Ct. 2161, 2171 (2008) (holding that the preclusive effect of a federal-court judgment is determined by federal common law). Section 1738 provides that state judicial proceedings "shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State, Territory, or Possession from which they are taken." Accordingly, we look to California law to determine the preclusive effect of Fomukong and Whitfield's judgment of dissolution. *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 375-76 (1996).

California law recognizes the doctrine of collateral estoppel (issue preclusion), which bars relitigation of issues decided in prior proceedings. *Mycogen Corp. v. Monsanto Co.*, 51 P.3d 297, 301-02 (Cal. 2002); *see also Ashe v. Swenson*, 397 U.S. 436, 443 (1970); *United States v. Bhatia*, 545 F.3d 757, 759 (9th Cir. 2008). The doctrine of collateral estoppel applies if (1) the issue sought to be precluded from relitigation is identical to the issue decided in the earlier proceeding; (2) the issue was actually litigated in the former proceeding; (3) the issue was necessarily decided in the former proceeding; and (4) the person against whom collateral estoppel is asserted was a party, or in privity with a party, to the earlier proceeding. *Lucido v. Superior Court*, 795 P.2d 1223, 1225-26 (Cal. 1990); *see also Sutphin v. Speik*, 99 P.2d 652, 655-56 (Cal. 1940). In other words, a divorce decree is res judicata with respect to the issues that were adjudicated. *Callnon v. Callnon*, 46 P.2d 988, 990 (Cal. Dist. Ct. App. 1935).

We hold that Fomukong and Whitfield's California divorce decree is entitled to res judicata effect.[3] Sprint Nextel seeks to relitigate Whitfield's property rights in the patents, the same issue resolved by the state-court judgment of dissolution. Fomukong and Whitfield's property rights were adjudicated by their summary dissolution because their joint petition put their property rights at issue. In a divorce proceeding, property rights are put at issue by (1) specific allegations describing such property, or by (2) an allegation that no community property existed. *Callnon*, 46 P.2d at 990 (citing *Allen v. McCrary*, 31 P.2d 388, 389 (Cal. 1934)). Fomukong and Whitfield alleged that they had no community property. The judgment of dissolution entered by the California court was based on this admission; under California Family Code § 2404, the judgment constituted a complete and final adjudication of Fomukong and Whitfield's property rights. *See* Cal. Fam. Code §§ 2404 (providing that entry of judgment of dissolution "constitutes . . . [a] final adjudication of the

rights and obligations of the parties with respect to the status of the marriage and property rights"); *see also id.* § 2406(b)(6). As the California Supreme Court explained in *Brown v. Brown*, 147 P.d 1168 (Cal. 1915), a judgment based on parties' admissions constitutes a "complete adjudication of all the rights of the parties embraced in the prayer for relief and arising from the facts stated in the complaint." *Id.* at 1170. Accordingly here, as in *Brown*, although the final divorce decree was silent as to particular property, it nevertheless adjudicated the parties' rights with respect to that property because it was based on an uncontested complaint which alleged that there was no community property. *See id.*

The final requirement under California law for collateral estoppel is met because Sprint Nextel is in privity with Whitfield. *See Citizens Suburban Co. v. Rosemont Dev. Co.*, 244 Cal. App. 2d 666, 680-81 (Cal. App. Ct. 1966). In this case, privity arose from Whitfield's express assignment of any property interest she had in the patents to Sprint Nextel. *Cf. Vallely Invests., L.P. v. BancAmerica Commercial Corp.*, 106 Cal.Rptr.2d 689, 694-95 (Cal.Ct.App. 2001); *Gulf Ins. Co. v. TIG Ins. Co.*, 103 Cal.Rptr.2d 305, 309-10 (Cal.Ct.App. 2001). Sprint Nextel is thus barred from relitigating Whitfield's property rights in this case.[4] Pursuant to the California divorce decree, Whitfield retained no property rights in the patents, so Enovsys had standing to bring and maintain this suit.[5]

II. Claim Construction and Infringement

We turn next to Sprint Nextel's argument that under the correct claim constructions, its systems do not infringe the '159 or '461 patents.[6]

A. The '159 Patent

Sprint Nextel argues that it is entitled to JMOL on infringement because the iDEN system does not include the same connecting circuitry shown in Figure 2 of the '159 patent. Enovsys urges us to hold that Sprint Nextel waived this argument. In denying Sprint Nextel's motion for post-verdict JMOL on this issue, the district court noted that it "never limited" its construction of connecting circuitry to the exact configuration shown in Figure 2 of the '159 patent.

We agree that Sprint Nextel waived any claimed error associated with the "connecting circuitry" structure: Here, as in *Eli Lilly & Co. v. Aradigm Corp.*, Sprint Nextel never requested the district court construe "connecting circuitry, " or offered a construction of the term. 376 F.3d 1352, 1360 (Fed. Cir. 2004). Rather, the district court's claim construction order notes that "the parties are not in dispute" as to the "means to resolve" structure, which included the now-disputed "connecting circuitry." Though it had ample opportunity to do so, at no time before or during trial did Sprint Nextel object to

the district court's claim construction, request clarification, or offer the construction it now advances on appeal. Indeed, Sprint Nextel's own expert testified that the district court's claim construction was "fine." *See Broadcom*, 543 F.3d at 694; *see also Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1358-59 (Fed. Cir. 2006).

B. The '461 Patent

Sprint Nextel similarly argues that it is entitled to JMOL on infringement with respect to the '461 patent because its accused systems do not satisfy the "preauthorized" limitation. In construing "preauthorized, " the district court largely adopted Sprint Nextel's proposed construction. Sprint Nextel had argued that the term meant "[p]ermission to submit a request has been granted in advance of determining whether the request will be authorized." The district court construed "preauthorized" to mean "authorized to submit a request in advance of determining whether the request will be granted." On appeal, Sprint Nextel argues that any preauthorization must be with respect to a particular mobile device, not just with respect to the network. Enovsys again urges us to hold that Sprint Nextel waived this argument. In denying Sprint Nextel's motion for post-verdict JMOL, the district court found that Sprint Nextel had never previously requested the court to determine whether preauthorization was for only one mobile device. The district court accordingly declined to address Sprint Nextel's postverdict objection to the claim construction.

As with the '159 patent, we hold that Sprint Nextel waived its right to argue its new claim construction of "preauthorized" by waiting until after the jury returned its verdict. *See Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1357 (Fed. Cir. 2003). Significantly, Sprint Nextel never objected to the district court's claim construction or requested clarification as to whether "preauthorized" pertained to the network or a particular mobile device. *Id.*

Conclusion

We hold that the district court correctly denied Sprint Nextel's motion to dismiss for lack of subject matter jurisdiction. On the merits, we affirm the denial of Sprint Nextel's post-verdict JMOL motions.

**AFFIRMED**

Appeal from the United States District Court for the Central District of California in case no. 06-CV-5306, Judge Ronald S.W. Lew.

Newman, Circuit Judge, concurring in part, dissenting in part.

I join the court's ruling with respect to standing. I write separately because the court, in reviewing the

question of infringement, confounds "claim construction" with "infringement, " and on this confusion, rules that the defendant waived critical aspects of its defense of non-infringement simply because those aspects were not raised in the guise of "claim construction." Thus the court holds that because the district court's claim construction was not specific to certain details of the defendant's system, the defendant "waived" its defense that these elements of its system are not within the scope of the claims. From this novel position I must, respectfully, dissent.

Amid the complexities of the procedures of "claim construction" as a prologue to determination of infringement, it is not unusual to see an intermingling or misplacement of the relationship between the claim as construed in light of the description of the invention in the specification, and the question of infringement by the accused device. Questions of infringement may sometimes be decided as claim construction, whereby the claim is construed with so tight a tie to the structure of the accused device that infringement *vel non* is immediately apparent &ndash; and summarily resolved. And questions of claim construction sometimes arise as questions of infringement, whereby the trier of fact (as distinguished from the giver of law) must decide whether the claim reads on the accused device. In either situation, any flaw is more a matter of procedural imprecision, not substantive "waiver, " and any error is normally tolerable, for in either situation the decisionmaker studies the claim, understands the accused device, and decides the relationship between them as a matter of substance, not technicality.

However, as with any tolerant relationship, intolerant situations may arise. Here, for example, the defendant Nextel presented a straightforward defense to the charge of infringement, by arguing that certain aspects of the patentee's invention are not present in the accused system. Yet my colleagues on this panel hold that this defense is "waived."

For example, the court holds that Nextel is precluded from arguing that its circuitry does not infringe claim 1 of the '159 patent. Nextel argued non-infringement on the ground that its circuitry differs from the "connecting circuitry" identified in the patent as structure corresponding to the "means to resolve" limitation. My colleagues hold that this argument cannot be raised, although Nextel presented evidence at trial that its circuitry differed from the circuitry shown in the '159 patent. The court now rules that Nextel waived this non-infringement argument because Nextel did not "object to the district court's claim construction, request clarification, or offer the construction it now advances on appeal." Maj. Op. at 20&ndash;21. However, the question is not of claim construction, but of infringement of the claim as construed.

A district court ordinarily does not resolve all infringement issues through a narrowly targeted claim construction focused on the accused device. Claim construction is derived from the specification of the patent, not the accused device. Here, the district court's claim construction order stated that

the structures disclosed in the specification that perform [the function of the "means to resolve"] are transceiver, *connecting circuitry*, CPU, satellite receiving means, terrestrial receiving means, decoders, and temporary store. The parties are not in dispute as to these structures.

*Enovsys LLC v. Nextel Commc'ns., Inc.*, No. 06-CV-5306, slip op. at 6 (C.D. Cal. Feb. 26, 2008) (emphasis added to the term at issue for infringement). The district court, instructing the jury on infringement, explained the following regarding the "means to resolve" limitation:

The words of the clause do not cover all means that perform the recited function of "resolving a global position from the satellites or earth-based communication means." *They cover only the structure described in the patent specification and drawings* that perform that function or an equivalent of that structure.

J.A. 2488 (emphasis added). The district court then listed the structures as it had done in its claim construction order. The claim construction and the jury instructions correctly limited the patented structures to those described in the specification. In raising its defense that its "connecting circuitry" was different from that in the specification, Nextel conformed with law and protocol. Thus Nextel presented evidence and argument at trial that its accused iDEN system did not meet the "means to resolve" limitation because it did not have the same "connecting circuitry" described in the specification. Although the jury rejected Nextel's position, it was considered, and this issue was raised on motion for JMOL. The judge denied Nextel's JMOL motion, and disagreed with Nextel's argument that the claim construction required "the exact connecting circuitry in the '159 patent." The trial judge did not treat Nextel's argument as a "waived" claim construction argument. However, my colleagues hold that the question of infringing this claim element should have been raised as an appeal from the claim construction. Indeed, whether this question could have been raised in this manner does not mean that defense to infringement is deemed waived and cannot be presented or appealed, on the apparent theory that the defendant was required to request a claim construction in terms of its own circuitry.

Any lapse of precision between fact and law does not lead to "waiver" of the right to defend or the right to judicial review (although it may affect the standard of review). It is incorrect, and a negation of the processes of law, to hold that such a defense against infringement was waived because it was not presented, resolved, or

ap&shy;pealed as a matter of claim construction.

---------

Notes:

[1] A court may also set aside a summary dissolution judgment for "other grounds recognized at law or in equity." Cal. Fam. Code § 2405; *see also* Cal. Civ. Proc. Code § 473. For example, a judgment must be set aside upon proof that the prerequisites for electing a summary dissolution procedure were not met. Cal. Fam. Code § 2400.

[2] Enovsys had the right to sue for infringement oc&shy;curring before the 2006 assignment because the assign&shy;ment agreement stated that Fomukong and his co-inventor were transferring their "right to sue and collect for past damages." The agreement thus sufficiently manifested an intent to transfer this right. *Minco Inc. v. Combustion Eng'g*, 95 F.3d 1109, 1117 (Fed. Cir. 1996).

[3] The related doctrines of claim and issue preclu&shy;sion are collectively referred to as res judicata. *Taylor*, 128 S.Ct. at 2171.

[4] Sprint Nextel also argues that we should not give preclusive effect to the California divorce decree because the judgment was obtained by fraud. *Cf. Matsushita Elec.*, 516 U.S. at 375 (holding that the federal court must decide whether "as an exception to § 1738, it should refuse to give preclusive effect to the state court judg&shy;ment" (citations omitted)). We decline to do so. No fed&shy;eral law modifies the operation of 28 U.S.C. § 1738, and we lack jurisdiction to set aside this state-court judgment. *See Miagra v. Warren City Sch. Dist. Bd. of Ed.*, 465 U.S. 75, 80 (1984). Only a California state court may set aside a judgment of dissolution, after one of the parties to the judgment has filed a motion to do so. Cal. Fam. Code § 2405.

[5] Because Whitfield had no property interest to as&shy;sign, Sprint Nextel has no interest in the asserted pat&shy;ents. Accordingly, the district court did not abuse its discretion in denying Sprint Nextel's request to present evidence of the assignment at trial.

[6] The dissent is correct that Sprint Nextel styled these arguments as defenses of non-infringement and presented them to the jury. As Sprint Nextel makes clear in its briefs on appeal, however, the issue is whether the district court's claim constructions were erroneous. Consistent with circuit precedent, we apply the doctrine of waiver when the party failed to raise the claim con&shy;struction argument until after trial. *See, e.g., Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 694 (Fed. Cir. 2008); *Conoco, Inc. v. Energy & Envt'l Int'l, L.C.*, 460 F.3d 1349, 1359 (Fed. Cir. 2006); *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1360 (Fed. Cir. 2004); *Interactive Gift Express, Inc. v. COmpuserve Inc.*,

256 F.3d 1323, 1346-48 (Fed. Cir. 2001).

---------

# EXHIBIT 4
# F.C.R.P.
# ("ILLUSTRATIVE CIVIL RULES FORM 18")

# UNITED STATES DISTRICT COURT

for the

<_____> DISTRICT OF <_____>

| | |
|---|---|
| <Name(s) of plaintiff(s)>, | ) |
| | ) |
| Plaintiff(s) | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. <Number> |
| <Name(s) of defendant(s)>, | ) |
| | ) |
| Defendant(s) | ) |
| | ) |

## COMPLAINT FOR PATENT INFRINGEMENT

1.    **<Statement of Jurisdiction. See Form 7.>**
      ***a. For diversity-of-citizenship jurisdiction.>***  The plaintiff is [a citizen of State A] [a corporation incorporated under the laws of State A with its principal place of business in State A].  The defendant is [a citizen of State B] [a corporation incorporated under the laws of State B with its principal place of business in State B].  The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332.
      ***b. For federal-question jurisdiction.>***  This action arises under [the United States Constitution; specify the article or amendment and the section] [a United States treaty; specify] [a federal statute, ___U.S.C. § ___].
      ***c. For a claim in the admiralty or maritime jurisdiction.>***  This is a case of admiralty or maritime jurisdiction.  <***To invoke admiralty status under Rule 9(h) use the following***:  This is an admiralty or maritime claim within the meaning of Rule 9(h).>

2.    On <Date>, United States Letters Patent No. <_____> were issued to the plaintiff for an invention in an electric motor.  The plaintiff owned the patent throughout the period of the defendant's infringing acts and still owns the patent.

3.    The defendant has infringed and is still infringing the Letters Patent by making, selling, and using electric motors that embody the patented invention, and the defendant will continue to do so unless enjoined by this court.

4.    The plaintiff has complied with the statutory requirement of placing a notice of the Letters Patent on all electric motors it manufactures and sells and has given the defendant written notice of the infringement.

      Therefore, the plaintiff demands:

      (a)      a preliminary and final injunction against the continuing  infringement;

(b)    an accounting for damages; and

(c)    interest and costs.

Date: <Date>                                      <Signature of the attorney or unrepresented party>

_____

<Printed name>
<Address>
<E-mail address>
<Telephone number>

**EXHIBIT 5**
**BUSINESS ENTITY SEARCH**
**(Utah Division of Corp. and Commercial Code)**

# Utah Business Search - Details

## BEST BUY STORES, L.P.

**Entity Number:** 4736922-0181
**Company Type:** Limited Partnership - Foreign
**Address:** 9 E LOOCKERMAN ST STE 1B Dover, DE 19901
**State of Origin:** DE
**Registered Agent:** NATIONAL REGISTERED AGENTS, INC.
**Registered Agent Address:**
3622 W BAY CIR Lehi UT 84043

## Status

**Status:** Expired ● *as of 09/02/2005*
**Status Description:** Canceled
**Employment Verification:** Not Registered with Verify Utah

## History

**Registration Date:** 03/24/2000
**Last Renewed:** 04/05/2005

## Additional Information

**NAICS Code:** 9999 **NAICS Title:** 9999-Nonclassifiable Establishment